# 23-1221

IN THE

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

◆❖◆

Dr. Lori A. Brightman, an individual,

*Plaintiff-Appellant,*

—against—

InMode Ltd., a foreign limited liability corporation,

*Defendant-Appellee,*

Does 1-10, Inclusive, Roe Corporations 11-20, Inclusive,

*Defendants.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## JOINT APPENDIX

Brian D. Koosed
K&L Gates LLP
1601 K Street, NW
Washington, DC 20006
(202) 778-9000

*Attorneys for Defendant-Appellee*

Joshua T. Reitzas
Berlandi Nussbaum & Reitzas LLP
125 Park Avenue, 25th Floor
New York, New York 10017
(212) 804-6329

*Attorneys for Plaintiff-Appellant*

# TABLE OF CONTENTS

PAGE

Docket Entries ........................................................ A-1

Scheduling Order, dated November 29, 2022 ........................... A-8

First Amended Complaint, dated December 27, 2022 .................... A-10

First Amended Complaint, dated December 29, 2022 .................... A-29

    Exhibit A—
    Declaration of Brian Lodwig, dated May 3, 2022 ................. A-48

Defendant InMode Ltd.'s Notice of Motion to Dismiss,
    dated January 13, 2023 ......................................... A-51

Defendant InMode Ltd.'s Memorandum of Law in Support
    of Its Motion to Dismiss the First Amended Complaint,
    dated January 13, 2023 ......................................... A-53

Declaration of Yair Malca in Support of Defendant InMode Ltd.'s
    Motion to Dismiss, dated January 13, 2023 ...................... A-85

    Exhibit A to Malca Declaration—
    Notice of Stock Option Award executed by Dr. Brightman
    and Invasix Ltd., dated April 12, 2010 ......................... A-87

    Exhibit B to Malca Declaration—
    Corresponding Stock Option Award Agreement entered into
    by Dr. Brightman and Invasix Ltd., on or about April 12, 2010 ...... A-90

    Exhibit C to Malca Declaration—
    Invasix Ltd.'s 2008 Option Plan ................................ A-95

ii

PAGE

Plaintiff Lori A. Brightman's Response to Defendant InMode Ltd.'s
Motion to Dismiss the First Amended Complaint,
dated February 9, 2023 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-109

    Exhibit 1—
    Declaration of Lori A. Brightman, dated February 9, 2023 . . . . . . . . A-141

Defendant InMode Ltd.'s Reply Memorandum of Law in Further
Support of its Motion to Dismiss the First Amended Complaint,
dated February 24, 2023 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-147

Opinion and Order Granting Defendant's Motion to Dismiss,
dated August 14, 2023 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-162

Judgment Appealed From, dated August 14, 2023 . . . . . . . . . . . . . . . . . . . . . A-168

Plaintiff's Notice of Appeal, dated August 29, 2023 . . . . . . . . . . . . . . . . . . A-169

# A-1

CLOSED,APPEAL,ECF

## U.S. District Court
### Southern District of New York (Foley Square)
### CIVIL DOCKET FOR CASE #: 1:22-cv-05861-MKV

| | |
|---|---|
| Brightman v. InMode Ltd et al | Date Filed: 07/08/2022 |
| Assigned to: Judge Mary Kay Vyskocil | Date Terminated: 08/14/2023 |
| Cause: 28:1332bc Diversity-Breach of Contract | Jury Demand: Plaintiff |
| | Nature of Suit: 190 Contract: Other |
| | Jurisdiction: Diversity |

**Plaintiff**

**Dr. Lori A. Brightman**
*an individual*

represented by **Joseph P Garin**
Lipson Neilson P.C.
9900 Covington Cross Drive
Suite 120
Las Vegas, NV 89144
702-382-1500
Fax: 702-382-1512
Email: kglad@lipsonneilson.com
*ATTORNEY TO BE NOTICED*

**Megan H Thongkham**
Lipson Neilson P.C.
9900 Covington Cross Drive
Suite 120
Las Vegas, NV 89144
702-382-1500
Email: mthongkham@lipsonneilson.com
*ATTORNEY TO BE NOTICED*

**Joshua T. Reitzas**
Berlandi Nussbaum & Reitzas LLP
1515 Broadway, 12th Floor
New York, NY 10036
(917)-902-6582
Fax: (646)-461-2312
Email: jreitzas@bnrllp.com
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**InMode Ltd**
*a foreign limited liability corporation*

represented by **Brian David Koosed**
K&L Gates (DC)
1601 K Street, N.W.
Washington, DC 20006
202-778-9000

# A-2

Fax: 202-778-9100
Email: brian.koosed@klgates.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Does 1-10, Inclusive**

**Defendant**

**Roe Corporations 11-20, Inclusive**

| Date Filed | # | Docket Text |
|---|---|---|
| 07/08/2022 | 1 | COMPLAINT against InMode Ltd. (Filing Fee $ 402.00, Receipt Number ANYSDC-26389650)Document filed by Lori Brightman. (Attachments: # 1 Civil Cover Sheet Summons).(Reitzas, Joshua) (Entered: 07/08/2022) |
| 07/11/2022 | | CASE OPENING INITIAL ASSIGNMENT NOTICE: The above-entitled action is assigned to Judge Cathy Seibel. Please download and review the Individual Practices of the assigned District Judge, located at https://nysd.uscourts.gov/judges/district-judges. Attorneys are responsible for providing courtesy copies to judges where their Individual Practices require such. Please download and review the ECF Rules and Instructions, located at https://nysd.uscourts.gov/rules/ecf-related-instructions..(pc) (Entered: 07/11/2022) |
| 07/11/2022 | | Magistrate Judge Paul E. Davison is so designated. Pursuant to 28 U.S.C. Section 636(c) and Fed. R. Civ. P. 73(b)(1) parties are notified that they may consent to proceed before a United States Magistrate Judge. Parties who wish to consent may access the necessary form at the following link: https://nysd.uscourts.gov/sites/default/files/2018-06/AO-3.pdf. (pc) (Entered: 07/11/2022) |
| 07/11/2022 | | Case Designated ECF. (pc) (Entered: 07/11/2022) |
| 07/11/2022 | | ***NOTICE TO ATTORNEY REGARDING PARTY MODIFICATION. Notice to attorney Joshua T. Reitzas. The party information for the following party/parties has been modified: DR Lori Brightman, InMode Ltd. The information for the party/parties has been modified for the following reason/reasons: party name contained a typographical error; party text was omitted;. (pc) (Entered: 07/11/2022) |
| 07/11/2022 | | ***NOTICE TO ATTORNEY TO ELECTRONICALLY FILE CIVIL COVER SHEET. Notice to Attorney Joshua T. Reitzas. Attorney must electronically file the Civil Cover Sheet. Use the event type Civil Cover Sheet found under the event list Other Documents. (pc) (Entered: 07/11/2022) |
| 07/11/2022 | | ***NOTICE TO ATTORNEY REGARDING DEFICIENT REQUEST FOR ISSUANCE OF SUMMONS. Notice to Attorney Joshua T. Reitzas to RE-FILE Document No. 1 Complaint. The filing is deficient for the following reason(s): the wrong event type was used to file the request for issuance of summons;. Re-file the document using the event type Request for Issuance of Summons found under the event list Service of Process - select the correct filer/filers - and attach the correct summons form PDF. (pc) (Entered: 07/11/2022) |
| 07/11/2022 | | ***NOTICE TO ATTORNEY REGARDING DEFICIENT PLEADING. Notice to Attorney Joshua T. Reitzas re: Document No. 1 Complaint. The filing is deficient for the following reason(s): all of the parties listed on the pleading were not entered on |

# A-3

| | | |
|---|---|---|
| | | **CM ECF;. Docket the event type Add Party to Pleading found under the event list Complaints and Other Initiating Documents... (pc)** (Entered: 07/11/2022) |
| 07/11/2022 | 2 | REQUEST FOR ISSUANCE OF SUMMONS as to InMode Ltd, re: 1 Complaint. Document filed by Lori A. Brightman..(Reitzas, Joshua) (Entered: 07/11/2022) |
| 07/11/2022 | 3 | CIVIL COVER SHEET filed..(Reitzas, Joshua) (Entered: 07/11/2022) |
| 07/12/2022 | 4 | ELECTRONIC SUMMONS ISSUED as to InMode Ltd. (vf) (Entered: 07/12/2022) |
| 08/04/2022 | 5 | MOTION for Joseph P. Garin to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number ANYSDC-26505104. **Motion and supporting papers to be reviewed by Clerk's Office staff.** Document filed by Lori A. Brightman. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C).(Garin, Joseph) (Entered: 08/04/2022) |
| 08/05/2022 | | **>>>NOTICE REGARDING PRO HAC VICE MOTION. Regarding Document No. 5 MOTION for Joseph P. Garin to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number ANYSDC-26505104. Motion and supporting papers to be reviewed by Clerk's Office staff.. The document has been reviewed and there are no deficiencies. (sgz)** (Entered: 08/05/2022) |
| 08/05/2022 | 6 | ORDER granting 5 Motion for Joseph P. Garin to Appear Pro Hac Vice (HEREBY ORDERED by Judge Cathy Seibel)(Text Only Order) (JR) (Entered: 08/05/2022) |
| 09/02/2022 | 7 | AFFIDAVIT OF SERVICE of Summons served on InMode Ltd. on August 16, 2022. Document filed by Lori A. Brightman..(Reitzas, Joshua) (Entered: 09/02/2022) |
| 09/13/2022 | 8 | PROPOSED STIPULATION AND ORDER. Document filed by InMode Ltd..(Koosed, Brian) (Entered: 09/13/2022) |
| 09/13/2022 | 9 | RELATED CASE AFFIDAVIT of Brian Lodwig (Exhibit A to Complaint) re: that this action be filed as Document filed by Lori A. Brightman..(Reitzas, Joshua) (Entered: 09/13/2022) |
| 09/16/2022 | 10 | STIPULATION: IT IS HEREBY STIPULATED AND AGREED, by and between the undersigned counsel in the above-captioned matter, as follows: InMode agrees to answer, move, or otherwise respond to the Complaint on or before October 27, 2022, as further set forth herein. If InMode wishes to move to dismiss, it shall seek a pre-motion conference in accordance with my Individual Practices. IT IS SO ORDERED. InMode Ltd answer due 10/27/2022. (Signed by Judge Cathy Seibel on 9/13/2022) (mml) (Entered: 09/16/2022) |
| 09/20/2022 | 11 | MOTION for Megan H. Thongkham to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number ANYSDC-26708490. **Motion and supporting papers to be reviewed by Clerk's Office staff.** Document filed by Lori A. Brightman. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C).(Thongkham, Megan) (Entered: 09/20/2022) |
| 09/21/2022 | | **>>>NOTICE REGARDING PRO HAC VICE MOTION. Regarding Document No. 11 MOTION for Megan H. Thongkham to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number ANYSDC-26708490. Motion and supporting papers to be reviewed by Clerk's Office staff.. The document has been reviewed and there are no deficiencies. (sgz)** (Entered: 09/21/2022) |
| 09/21/2022 | 12 | ORDER granting 11 Motion for Megan H. Thongkham to Appear Pro Hac Vice (HEREBY ORDERED by Judge Cathy Seibel)(Text Only Order) (Seibel, Cathy) (Entered: 09/21/2022) |
| 10/11/2022 | 13 | LETTER MOTION for Conference re: 10 Stipulation and Order,, Set Deadlines, addressed to Judge Cathy Seibel from Brian D. Koosed dated October 11, 2022. Document filed by |

# A-4

| | | |
|---|---|---|
| | | InMode Ltd. (Attachments: # 1 Exhibit A- Notice of Award, # 2 Exhibit B- Option Agreement, # 3 Exhibit C- Row Option Plan).(Koosed, Brian) (Entered: 10/11/2022) |
| 10/11/2022 | 14 | ORDER granting 13 Letter Motion for Conference: Telephonic Pre-Motion Conference set for 11/16/22 at 12:15 pm. Call 877-336-1839 and enter access code 1047966#. Plaintiff shall state her position, by letter of no more than 3 pages, no later than 11/9/22. (HEREBY ORDERED by Judge Cathy Seibel)(Text Only Order) (Seibel, Cathy) (Entered: 10/11/2022) |
| 11/08/2022 | 15 | FIRST LETTER addressed to Judge Cathy Seibel from Joshua T. Reitzas dated 11/08/2022 re: Brightman v. InMode, Ltd.. Document filed by Lori A. Brightman..(Reitzas, Joshua) (Entered: 11/08/2022) |
| 11/16/2022 | | NOTICE OF CASE REASSIGNMENT to Judge Mary Kay Vyskocil. Judge Cathy Seibel is no longer assigned to the case. (aea) (Entered: 11/16/2022) |
| 11/16/2022 | | Magistrate Judge Stewart D. Aaron is so redesignated. (aea) (Entered: 11/16/2022) |
| 11/16/2022 | | Minute Entry for proceedings held before Judge Cathy Seibel: Pre-Motion Conference held on 11/16/2022. Plaintiff's counsel(s) Joseph Garin, Esq. and Joshua Reitzas, Esq. appear telephonically. Defendants' counsel(s) Brian Koosed, Esq. and Kodey Haddox, Esq. appear telephonically. Law Clerk Jane Ramage appears telephonically. The parties inform the Court that this case should be held in Manhattan. The Court will issue a transfer of assignment. This proceeding was recorded via the AT&T Teleconference platform. (wc) (Entered: 11/16/2022) |
| 11/29/2022 | 16 | SCHEDULING ORDER: IT IS HEREBY ORDERED that, by December 6, 2022, Plaintiff shall file a letter informing the Court and Defendants whether Plaintiff intends to file an amended complaint. This will be Plaintiff's last opportunity to amend in response to any issue raised in the parties' pre-motion letters. IT IS FURTHER ORDERED that, if Plaintiff elects to amend, it shall file the amended complaint by December 13, 2022. Defendants shall respond within 14 days. If Defendants respond with a motion to dismiss, Plaintiff shall file any opposition by January 20, 2023. Defendants shall file any reply by February 3, 2023. IT IS FURTHER ORDERED that, if Plaintiff elects not to amend, Defendants shall file their contemplated motion by December 20, 2022. Any opposition shall be filed by January 20, 2023, and any reply shall be filed by February 3, 2023. Any request for an extension or adjournment shall be made by letter filed on ECF and must be received at least 48 hours before the deadline. SO ORDERED. Amended Pleadings due by 12/13/2022. Motions due by 12/20/2022. Responses due by 1/20/2023 Replies due by 2/3/2023. (Signed by Judge Mary Kay Vyskocil on 11/29/2022) (tg) (Entered: 11/29/2022) |
| 12/05/2022 | 17 | FIRST LETTER addressed to Judge Mary Kay Vyskocil from Berlandi Nussbaum & Reitzas LLP dated December 5, 2022 re: Amending Complaint. Document filed by Lori A. Brightman..(Reitzas, Joshua) (Entered: 12/05/2022) |
| 12/09/2022 | 18 | JOINT LETTER MOTION for Extension of Time addressed to Judge Mary Kay Vyskocil from Brian D. Koosed dated December 9, 2022. Document filed by InMode Ltd..(Koosed, Brian) (Entered: 12/09/2022) |
| 12/12/2022 | 19 | ORDER granting 18 Letter Motion for Extension of Time. Granted. SO ORDERED. Amended Pleadings due by 12/27/2022. Motions due by 1/13/2023. (Signed by Judge Mary Kay Vyskocil on 12/12/2022) (tg) (Entered: 12/12/2022) |
| 12/12/2022 | | Set/Reset Deadlines: Responses due by 2/9/2023 Replies due by 2/24/2023. (tg) (Entered: 12/12/2022) |
| 12/27/2022 | 20 | **FILING ERROR - DEFICIENT DOCKET ENTRY - FILED AGAINST PARTY ERROR -** FIRST AMENDED COMPLAINT amending 1 Complaint against InMode Ltd |

| | | |
|---|---|---|
| | | with JURY DEMAND.Document filed by Lori A. Brightman. Related document: 1 Complaint..(Reitzas, Joshua) Modified on 12/28/2022 (pc). (Entered: 12/27/2022) |
| 12/28/2022 | | ***NOTICE TO ATTORNEY REGARDING DEFICIENT PLEADING. Notice to Attorney Joshua T. Reitzas to RE-FILE re: Document No. 20 Amended Complaint. The filing is deficient for the following reason(s): all of the parties listed on the pleading were not entered on CM ECF; all of the parties listed on the pleading were not entered on CM ECF. Docket the event type Add Party to Pleading found under the event list Complaints and Other Initiating Documents.. Re-file the pleading using the event type Amended Complaint found under the event list Complaints and Other Initiating Documents - attach the correct signed PDF - select the individually named filer/filers - select the individually named party/parties the pleading is against. (pc) (Entered: 12/28/2022) |
| 12/29/2022 | | ADD PARTY FOR PLEADING. Defendants/Respondents DOES 1-10, inclusive, ROE CORPORATIONS 11-20, INCLUSIVE added. Party added pursuant to 20 Amended Complaint,.Document filed by Lori A. Brightman. Related document: 20 Amended Complaint,..(Reitzas, Joshua) (Entered: 12/29/2022) |
| 12/29/2022 | 21 | FILING ERROR - DEFICIENT DOCKET ENTRY - FILED AGAINST PARTY ERROR - FIRST AMENDED COMPLAINT amending 20 Amended Complaint, against All Defendants with JURY DEMAND.Document filed by Lori A. Brightman. Related document: 20 Amended Complaint,. (Attachments: # 1 Affidavit Exhibit A - Declaration of Brian Lodwig).(Reitzas, Joshua) Modified on 12/29/2022 (pc). (Entered: 12/29/2022) |
| 12/29/2022 | | ***NOTICE TO ATTORNEY REGARDING DEFICIENT PLEADING. Notice to Attorney Joshua T. Reitzas to RE-FILE Document No. 21 Amended Complaint,. The filing is deficient for the following reason(s): the All Defendant radio button was selected;. Re-file the pleading using the event type Amended Complaint found under the event list Complaints and Other Initiating Documents - attach the correct signed PDF - select the individually named filer/filers - select the individually named party/parties the pleading is against. (pc) (Entered: 12/29/2022) |
| 12/29/2022 | | ***NOTICE TO ATTORNEY REGARDING PARTY MODIFICATION. Notice to attorney Joshua T. Reitzas. The party information for the following party/parties has been modified: DOES 1-10, inclusive, ROE CORPORATIONS 11-20, INCLUSIVE. The information for the party/parties has been modified for the following reason/reasons: party name was entered in all caps;. (pc) (Entered: 12/29/2022) |
| 01/13/2023 | 22 | MOTION to Dismiss . Document filed by InMode Ltd..(Koosed, Brian) (Entered: 01/13/2023) |
| 01/13/2023 | 23 | MEMORANDUM OF LAW in Support re: 22 MOTION to Dismiss . . Document filed by InMode Ltd..(Koosed, Brian) (Entered: 01/13/2023) |
| 01/13/2023 | 24 | DECLARATION of Yair Malca in Support re: 22 MOTION to Dismiss .. Document filed by InMode Ltd. (Attachments: # 1 Exhibit A - Notice of Stock Option Award, # 2 Exhibit B - Stock Option Award Agreement, # 3 Exhibit C - 2008 Option Plan).(Koosed, Brian) (Entered: 01/13/2023) |
| 01/25/2023 | 25 | AFFIDAVIT OF SERVICE of Summons and Amended Complaint,. InMode Ltd served on 1/20/2023, answer due 2/10/2023. Service was accepted by Sue Zouky, Business Document Specialist. Document filed by Lori A. Brightman..(Reitzas, Joshua) (Entered: 01/25/2023) |
| 02/09/2023 | 26 | MEMORANDUM OF LAW in Opposition re: 22 MOTION to Dismiss . . Document filed by Lori A. Brightman. (Attachments: # 1 Exhibit Declaration of Dr Brightman).(Reitzas, Joshua) (Entered: 02/09/2023) |

| 02/09/2023 | 27 | DECLARATION of Joshua T Reitzas in Opposition re: 22 MOTION to Dismiss .. Document filed by Lori A. Brightman..(Reitzas, Joshua) (Entered: 02/09/2023) |
|---|---|---|
| 02/24/2023 | 28 | REPLY MEMORANDUM OF LAW in Support re: 22 MOTION to Dismiss . *the First Amended Complaint*. Document filed by InMode Ltd..(Koosed, Brian) (Entered: 02/24/2023) |
| 08/14/2023 | 29 | OPINION AND ORDER GRANTING DEFENDANT'S MOTION TO DISMISS re: 22 MOTION to Dismiss . filed by InMode Ltd. For the reasons stated herein, the motion to dismiss filed by InMode is GRANTED. This action is therefore dismissed without prejudice to it being refiled in the proper forum. The Clerk of Court respectfully is requested to close all pending motions and close the case. SO ORDERED. (Signed by Judge Mary Kay Vyskocil on 8/14/2023) (tg) Transmission to Orders and Judgments Clerk for processing. (Entered: 08/14/2023) |
| 08/14/2023 | 30 | CLERK'S JUDGMENT re: 29 Memorandum & Opinion in favor of InMode Ltd against Lori A. Brightman. It is hereby ORDERED, ADJUDGED AND DECREED: That for the reasons stated in the Court's Opinion and Order dated August 14, 2023, the motion to dismiss filed by InMode is GRANTED. This action is therefore dismissed without prejudice to it being refiled in the proper forum. Accordingly, the case is closed. (Signed by Clerk of Court Ruby Krajick on 8/14/2023) (Attachments: # 1 Appeal Package) (tp) (Entered: 08/14/2023) |
| 08/29/2023 | 31 | **FILING ERROR - NO ORDER SELECTED FOR APPEAL** - FIRST NOTICE OF APPEAL. Document filed by Lori A. Brightman. Form C and Form D are due within 14 days to the Court of Appeals, Second Circuit. (Attachments: # 1 Affidavit Affirmation of Service).(Reitzas, Joshua) Modified on 8/30/2023 (km). (Entered: 08/29/2023) |
| 08/30/2023 | | ***NOTICE TO ATTORNEY REGARDING DEFICIENT APPEAL. Notice to attorney Joshua Reitzas to RE-FILE Document No. 31 Notice of Appeal.. The filing is deficient for the following reason(s): the order/judgment being appealed was not selected. Re-file the appeal using the event type Notice of Appeal found under the event list Appeal Documents - attach the correct signed PDF - select the correct named filer/filers - select the correct order/judgment being appealed. (km)** (Entered: 08/30/2023) |
| 08/31/2023 | 32 | FIRST NOTICE OF APPEAL from 30 Clerk's Judgment,, 29 Memorandum & Opinion,,. Document filed by Lori A. Brightman. Form C and Form D are due within 14 days to the Court of Appeals, Second Circuit. (Attachments: # 1 Affidavit Affirmation of Service). (Reitzas, Joshua) Modified on 8/31/2023 (km). (Entered: 08/31/2023) |
| 08/31/2023 | | Appeal Fee Due: for 32 Notice of Appeal. Appeal fee due by 9/14/2023.(km) (Entered: 08/31/2023) |
| 08/31/2023 | | Transmission of Notice of Appeal and Certified Copy of Docket Sheet to US Court of Appeals re: 32 Notice of Appeal.(km) (Entered: 08/31/2023) |
| 08/31/2023 | | Appeal Record Sent to USCA (Electronic File). Certified Indexed record on Appeal Electronic Files for 32 Notice of Appeal, filed by Lori A. Brightman were transmitted to the U.S. Court of Appeals.(km) (Entered: 08/31/2023) |
| 09/07/2023 | | Appeal Fee Payment: for 32 Notice of Appeal,. Filing fee $ 505.00, receipt number ANYSDC-28252516..(Reitzas, Joshua) (Entered: 09/07/2023) |

**PACER Service Center**

**A-7**

| Transaction Receipt | | | |
|---|---|---|---|
| 11/06/2023 09:47:35 | | | |
| **PACER Login:** | teamrpacc | **Client Code:** | 97448 |
| **Description:** | Docket Report | **Search Criteria:** | 1:22-cv-05861-MKV |
| **Billable Pages:** | 6 | **Cost:** | 0.60 |

**A-8**

| | |
|---|---|
| | USDC SDNY<br>DOCUMENT<br>ELECTRONICALLY FILED<br>DOC #:_____<br>DATE FILED:  11/29/2022 |

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

DR. LORI A. BRIGHTMAN, an individual,

                              Plaintiff,

              -against-

INMODE LTD., a foreign limited liability
corporation, et al.,

                              Defendants.

---

1:22-cv-5861 (MKV)

**SCHEDULING ORDER**

MARY KAY VYSKOCIL, United States District Judge:

The Court is in receipt of the parties' letters regarding Defendants' contemplated motion to dismiss this action [ECF Nos. 13, 15].  After reviewing the arguments set out therein, the Court has determined that a pre-motion conference is not necessary.

IT IS HEREBY ORDERED that, by December 6, 2022, Plaintiff shall file a letter informing the Court and Defendants whether Plaintiff intends to file an amended complaint.  **This will be Plaintiff's last opportunity to amend in response to any issue raised in the parties' pre-motion letters.**

IT IS FURTHER ORDERED that, if Plaintiff elects to amend, it shall file the amended complaint by December 13, 2022.  Defendants shall respond within 14 days.  If Defendants respond with a motion to dismiss, Plaintiff shall file any opposition by January 20, 2023. Defendants shall file any reply by February 3, 2023.

IT IS FURTHER ORDERED that, if Plaintiff elects not to amend, Defendants shall file their contemplated motion by December 20, 2022.  Any opposition shall be filed by January 20, 2023, and any reply shall be filed by February 3, 2023.

Any request for an extension or adjournment shall be made by letter filed on ECF and must be received at least 48 hours before the deadline.

**SO ORDERED.**

**Date:   November 29, 2022**
**New York, NY**

_____
**MARY KAY VYSKOCIL**
**United States District Judge**

**BERLANDI NUSSBAUM & REITZAS LLP**
125 Park Avenue, 25th Floor
New York, New York 10017
(212) 804-6329 (Ph)
(646) 461-2312 (fax)
*Attorneys for Plaintiff Dr. Lori A. Brightman*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| DR. LORI A. BRIGHTMAN, an individual,<br><br>Plaintiff,<br><br>v.<br><br>INMODE LTD., a foreign limited liability corporation; DOES 1 – 10, INCLUSIVE; AND ROE CORPORATIONS 11-20, INCLUSIVE,<br><br>Defendants. | **CASE** No.: 1:22-cv-05861 MKV<br><br>**FIRST AMENDED COMPLAINT**<br><br>**JURY DEMANDED** |

Plaintiff, Dr. Lori A. Brightman ("Dr. Brightman"), by and through her attorneys, Berlandi Nussbaum & Reitzas LLP, and for causes of action against Defendant INMODE LTD. ("InMode" or "Defendant"), alleges as follows:

**JURISDICTION**

1.     This Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332.  Dr. Brightman is a citizen of Massachusetts, and InMode is neither incorporated nor maintains its principal place of business in New York.

2.     Dr. Brightman seeks monetary damages based on the worth of the InMode's corporate stock which Defendant refuses to transfer and has a value at the time of this filing in excess of $75,000.00.

3.     The Court has the authority to grant declaratory relief pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202.

4.     Venue is appropriate under 28 U.S.C. §1391(b)(2), because a substantial part of the

events giving rise to Dr. Brightman's claims occurred in New York, including among other things, performance of services requested by Defendant, including a clinical trial InMode specifically requested and had been performed by Dr. Brightman in her office located in New York County.

5.      Pursuant to FRCP 38, Plaintiff hereby demands trial by jury.

<u>**JURISDICTION**</u>

6.      Dr. Lori A. Brightman is an individual who resides in the Commonwealth of Massachusetts.

7.      Dr. Brightman is a widely renowned board-certified dermatologist and dermatologic surgeon who has published countless medical journals and articles.  In addition, she has served as the Chair of the *Ethics and Conflict of Interest Committee* for the American Society for Laser Medicine and Surgery, faculty of the American Society for Dermatologic Surgery, and a physician in the *Dermatology and Dermatologic Surgery Department* at Massachusetts Institute of Technology (MIT).  Dr. Brightman has also received the *Bertha Curtis Humanitarian Award* for her work with, and creation of, the charitable foundation *Kindness for Kids*.  Dr. Brightman has been licensed as a physician since approximately 2001.

8.      In addition to her experiences in private practice, Dr. Brightman is an international trainer, researcher, developer, principal and co-investigator of clinical trials in a broad range of therapeutics including but not limited to various injectables and laser manufacturers. She provides product development support, trains other physicians on best practices and counsels attorneys, investors, consultants and media regarding these various products including specifically medical devices such as Bi-Polar Fractional RF devices.

9.      InMode is and was at all times relevant hereto a foreign corporation incorporated in Israel, and upon information and belief, maintains its principal place of business in Lake Forest, California. InMode is a provider of surgical aesthetic and medical treatment solutions. It incorporated in Israel in January 2008 under the name Invasix Ltd. The corporate name was changed to InMode Ltd. in November 2017.  InMode regularly conducts business in the State of New York and many of the events and circumstances in this pleading occurred in New York

County, including services such as a clinical trial performed by Dr. Brightman.

10.     At all relevant times mentioned herein, Moshe Mizrahy was CEO of Invasix, Inc. which corporate name was later changed to "InMode Ltd".

11.     At all relevant times, Brian Lodwig was President, North America Division of Invasix, Inc. which corporate name was later changed to "InMode Ltd".

12.     InMode failed to honor promises to Dr. Brightman despite having received the benefit of Dr. Brightman's services.

**GENERAL ALLEGATIONS**

**I.      Dr. Brightman's Prior Dealings With Invasix/InMode and the 2009 Clinical Trial Agreement**.

13.     Dr. Brightman was introduced to Brian Lodwig ("Lodwig") and Moshe Mizrahy ("Mizrahy") through her work with Syneron beginning in 2008. Mizrahy was CEO of Syneron at that time.

14.     Lodwig and Mizrahy left Syneron and began Invasix. Initially, Mizrahy began discussing Invasix technology with Dr. Brightman. At the time, Dr. Brightman was a highly regarding expert experienced with developing technology, running clinical trials, and publishing and presenting internationally.

15.     In early 2009, offered 7,500 InMode stock options to Dr. Brightman to be available when Defendant went public in exchange for her performance of procedures on 15 patients in a clinical trial.  By email of April 5, 2009, Moshe Mizrahy wrote:

> Date: Sun, 5 Apr 2009 11:17:03 +0300
>
> Dear Lori,
>
>       Again, I would like to take this opportunity to thank you for making the trip to Toronto. I hope you enjoyed the training.
>
>       In this e-mail I would like to summarize the discussion that you, Dr. Michael Kreindel, and I had in Toronto.
>
>       You will conduct a study for Invasix that will include 15 patients to be

3

divided into two groups: 7-8 patients will be treated on the neck and the other 7-8 patients will be treated on the upper arms (see enclosed some pictures that we took of the first neck treatment conducted by Dr. Steve Mulholland in Toronto, using the 12 cm. handpiece we showed you in Toronto).

Yang will help with the site approval. If she needs anything from you, she will contact you directly.

The study that you will conduct is very important to us - it will serve us to communicate the message of small area shaping and tightening to the dermatologist community. As we told you, we do not intend to work with other dermatologists on Invasix (we are currently concentrating on the plastic surgeon community) so we see you as our opinion leaders in the derm community.

In this study, we would like to prove the mechanism of operation of our technology as a superior mechanism vis a vis other methods of laser and ultrasound. Therefore, as we discussed, the study will include 3 venues of gold-standard clinical proof: before and after 3 D pictures using the Canfield Vectra system, histologies and skin tightening and laxity analysis. As you told us, you are capable of analyzing the results throught these 3 venues. We are therefore willing to add as per your request the $ 500 per patient in addition to what is specified in our contract.

In addition, I would like to tell you that the Board of Directors of Invasix has approved allocating 7,500 options to you, to be vested over 3 years, as of January 1st, 2009.

I look forward to working closely with you and to beginning our study. Once we receive site approval - we will ship you a system and Dr. Michael Kreindel will come to work with you on the first case.

Moshe Mizrahy
CEO, Invasix
Cell: +972-547-486900
E-mail: mm_bsg@barak.net.il <mailto:mm_bsg@barak.net.il>

16.    Dr. Brightman recognized that Mizrahy was the CEO of Invasix (which later became InMode) and she relied on his actual or apparent authority to bind defendant. Dr. Brightman agreed to this limited clinical trial to be performed in her office in New York in exchange for the 7,500 stock options promised by Mizrahy. Dr. Brightman then proceeded to complete a clinical trial in her New York office for surgical procedures of Radiofrequency-

4

Assisted Liposuction ("RFAL") on 15 patients along with documentation of the results including 3D Vectra measurements, histology and assessment of skin tightening.

17.     The study was intended to prove the mechanism of operation of RFAL as a superior mechanism vis-a-vis other methods of laser and ultrasound. Dr. Brightman commenced treating the clinical trial patients in her New York office on June 30, 2009 under the agreement.

18.     In April, 2010, and after Dr. Brightman had substantially completed the required Clinical Trial work, Mizrahy sent Dr. Brightman a Notice of Stock Option Award ("Written Agreement").

19.     When Dr. Brightman received the April, 2010 Written Agreement, she noted it incorrectly identified 7,000 shares of stock and not the 7,500 shares promised by Mizrahy on behalf of InMode.

20.     The Written Agreement also included new terms and conditions which were not even discussed or agreed to by the parties.  These new terms were inconsistent with the agreement of the parties which had been substantially peformed by Dr. Brightman, and the new terms and conditons were otherwise not supported by a separate or new consideration.  For example, the Written Agreement included forum selection and expiration terms that were never discussed or agreed to by the parties.

21.     Dr. Brightman objected to the Written Agreement. However, Mizrahy assured Dr. Brightman that he would send a corrected agreement but insisted that she needed to sign it simply as a place-holderIn reliance on Mizrahy's assurance, the Written Agreement was signed and returned by Dr. Brightman. Ultimately, however, Mizrahy never provided Dr. Brightman with a corrected version of the Written Agreement consistent with the terms and conditions agreed to in order to obtain Dr. Brightman's work on the limited clinical trial.

**II.      Dr. Brightman Agrees to Provide New Services for InMode Outside of the Clinical Trial Agreement**

22.     Later in 2009, Lodwig conveyed in a telephone call with Dr. Brightman how much he appreciated Dr. Brightman's work on the Clinical Trial. Lodwig asked Dr. Brightman if she

5

would be interested in providing new services to InMode at upcoming society meetings or by publications she might be able to author or participate in.

23.     He told Dr. Brightman that InMode wanted to keep her as their "only dermatology key opinion leader" in the derm/aesthetic market. He further told Dr. Brightman that if she agreed to this new work, InMode would compensate her with additional stock options to be provided and available when Defendant went public.

24.     Lodwig advised Dr. Brightman that he was authorized by the Board of Directors to hire her for new work outside of the Clinical Trial and he offered her shares of stock as follows: 5,000 share of stock yearly for attending (live,  virtual, or electronic) meetings (derm meetings, society meetings, aesthetic meetings); any publications (print or electronic) she can get will also be 5,000 shares / publication; international meetings will also be 5,000 shares per international meeting for attending (live, virtual or electronic) international meetings; and 5,000 shares per year for taking potential prospect calls/emails answering InMode's questions.

25.     Dr. Brightman relied on Logwig's actual or apparent authority to bind Defendant, she accepted the offer and she performed the agreed upon services. Thereafter, emails came forth with various requests for work by Dr. Brightman consistent with this Agreement.

26.     Dr. Brightman thus performed additional work with the promised stock options as compensation. The additional work performed consisted of writing, submitting and then presenting abstract and lectures for dermatology, society and aesthetic meetings, international meetings and publications, and fielding calls, emails, inquiries from other physicians regarding RFAL. These were all additional items of work Dr. Brightman performed based on the promises from InMode and its authorized agent Lodwig.

27.     The scope of additional works that Dr. Brightman provided to InMode resulted in her earning 45,000 additional options for 2009 - 2011 based on the following:

       a.     Attending and presenting at various events such as Dermatologic, Laser, and Aesthetic meetings, and the like for a total of 15,000 options;

       b.     Attending (in person, virtually or electronically) at various events

internationally for Dermatologic, Laser, and Aesthetic meeting which included 5 Continents 2009, Dubai Derm 2010 and a Polish Trade magazine 2011 for a total of 15,000 options; and

c.       Three (3) publications in: i) Skin and Allergy News; ii) ASDS Media; and iii) A Polish Trade magazine for a total of 15,000 stock options.

28.       At all times herein, Lodwig was a duly authorized representative of InMode and/or had the actual and/or apparent authority to act and negotiate with Dr. Brightman on behalf of InMode. Dr. Brightman reasonably and justifiably relied on Lodwig's actual or apparent authority to transact business of InMode by providing services and devoting time for the benefit of InMode.

29.       Lodwig advised Dr. Brightman that the options were to be of the same kind that Lodwig himself would receive as an InMode executive, though the precise value of each share of stock would not be known until the company went public when the shares would be provided. Lodwig advised Dr. Brightman that her options were in place and no further documentation was required.

30.       Dr. Brightman reasonably relied on Lodwig's statements and Lodwig's actual and/or apparent authority to transact business of InMode and, this reliance was manifested by Dr. Brightman devoting significant effort and time providing services of value to InMode.

31.       On October 13, 2011, Dr. Brightman met with Lodwig in her office with Chris Yackel, Senior Territory Manager at Invasix. During this meeting, Lodwig reviewed with Dr. Brightman all the additional work she had done for RFAL promotion, which by then had reached the equivalent of 45,000 stock options. Lodwig further confirmed to Dr. Brightman that she was indeed "covered for those options" and no further documentation was required.  Lodwig added that "the Board and Mizrahy approved of our agreement.  This is all set."

32.       Dr. Brightman asked Lodwig about any necessary paperwork, and she was assured by Lodwig, "Lori, do not worry about that, no, this is coming from Moshe (Mizrahy) directly." "We know the extra work you have done for us (of course outside of the RFAL clinical trial). This is all set." Both Yackel and Lodwig have an independent recollection of this meeting and both

**A-17**

have confirmed these discussions occurred.

33.     In consideration for her services to promote RFAL, such as presentations, publications, speaking with other physicians etc., InMode, Lodwig and Mizrahy had agreed to pay Dr. Brightman a total of 45,000 options in InMode stock.

34.     Those options were Dr. Brightman's only compensation for the extra services she provided.  In performing those services, Dr. Brightman even paid her own expenses for travel and accommodation.

35.     To date, despite request, Dr. Brightman has not received any monetary compensation for, nor was she compensated with the additional 45,000 stock options promised to her for her additional work relating to RFAL.

36.     As of the date of this Complaint, Dr. Brightman has not received the stock options she was promised and in April 2021 was for the first time advised by Mizrahy or other InMode personnel that InMode will not fulfill its promises despite her performance of services requested.

**III.    Dr. Brightman Agrees to Provide Additional Services to Promote Fractora Device for InMode in Exchange for New and Additional Stock Options**

37.     During the same October 13, 2011 meeting between Lodwig and Dr. Brightman, Lodwig said he knew Dr. Brightman had met with Mizrahy recently on September 21, 2011, in her office in New York to discuss her work. Lodwig informed Dr. Brightman that Mizrahy wanted for Dr. Brightman to also work with the Fractora device, which is for minimally invasive anti-aging skin and tissue resurfacing.

38.     He said, "We have spoken about this, this is coming from Moshe, he would like for you to do with Fractora what you did for RFAL, we know what you can do with this."

39.     Further, Lodwig told Dr. Brightman, "We, myself and Moshe (for the Company), are willing to do the same stock option deal we have done with RFAL with Fractora. So, 5,000 yearly for meetings (derm meetings, society meetings, aesthetic meetings), any publications you can get will also be 5,000 and of course international meetings are very important to us so we will also continue to do 5,000 per international meeting and 5,000 for taking potential prospect

calls/emails answering their questions."

40.     Dr. Brightman said she would be happy to do the new work for the same compensation arrangement as she had been doing with RFAL.

41.     Dr. Brightman also asked Lodwig if any necessary paperwork was needed for this new work, and again she was assured by Lodwig, "Lori, this is coming from Moshe (Mizrahy) directly (for InMode)." "We know the work you have done for us of course. This is all set."

42.     At that time, Dr. Brightman had worked with Lodwig for years prior when he was employed at Syneron. Lodwig, as well as other Syneron employees, had made promises for compensation for work to be done and had ALWAYS come forth with the promised financial compensation without issue. Based upon these past fulfilled promises, Dr. Brightman believed Lodwig was a person of his word and agreed to continue to do this extra work. She knew this is a very common practice in their industry.

43.     Both Chris Yackel and Brian Lodwig have independent recollection of the October 13, 2011 meeting and these discussions.

44.     Like the work she performed for RFAL, Dr. Brightman understood that she was being offered additional stock options to be provided when Defendant went public for promoting Fractora as follows: (1) 5,000 yearly for meetings (derm meetings, society meetings, aesthetic meetings); (2) 5,000 shares of stock annually for any publications obtained for Fractora; (3) 5,000 shares of stock annually per international meeting; and 5,000 yearly for taking potential prospect calls/emails answering their questions regarding Fractora, and she accepted the offer.

45.     Based on this compensation arrangement proposed by Lodwig, Dr. Brightman agreed to provide – and did in fact provide – numerous new services for InMode, including but not limited to:

        a.     Providing product feedback and working to produce photos and information from non-clinical trials of the Fractora device.

        b.     Handling and responding to phone calls from InMode and other physicians regarding her work with InMode's Fractora technologies.

9

46.     For the scope of additional works that Dr. Brightman provided to InMode to develop with a goal of promoting Fractora from 2011 through 2012, she was to receive 5,000 options per year for a total of 10,000.

47.     At all times herein, Mizrahy as CEO and Lodwig as President were duly authorized representative of InMode and / or had the actual and/or apparent authority to act and negotiate with Dr. Brightman on behalf of InMode. Dr. Brightman reasonably and justifiably relied on Lodwig's actual or apparent authority to transact business of InMode by providing services and devoting time for the benefit of InMode.

48.     Lodwig advised Dr. Brightman that the options were to be of the same kind that Lodwig himself would receive as an InMode executive, though the precise value of each share of stock would not be known until the company went public.

49.     Dr. Brightman reasonably relied on Lodwig's statements and his actual / apparent authority as President to transact business of InMode and, this reliance was manifested by Dr. Brightman devoting significant effort and time providing services of value to InMode.

50.     Dr. Brightman performed her part of the contract relating to Fractora, but received no additional monetary compensation for any of the foregoing services, in violation of the parties' industry-standard agreement, which Dr. Brightman understood to include compensation with stock options as promised on multiple occasions by Lodwig with Mizrahy's approval.

51.     In consideration for her consulting, marketing and sales assistance to InMode, Lodwig and Mizrahy had agreed to pay Dr. Brightman a total of additional 10,000 options in InMode stock, available when the Defendant went public. The terms of these options were identical to the terms of the options offered to Dr. Brightman in exchange for her marketing and sales-related services. At this time, Lodwig still had the actual and/or apparent authority to transact business on behalf of InMode.

52.     With this arrangement, and in reliance on Lodwig's apparent authority as president and his statements promising options, Dr. Brightman completed the work described above which was very valuable and benefitted InMode.

**A-20**

53.     Dr. Brightman did not receive compensation for, nor was she compensated with, the additional stock options promised to her for the separate work relating to Fractora.

54.     After completing the work for Fractora, Dr. Brightman would from time to time hear from Lodwig.  In approximately December 2017, Lodwig left InMode and Dr. Brightman did not hear from him for several years.

55.     It was not until April 2021 that Dr. Brightman heard from Ludwig for the first time in many years.During their call, Dr. Brightman was shocked to learn from Ludwig that InMode had gone public.

56.     In fact, on or around August 8, 2019, InMode made its initial public offering. InMode stock subsequently split in 2021 on a 2:1 basis. Dr. Brightman is owed 125,000 shares.[1]

57.     On or about April 12, 2021, having just learned for the first time of InMode having gone public, Dr. Brightman emailed Mizrahy about the original 7,500 options she had been promised.

58.     Despite the stock options not being due under Dr. Brightman's agreement until InMode went public, Mizrahy responded on or about April 14, 2021 advising that Dr. Brightman's options were expired based on the inconsistent Written Agreement.  Mizrahy falsely contends that he had tried to contact her before April 2021 about InMode having gone public.  This April 14, 2021 email from Mizarahy was the first time Dr. Brightman learned InMode would not honor the commitments to provide the stock promised to Dr. Brightman.

59.     As of the date of this Complaint, Dr. Brightman has not received any of the stock options she was promised under the Clinical Trial Agreement, or for the work performed for RFAL and Fractora. Further, Dr. Brightman was advised by Mizrahy or other InMode personnel that InMode will not fulfill its promises to provide the stock options which were first due to Dr. Brightman at the time InMode went public.

---

[1] This is based on the original clinical trial promise of 7,500 shares, the promise of 45,000 shares for RFAL work, and the promise of 10,000 for Fractora work.  Based on the stock split, this amounts to 125,000 options / shares.

**FIRST CAUSE OF ACTION**

**(Negligent Misrepresentation)**

60.    Dr. Brightman realleges and incorporates each and every one of the allegations contained in the preceding paragraphs as if set forth fully herein.

61.    Plaintiff and Defendant were in a privity or privity-like relationship, because Defendant hired Plaintiff to perform services for it.

62.    Defendant, in the course of action in which it had a pecuniary interest, failed to exercise reasonable care or competence in obtaining or communicating information to Dr. Brightman as set forth above.

63.    Such information included, without limitation, that Dr. Brightman needed to sign and return the Written Agreement as a place-holder despite UCC 8-113(a) excluding stock options from a writing requirement statute of frauds.

64.    Such information included, without limitation, that Dr. Brightman was to receive 45,000 stock options in InMode when the company went public in exchange for her additional work such as presentations, publications, speaking with other physicians etc. in order to promote RFAL, and that no documentation of this arrangement was needed.

65.    Such information likewise included, without limitation, that Dr. Brightman was to receive 10,000 stock options in InMode when the company went public in exchange for her additional work such as presentations, publications, speaking with other physicians etc. in order to promote Fractora, and that no documentation of this arrangement was needed.

66.    Dr. Brightman justifiably relied on this information in providing services for InMode.

67.    Attached as Exhibit A to this Complaint is a declaration of Brian Lodwig, who at all relevant times was the president of Defendant.  In it he testifies that either he or Mr. Misrahy did in fact make all of the above representations to Plaintiff on behalf of the Defendant.

68.    InMode stock went public in approximately August 2019 and appreciated significantly ever since and the stock was split 2:1. The high value of InMode following the 2:1

split was priced as high as $99.27/share.  Dr. Brightman is entitled to damages based on the 2:1 split and highest share value of $99.27 / share.

69.     As a direct and proximate result of Defendant's conduct, Dr. Brightman has suffered damages in an amount in excess of seventy-five thousand dollars ($75,000), plus interest.

**70.**     Dr. Brightman has been required to retain the services of Berlandi Nussbaum & Reitzas LLP and Lipson Neilson P.C. to prosecute this action, and is entitled to recover an award of reasonable attorneys' fees and costs incurred herein. **SECOND CAUSE OF ACTION**

**(Promissory Estoppel)**

71.     Dr. Brightman realleges and incorporates each and every one of the allegations contained in the preceding paragraphs as if set forth fully herein.

72.     Beginning in 2009, at other dates and times indicated herein, Defendant, through Lodwig and Mizrahy, requested that Dr. Brightman perform various services for InMode.

73.     Defendant, through Lodwig and Mizrahy, unequivocally represented to Dr. Brightman that it would compensate Dr. Brightman with stock options in InMode, whichwould be first available when the company went public,for her services to InMode for the Fractora product and for other work.

74.     Lodwig as CEO and Mizrahy President were at all times acting as Defendant's duly authorized agents and/or had actual and/or apparent authority to transact business on Defendant's behalf with Dr. Brightman.

75.     Defendant, through Lodwig and Mizrahy, intended that Dr. Brightman rely upon the express statements that Dr. Brightman would be compensated with stock options as set forth above in exchange for her time and effort on behalf of InMode.

76.     Dr. Brightman reasonably relied upon Defendant's representations and promises in belief that she would in fact receive such compensation for her services, and as such did not request or obtain monetary compensation for her time and valuable services, all to her detriment.

77.     In April, 2019, Dr. Brightman learned for the first time that Defendant would not honor its commitments to her.

78.     Defendant failed to compensate Dr. Brightman with the promised InMode stock options in consideration of her work for the Fractora product.

79.     Dr. Brightman is entitled under principles of promissory estoppel and/or quantum meruit to be compensated by Defendant with the entire amount of stock options promised and owed to her by Defendant.

80.     As a direct and proximate result of Defendant's conduct, Dr. Brightman has suffered damages in an amount in excess of seventy-five thousand dollars (75,000). Dr. Brightman has been required to retain the services of Berlandi Nussbaum & Reitzas LLP and Lipson Neilson P.C. to prosecute this action, and is entitled to recover an award of reasonable attorneys' fees and costs incurred herein. **THIRD CAUSE OF ACTION**

**(Unjust Enrichment)**

81.     Dr. Brightman realleges and incorporates each and every one of the allegations contained in the preceding paragraphs as if set forth fully herein.

82.     As set forth above, Dr. Brightman provided extensive services to Defendant, all of which she received no monetary compensation for despite assurances to the contrary.

83.     Dr. Brightman provided such services based on Defendant's assurances that she would be compensated with InMode stock options, which Defendant, for the first time in April 2019,repudiated after receiving the benefit of Dr. Brightman's services.

84.     In light of Defendant's conduct set forth herein, Dr. Brightman should be compensated with the stock options Defendant promised her in the interests of equity.

85.     It would be against equity and good conscience to permit the defendant to retain what is sought to be recovered.

86.     As a direct and proximate result of Defendant's conduct, Dr. Brightman has suffered damages in an amount in excess of seventy-five thousand dollars ($75,000). Dr. Brightman has been required to retain the services of Berlandi Nussbaum & Reitzas LLP and Lipson Neilson P.C. to prosecute this action, and is entitled to recover an award of reasonable attorneys' fees and costs incurred herein.

## FOURTH CAUSE OF ACTION

### (Fraud)

87.     Dr. Brightman realleges and incorporates each and every one of the allegations contained in the preceding paragraphs as if set forth fully herein.

88.     Defendant, through Mizrahy as CEO, represented to Dr. Brightman that she was required to sign and return the incorrect Written Agreement as a place-holder when, in fact, UCC 8-113(a) excludes a promise of stock options from a writing requirement statute of frauds.

89.     Defendant, through Lodwig, represented and confirmed to Dr. Brightman in October 2011 that, in exchange for her services to InMode for the Fractora product, she would be compensated with stock options in InMode. Defendant advised Dr. Brightman that no documentation as to this arrangement was necessary. Further, that Mizrahy and Lodwig on behalf of InMode would "be sure to take care of Dr. Brightman" and that this was "all set."

90.     At all times relevant herein, Mizrahy as CEO and Lodwig as President, were acting with actual and/or apparent authority of Defendant.

91.     Defendant knew or should have known that these representations were false.

92.     Defendant intended for Dr. Brightman to rely on these representations.

93.     Dr. Brightman reasonably relied on these representations, as she performed the valuable services for Plaintiff for which she was to receive stock options, first due when InMode went public, as compensation.

94.     Dr. Brightman's reliance was to her detriment, as she received no other compensation for the significant time, effort, and resources she spent performing services for Plaintiff.

95.     Dr. Brightman only first discovered those representations were false, and only could have discovered they were false, upon attempting to exercise her options in April of 2021.

96.     As a result of Plaintiff's fraud, Dr. Brightman has been damaged in an amount in excess of seventy-five thousand dollars ($75,000) plus punitive and/or exemplary damages as permitted by law.

97.     Dr. Brightman has been required to retain the services of Berlandi Nussbaum & Reitzas LLP and Lipson Neilson P.C. to prosecute this action, and is entitled to recover an award of reasonable attorneys' fees and costs incurred herein.

## FIFTH CAUSE OF ACTION

### (Declaratory Relief and Specific Performance)

98.     Dr. Brightman realleges and incorporates each and every one of the allegations contained in the preceding paragraphs as if set forth fully herein.

99.     Dr. Brightman entered into contracts with InMode as set forth more fully above.

100.    For the first agreement, Mizrahy directed that a Written Agreement be sent to Dr. Brightman. However, the Written Agreement provided for 7,000 stock options when in fact it was agreed she would receive 7,500 options and additional, new terms and conditions were included that were not discussed or agreed to by the parties.

101.    Dr. Brightman confronted Mr. Mizrahy about the discrepancy. Mizrahy assured her that he would send a corrected agreement but insisted that she sign it simply as a place-holder pending receipt of the corrected version.

102.    In reliance on his assurance, the written agreement was signed and returned.

103.    Dr. Brightman later provided new services at the requet of Brian Lodwig which were unrelated to the purported Written Agreement.

104.    Mizrahy failed to send a corrected version of the Written Agreement to conform the original agreement of the parties.

105.    As for the other agreements arranged by Brian Lodwig, related to new work Dr. Brightman was asked to perform on matters unrelated to the purported Written Agreement, Dr. Brightman at all times acted in good faith and substantially performed all of the contractual obligations requested of her by InMode.

106.    InMode accepted the benefit of Dr. Brightman's work and never expressed any dissatisfaction with her work.

107.    It is within InMode's power to perform its obligations to deliver stock owed to Dr. Brightman.

108.    InMode has failed and refused without justification to deliver stock options owed and first due to Dr. Brightman as of August 2019 when InMode went public and InMode is in breach of contract.

109.    Dr. Brightman is entitled damages for the highest value since InMode went public the 125,000 shares of InMode stock which she worked to obtain.

110.    Dr. Brightman is alternatively entitled to an order requiring InMode to perform its obligations and deliver the options it previously agreed to provide together with all other damages, attorney fees, costs and interest allowed by law.

111.    There is an actual and substantial controversy between the parties, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment that InMode breached its obligations to Dr. Brightman and, further, order and direct that InMode specifically perform it obligations to Dr. Brightman by delivering the stock she is entitled to recover.

Dr. Brightman has been required to retain the services of Berlandi Nussbaum & Reitzas LLP and Lipson Neilson P.C. to prosecute this action, and is entitled to recover an award of reasonable attorneys' fees and costs incurred herein. **SIXTH CAUSE OF ACTION**

**Breach of Implied Covenants of Good Faith and Fair Dealing**

112.    Dr. Brightman realleges and incorporates each and every one of the allegations contained in the preceding paragraphs as if set forth fully herein.

113.    Every contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement.

114.    New York law recognizes in every contract there an implied covenant that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract, which means that in every contract there exists an implied covenant of good faith and fair dealing.

115.    A party to a contract breaches these duties when their conduct frustrates the purpose

of the contract, is often described as bad faith, and for example is identified by, "evasion of the spirit of the bargain," "abuse of a power to specify terms," "interference with or failure to cooperate in the other party's performance," and willful rendering of imperfect performance.

116.   InMode breached the implied covenant of good faith and fair dealing by, among other things, refusing to cooperate with Dr. Brightman's efforts to obtain stock she was promised resulting in a significant diminution of value of the shares.

117.   Dr. Brightman is entitled to recover damages for the highest value since InMode went public the 125,000 shares of InMode stock which she worked to obtain, together with all other consequential damages such as attorney fees, costs and interest allowed by law.

118.   Dr. Brightman has been required to retain the services of Berlandi Nussbaum & Reitzas LLP and Lipson Neilson P.C. to prosecute this action, and is entitled to recover an award of reasonable attorneys' fees and costs incurred herein.

**[THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK]**

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs prays for relief in favor of Plaintiff and against Defendant as follows:

1.      For damages to which Plaintiffs are entitled in an amount in excess of seventy-five thousand dollars ($75,000);

2.      For Declaratory Judgment that InMode breached its obligations to Dr. Brightman;

3.      Specific performance of InMode's contractual obligations to Plaintiffs;

4.      For punitive damages and permitted as otherwise allowed by law;

5.      For pre-and post-judgment interest;

6.      For all attorneys' fees and costs of suit; and / or

7.      For such other and further relief as this Court may deem just and proper.

**JURY DEMAND**

Plaintiffs demand trial by jury of all issues so triable pursuant to Rule 38 of the Federal Rules of Civil Procedure.

Dated:        December 27, 2022
              New York, New York


                                **BERLANDI NUSSBAUM & REITZAS LLP**

                        By:      /s/ Joshua T. Reitzas
                                Joshua T. Reitzas (JR2149)
                                125 Park Avenue, 25th Floor
                                New York, New York 10017
                                (212) 804-6329 (Ph)
                                (646) 461-2312 (fax)
                                *Attorneys for Plaintiff*
                                *Dr. Lori A. Brightman*

**BERLANDI NUSSBAUM & REITZAS LLP**
125 Park Avenue, 25th Floor
New York, New York 10017
(212) 804-6329 (Ph)
(646) 461-2312 (fax)
*Attorneys for Plaintiff Dr. Lori A. Brightman*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| DR. LORI A. BRIGHTMAN, an individual, | **CASE** No.: 1:22-cv-05861 MKV |
| Plaintiff, | **FIRST AMENDED COMPLAINT** |
| v. | |
| INMODE LTD., a foreign limited liability corporation; DOES 1 – 10, INCLUSIVE; AND ROE CORPORATIONS 11-20, INCLUSIVE, | **JURY DEMANDED** |
| Defendants. | |

Plaintiff, Dr. Lori A. Brightman ("Dr. Brightman"), by and through her attorneys, Berlandi Nussbaum & Reitzas LLP, and for causes of action against Defendant INMODE LTD. ("InMode" or "Defendant"), alleges as follows:

**JURISDICTION**

1.    This Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332.  Dr. Brightman is a citizen of Massachusetts, and InMode is neither incorporated nor maintains its principal place of business in New York.

2.    Dr. Brightman seeks monetary damages based on the worth of the InMode's corporate stock which Defendant refuses to transfer and has a value at the time of this filing in excess of $75,000.00.

3.    The Court has the authority to grant declaratory relief pursuant to the Declaratory Judgment Act, 28 USC §§ 2201 and 2202.

4.    Venue is appropriate under 28 U.S.C. §1391(b)(2), because a substantial part of the

1

events giving rise to Dr. Brightman's claims occurred in New York, including among other things, performance of services requested by Defendant, including a clinical trial InMode specifically requested and had been performed by Dr. Brightman in her office located in New York County.

5.    Pursuant to FRCP 38, Plaintiff hereby demands trial by jury.

## **JURISDICTION**

6.    Dr. Lori A. Brightman is an individual who resides in the Commonwealth of Massachusetts.

7.    Dr. Brightman is a widely renowned board-certified dermatologist and dermatologic surgeon who has published countless medical journals and articles.  In addition, she has served as the Chair of the *Ethics and Conflict of Interest Committee* for the American Society for Laser Medicine and Surgery, faculty of the American Society for Dermatologic Surgery, and a physician in the *Dermatology and Dermatologic Surgery Department* at Massachusetts Institute of Technology (MIT).  Dr. Brightman has also received the *Bertha Curtis Humanitarian Award* for her work with, and creation of, the charitable foundation *Kindness for Kids*.  Dr. Brightman has been licensed as a physician since approximately 2001.

8.    In addition to her experiences in private practice, Dr. Brightman is an international trainer, researcher, developer, principal and co-investigator of clinical trials in a broad range of therapeutics including but not limited to various injectables and laser manufacturers. She provides product development support, trains other physicians on best practices and counsels attorneys, investors, consultants and media regarding these various products including specifically medical devices such as Bi-Polar Fractional RF devices.

9.    InMode is and was at all times relevant hereto a foreign corporation incorporated in Israel, and upon information and belief, maintains its principal place of business in Lake Forest, California. InMode is a provider of surgical aesthetic and medical treatment solutions. It incorporated in Israel in January 2008 under the name Invasix Ltd. The corporate name was changed to InMode Ltd. in November 2017.  InMode regularly conducts business in the State of New York and many of the events and circumstances in this pleading occurred in New York

2

County, including services such as a clinical trial performed by Dr. Brightman.

10.     At all relevant times mentioned herein, Moshe Mizrahy was CEO of Invasix, Inc. which corporate name was later changed to "InMode Ltd".

11.     At all relevant times, Brian Lodwig was President, North America Division of Invasix, Inc. which corporate name was later changed to "InMode Ltd".

12.     InMode failed to honor promises to Dr. Brightman despite having received the benefit of Dr. Brightman's services.

## GENERAL ALLEGATIONS

**I.      Dr. Brightman's Prior Dealings With Invasix/InMode and the 2009 Clinical Trial Agreement.**

13.     Dr. Brightman was introduced to Brian Lodwig ("Lodwig") and Moshe Mizrahy ("Mizrahy") through her work with Syneron beginning in 2008. Mizrahy was CEO of Syneron at that time.

14.     Lodwig and Mizrahy left Syneron and began Invasix. Initially, Mizrahy began discussing Invasix technology with Dr. Brightman. At the time, Dr. Brightman was a highly regarding expert experienced with developing technology, running clinical trials, and publishing and presenting internationally.

15.     In early 2009, offered 7,500 InMode stock options to Dr. Brightman to be available when Defendant went public in exchange for her performance of procedures on 15 patients in a clinical trial.  By email of April 5, 2009, Moshe Mizrahy wrote:

> Date: Sun, 5 Apr 2009 11:17:03 +0300
>
> Dear Lori,
>
>     Again, I would like to take this opportunity to thank you for making the trip to Toronto. I hope you enjoyed the training.
>
>     In this e-mail I would like to summarize the discussion that you, Dr. Michael Kreindel, and I had in Toronto.
>
>     You will conduct a study for Invasix that will include 15 patients to be

3

divided into two groups: 7-8 patients will be treated on the neck and the other 7-8 patients will be treated on the upper arms (see enclosed some pictures that we took of the first neck treatment conducted by Dr. Steve Mulholland in Toronto, using the 12 cm. handpiece we showed you in Toronto).

Yang will help with the site approval. If she needs anything from you, she will contact you directly.

The study that you will conduct is very important to us - it will serve us to communicate the message of small area shaping and tightening to the dermatologist community. As we told you, we do not intend to work with other dermatologists on Invasix (we are currently concentrating on the plastic surgeon community) so we see you as our opinion leaders in the derm community.

In this study, we would like to prove the mechanism of operation of our technology as a superior mechanism vis a vis other methods of laser and ultrasound. Therefore, as we discussed, the study will include 3 venues of gold-standard clinical proof: before and after 3 D pictures using the Canfield Vectra system, histologies and skin tightening and laxity analysis. As you told us, you are capable of analyzing the results throught these 3 venues. We are therefore willing to add as per your request the $ 500 per patient in addition to what is specified in our contract.

In addition, I would like to tell you that the Board of Directors of Invasix has approved allocating 7,500 options to you, to be vested over 3 years, as of January 1st, 2009.

I look forward to working closely with you and to beginning our study. Once we receive site approval - we will ship you a system and Dr. Michael Kreindel will come to work with you on the first case.

Moshe Mizrahy
CEO, Invasix
Cell: +972-547-486900
E-mail: mm_bsg@barak.net.il <mailto:mm_bsg@barak.net.il>

16.     Dr. Brightman recognized that Mizrahy was the CEO of Invasix (which later became InMode) and she relied on his actual or apparent authority to bind defendant.  Dr. Brightman agreed to this limited clinical trial to be performed in her office in New York in exchange for the 7,500 stock options promised by Mizrahy. Dr. Brightman then proceeded to complete a clinical trial in her New York office for surgical procedures of Radiofrequency-

Assisted Liposuction ("RFAL") on 15 patients along with documentation of the results including 3D Vectra measurements, histology and assessment of skin tightening.

17.     The study was intended to prove the mechanism of operation of RFAL as a superior mechanism vis-a-vis other methods of laser and ultrasound. Dr. Brightman commenced treating the clinical trial patients in her New York office on June 30, 2009 under the agreement.

18.     In April, 2010, and after Dr. Brightman had substantially completed the required Clinical Trial work, Mizrahy sent Dr. Brightman a Notice of Stock Option Award ("Written Agreement").

19.     When Dr. Brightman received the April, 2010 Written Agreement, she noted it incorrectly identified 7,000 shares of stock and not the 7,500 shares promised by Mizrahy on behalf of InMode.

20.     The Written Agreement also included new terms and conditions which were not even discussed or agreed to by the parties.  These new terms were inconsistent with the agreement of the parties which had been substantially peformed by Dr. Brightman, and the new terms and conditons were otherwise not supported by a separate or new consideration.  For example, the Written Agreement included forum selection and expiration terms that were never discussed or agreed to by the parties.

21.     Dr. Brightman objected to the Written Agreement. However, Mizrahy assured Dr. Brightman that he would send a corrected agreement but insisted that she needed to sign it simply as a place-holderIn reliance on Mizrahy's assurance, the Written Agreement was signed and returned by Dr. Brightman. Ultimately, however, Mizrahy never provided Dr. Brightman with a corrected version of the Written Agreement consistent with the terms and conditions agreed to in order to obtain Dr. Brightman's work on the limited clinical trial.

II.     **Dr. Brightman Agrees to Provide New Services for InMode Outside of the Clinical Trial Agreement**

22.     Later in 2009, Lodwig conveyed in a telephone call with Dr. Brightman how much he appreciated Dr. Brightman's work on the Clinical Trial. Lodwig asked Dr. Brightman if she

would be interested in providing new services to InMode at upcoming society meetings or by publications she might be able to author or participate in.

23.     He told Dr. Brightman that InMode wanted to keep her as their "only dermatology key opinion leader" in the derm/aesthetic market. He further told Dr. Brightman that if she agreed to this new work, InMode would compensate her with additional stock options to be provided and available when Defendant went public.

24.     Lodwig advised Dr. Brightman that he was authorized by the Board of Directors to hire her for new work outside of the Clinical Trial and he offered her shares of stock as follows: 5,000 share of stock yearly for attending (live, virtual, or electronic) meetings (derm meetings, society meetings, aesthetic meetings); any publications (print or electronic) she can get will also be 5,000 shares / publication; international meetings will also be 5,000 shares per international meeting for attending (live, virtual or electronic) international meetings; and 5,000 shares per year for taking potential prospect calls/emails answering InMode's questions.

25.     Dr. Brightman relied on Logwig's actual or apparent authority to bind Defendant, she accepted the offer and she performed the agreed upon services. Thereafter, emails came forth with various requests for work by Dr. Brightman consistent with this Agreement.

26.     Dr. Brightman thus performed additional work with the promised stock options as compensation. The additional work performed consisted of writing, submitting and then presenting abstract and lectures for dermatology, society and aesthetic meetings, international meetings and publications, and fielding calls, emails, inquiries from other physicians regarding RFAL. These were all additional items of work Dr. Brightman performed based on the promises from InMode and its authorized agent Lodwig.

27.     The scope of additional works that Dr. Brightman provided to InMode resulted in her earning 45,000 additional options for 2009 - 2011 based on the following:

      a.     Attending and presenting at various events such as Dermatologic, Laser, and Aesthetic meetings, and the like for a total of 15,000 options;

      b.     Attending (in person, virtually or electronically) at various events

6

internationally for Dermatologic, Laser, and Aesthetic meeting which included 5 Continents 2009, Dubai Derm 2010 and a Polish Trade magazine 2011 for a total of 15,000 options; and

c.      Three (3) publications in: i) Skin and Allergy News; ii) ASDS Media; and iii) A Polish Trade magazine for a total of 15,000 stock options.

28.      At all times herein, Lodwig was a duly authorized representative of InMode and/or had the actual and/or apparent authority to act and negotiate with Dr. Brightman on behalf of InMode. Dr. Brightman reasonably and justifiably relied on Lodwig's actual or apparent authority to transact business of InMode by providing services and devoting time for the benefit of InMode.

29.      Lodwig advised Dr. Brightman that the options were to be of the same kind that Lodwig himself would receive as an InMode executive, though the precise value of each share of stock would not be known until the company went public when the shares would be provided. Lodwig advised Dr. Brightman that her options were in place and no further documentation was required.

30.      Dr. Brightman reasonably relied on Lodwig's statements and Lodwig's actual and/or apparent authority to transact business of InMode and, this reliance was manifested by Dr. Brightman devoting significant effort and time providing services of value to InMode.

31.      On October 13, 2011, Dr. Brightman met with Lodwig in her office with Chris Yackel, Senior Territory Manager at Invasix. During this meeting, Lodwig reviewed with Dr. Brightman all the additional work she had done for RFAL promotion, which by then had reached the equivalent of 45,000 stock options. Lodwig further confirmed to Dr. Brightman that she was indeed "covered for those options" and no further documentation was required.  Lodwig added that "the Board and Mizrahy approved of our agreement.  This is all set."

32.      Dr. Brightman asked Lodwig about any necessary paperwork, and she was assured by Lodwig, "Lori, do not worry about that, no, this is coming from Moshe (Mizrahy) directly." "We know the extra work you have done for us (of course outside of the RFAL clinical trial). This is all set." Both Yackel and Lodwig have an independent recollection of this meeting and both

have confirmed these discussions occurred.

33.     In consideration for her services to promote RFAL, such as presentations, publications, speaking with other physicians etc., InMode, Lodwig and Mizrahy had agreed to pay Dr. Brightman a total of 45,000 options in InMode stock.

34.     Those options were Dr. Brightman's only compensation for the extra services she provided.  In performing those services, Dr. Brightman even paid her own expenses for travel and accommodation.

35.     To date, despite request, Dr. Brightman has not received any monetary compensation for, nor was she compensated with the additional 45,000 stock options promised to her for her additional work relating to RFAL.

36.     As of the date of this Complaint, Dr. Brightman has not received the stock options she was promised and in April 2021 was for the first time advised by Mizrahy or other InMode personnel that InMode will not fulfill its promises despite her performance of services requested.

**III.     Dr. Brightman Agrees to Provide Additional Services to Promote Fractora Device for InMode in Exchange for New and Additional Stock Options**

37.     During the same October 13, 2011 meeting between Lodwig and Dr. Brightman, Lodwig said he knew Dr. Brightman had met with Mizrahy recently on September 21, 2011, in her office in New York to discuss her work. Lodwig informed Dr. Brightman that Mizrahy wanted for Dr. Brightman to also work with the Fractora device, which is for minimally invasive anti-aging skin and tissue resurfacing.

38.     He said, "We have spoken about this, this is coming from Moshe, he would like for you to do with Fractora what you did for RFAL, we know what you can do with this."

39.     Further, Lodwig told Dr. Brightman, "We, myself and Moshe (for the Company), are willing to do the same stock option deal we have done with RFAL with Fractora. So, 5,000 yearly for meetings (derm meetings, society meetings, aesthetic meetings), any publications you can get will also be 5,000 and of course international meetings are very important to us so we will also continue to do 5,000 per international meeting and 5,000 for taking potential prospect

calls/emails answering their questions."

40.     Dr. Brightman said she would be happy to do the new work for the same compensation arrangement as she had been doing with RFAL.

41.     Dr. Brightman also asked Lodwig if any necessary paperwork was needed for this new work, and again she was assured by Lodwig, "Lori, this is coming from Moshe (Mizrahy) directly (for InMode)." "We know the work you have done for us of course. This is all set."

42.     At that time, Dr. Brightman had worked with Lodwig for years prior when he was employed at Syneron. Lodwig, as well as other Syneron employees, had made promises for compensation for work to be done and had ALWAYS come forth with the promised financial compensation without issue. Based upon these past fulfilled promises, Dr. Brightman believed Lodwig was a person of his word and agreed to continue to do this extra work. She knew this is a very common practice in their industry.

43.     Both Chris Yackel and Brian Lodwig have independent recollection of the October 13, 2011 meeting and these discussions.

44.     Like the work she performed for RFAL, Dr. Brightman understood that she was being offered additional stock options to be provided when Defendant went public for promoting Fractora as follows: (1) 5,000 yearly for meetings (derm meetings, society meetings, aesthetic meetings); (2) 5,000 shares of stock annually for any publications obtained for Fractora; (3) 5,000 shares of stock annually per international meeting; and 5,000 yearly for taking potential prospect calls/emails answering their questions regarding Fractora, and she accepted the offer.

45.     Based on this compensation arrangement proposed by Lodwig, Dr. Brightman agreed to provide – and did in fact provide – numerous new services for InMode, including but not limited to:

> a.     Providing product feedback and working to produce photos and information from non-clinical trials of the Fractora device.

> b.     Handling and responding to phone calls from InMode and other physicians regarding her work with InMode's Fractora technologies.

9

46.     For the scope of additional works that Dr. Brightman provided to InMode to develop with a goal of promoting Fractora from 2011 through 2012, she was to receive 5,000 options per year for a total of 10,000.

47.     At all times herein, Mizrahy as CEO and Lodwig as President were duly authorized representative of InMode and / or had the actual and/or apparent authority to act and negotiate with Dr. Brightman on behalf of InMode. Dr. Brightman reasonably and justifiably relied on Lodwig's actual or apparent authority to transact business of InMode by providing services and devoting time for the benefit of InMode.

48.     Lodwig advised Dr. Brightman that the options were to be of the same kind that Lodwig himself would receive as an InMode executive, though the precise value of each share of stock would not be known until the company went public.

49.     Dr. Brightman reasonably relied on Lodwig's statements and his actual / apparent authority as President to transact business of InMode and, this reliance was manifested by Dr. Brightman devoting significant effort and time providing services of value to InMode.

50.     Dr. Brightman performed her part of the contract relating to Fractora, but received no additional monetary compensation for any of the foregoing services, in violation of the parties' industry-standard agreement, which Dr. Brightman understood to include compensation with stock options as promised on multiple occasions by Lodwig with Mizrahy's approval.

51.     In consideration for her consulting, marketing and sales assistance to InMode, Lodwig and Mizrahy had agreed to pay Dr. Brightman a total of additional 10,000 options in InMode stock, available when the Defendant went public. The terms of these options were identical to the terms of the options offered to Dr. Brightman in exchange for her marketing and sales-related services. At this time, Lodwig still had the actual and/or apparent authority to transact business on behalf of InMode.

52.     With this arrangement, and in reliance on Lodwig's apparent authority as president and his statements promising options, Dr. Brightman completed the work described above which was very valuable and benefitted InMode.

53.     Dr. Brightman did not receive compensation for, nor was she compensated with, the additional stock options promised to her for the separate work relating to Fractora.

54.     After completing the work for Fractora, Dr. Brightman would from time to time hear from Lodwig.  In approximately December 2017, Lodwig left InMode and Dr. Brightman did not hear from him for several years.

55.     It was not until April 2021 that Dr. Brightman heard from Ludwig for the first time in many years.During their call, Dr. Brightman was shocked to learn from Ludwig that InMode had gone public.

56.     In fact, on or around August 8, 2019, InMode made its initial public offering. InMode stock subsequently split in 2021 on a 2:1 basis. Dr. Brightman is owed 125,000 shares.[1]

57.     On or about April 12, 2021, having just learned for the first time of InMode having gone public, Dr. Brightman emailed Mizrahy about the original 7,500 options she had been promised.

58.     Despite the stock options not being due under Dr. Brightman's agreement until InMode went public, Mizrahy responded on or about April 14, 2021 advising that Dr. Brightman's options were expired based on the inconsistent Written Agreement.  Mizrahy falsely contends that he had tried to contact her before April 2021 about InMode having gone public.  This April 14, 2021 email from Mizarahy was the first time Dr. Brightman learned InMode would not honor the commitments to provide the stock promised to Dr. Brightman.

59.     As of the date of this Complaint, Dr. Brightman has not received any of the stock options she was promised under the Clinical Trial Agreement, or for the work performed for RFAL and Fractora. Further, Dr. Brightman was advised by Mizrahy or other InMode personnel that InMode will not fulfill its promises to provide the stock options which were first due to Dr. Brightman at the time InMode went public.

---

[1] This is based on the original clinical trial promise of 7,500 shares, the promise of 45,000 shares for RFAL work, and the promise of 10,000 for Fractora work.  Based on the stock split, this amounts to 125,000 options / shares.

## FIRST CAUSE OF ACTION

### (Negligent Misrepresentation)

60.     Dr. Brightman realleges and incorporates each and every one of the allegations contained in the preceding paragraphs as if set forth fully herein.

61.     Plaintiff and Defendant were in a privity or privity-like relationship, because Defendant hired Plaintiff to perform services for it.

62.     Defendant, in the course of action in which it had a pecuniary interest, failed to exercise reasonable care or competence in obtaining or communicating information to Dr. Brightman as set forth above.

63.     Such information included, without limitation, that Dr. Brightman needed to sign and return the Written Agreement as a place-holder despite UCC 8-113(a) excluding stock options from a writing requirement statute of frauds.

64.     Such information included, without limitation, that Dr. Brightman was to receive 45,000 stock options in InMode when the company went public in exchange for her additional work such as presentations, publications, speaking with other physicians etc. in order to promote RFAL, and that no documentation of this arrangement was needed.

65.     Such information likewise included, without limitation, that Dr. Brightman was to receive 10,000 stock options in InMode when the company went public in exchange for her additional work such as presentations, publications, speaking with other physicians etc. in order to promote Fractora, and that no documentation of this arrangement was needed.

66.     Dr. Brightman justifiably relied on this information in providing services for InMode.

67.     Attached as Exhibit A to this Complaint is a declaration of Brian Lodwig, who at all relevant times was the president of Defendant.  In it he testifies that either he or Mr. Misrahy did in fact make all of the above representations to Plaintiff on behalf of the Defendant.

68.     InMode stock went public in approximately August 2019 and appreciated significantly ever since and the stock was split 2:1. The high value of InMode following the 2:1

12

split was priced as high as $99.27/share.  Dr. Brightman is entitled to damages based on the 2:1 split and highest share value of $99.27 / share.

69.     As a direct and proximate result of Defendant's conduct, Dr. Brightman has suffered damages in an amount in excess of seventy-five thousand dollars ($75,000), plus interest.

**70.**     Dr. Brightman has been required to retain the services of Berlandi Nussbaum & Reitzas LLP and Lipson Neilson P.C. to prosecute this action, and is entitled to recover an award of reasonable attorneys' fees and costs incurred herein. **SECOND CAUSE OF ACTION**

**(Promissory Estoppel)**

71.     Dr. Brightman realleges and incorporates each and every one of the allegations contained in the preceding paragraphs as if set forth fully herein.

72.     Beginning in 2009, at other dates and times indicated herein, Defendant, through Lodwig and Mizrahy, requested that Dr. Brightman perform various services for InMode.

73.     Defendant, through Lodwig and Mizrahy, unequivocally represented to Dr. Brightman that it would compensate Dr. Brightman with stock options in InMode, whichwould be first available when the company went public,for her services to InMode for the Fractora product and for other work.

74.     Lodwig as CEO and Mizrahy President were at all times acting as Defendant's duly authorized agents and/or had actual and/or apparent authority to transact business on Defendant's behalf with Dr. Brightman.

75.     Defendant, through Lodwig and Mizrahy, intended that Dr. Brightman rely upon the express statements that Dr. Brightman would be compensated with stock options as set forth above in exchange for her time and effort on behalf of InMode.

76.     Dr. Brightman reasonably relied upon Defendant's representations and promises in belief that she would in fact receive such compensation for her services, and as such did not request or obtain monetary compensation for her time and valuable services, all to her detriment.

77.     In April, 2019, Dr. Brightman learned for the first time that Defendant would not honor its commitments to her.

78.     Defendant failed to compensate Dr. Brightman with the promised InMode stock options in consideration of her work for the Fractora product.

79.     Dr. Brightman is entitled under principles of promissory estoppel and/or quantum meruit to be compensated by Defendant with the entire amount of stock options promised and owed to her by Defendant.

80.     As a direct and proximate result of Defendant's conduct, Dr. Brightman has suffered damages in an amount in excess of seventy-five thousand dollars (75,000). Dr. Brightman has been required to retain the services of Berlandi Nussbaum & Reitzas LLP and Lipson Neilson P.C. to prosecute this action, and is entitled to recover an award of reasonable attorneys' fees and costs incurred herein. **THIRD CAUSE OF ACTION**

**(Unjust Enrichment)**

81.     Dr. Brightman realleges and incorporates each and every one of the allegations contained in the preceding paragraphs as if set forth fully herein.

82.     As set forth above, Dr. Brightman provided extensive services to Defendant, all of which she received no monetary compensation for despite assurances to the contrary.

83.     Dr. Brightman provided such services based on Defendant's assurances that she would be compensated with InMode stock options, which Defendant, for the first time in April 2019, repudiated after receiving the benefit of Dr. Brightman's services.

84.     In light of Defendant's conduct set forth herein, Dr. Brightman should be compensated with the stock options Defendant promised her in the interests of equity.

85.     It would be against equity and good conscience to permit the defendant to retain what is sought to be recovered.

86.     As a direct and proximate result of Defendant's conduct, Dr. Brightman has suffered damages in an amount in excess of seventy-five thousand dollars ($75,000). Dr. Brightman has been required to retain the services of Berlandi Nussbaum & Reitzas LLP and Lipson Neilson P.C. to prosecute this action, and is entitled to recover an award of reasonable attorneys' fees and costs incurred herein.

## FOURTH CAUSE OF ACTION

### (Fraud)

87.     Dr. Brightman realleges and incorporates each and every one of the allegations contained in the preceding paragraphs as if set forth fully herein.

88.     Defendant, through Mizrahy as CEO, represented to Dr. Brightman that she was required to sign and return the incorrect Written Agreement as a place-holder when, in fact, UCC 8-113(a) excludes a promise of stock options from a writing requirement statute of frauds.

89.     Defendant, through Lodwig, represented and confirmed to Dr. Brightman in October 2011 that, in exchange for her services to InMode for the Fractora product, she would be compensated with stock options in InMode. Defendant advised Dr. Brightman that no documentation as to this arrangement was necessary. Further, that Mizrahy and Lodwig on behalf of InMode would "be sure to take care of Dr. Brightman" and that this was "all set."

90.     At all times relevant herein, Mizrahy as CEO and Lodwig as President, were acting with actual and/or apparent authority of Defendant.

91.     Defendant knew or should have known that these representations were false.

92.     Defendant intended for Dr. Brightman to rely on these representations.

93.     Dr. Brightman reasonably relied on these representations, as she performed the valuable services for Plaintiff for which she was to receive stock options, first due when InMode went public, as compensation.

94.     Dr. Brightman's reliance was to her detriment, as she received no other compensation for the significant time, effort, and resources she spent performing services for Plaintiff.

95.     Dr. Brightman only first discovered those representations were false, and only could have discovered they were false, upon attempting to exercise her options in April of 2021.

96.     As a result of Plaintiff's fraud, Dr. Brightman has been damaged in an amount in excess of seventy-five thousand dollars ($75,000) plus punitive and/or exemplary damages as permitted by law.

97.     Dr. Brightman has been required to retain the services of Berlandi Nussbaum & Reitzas LLP and Lipson Neilson P.C. to prosecute this action, and is entitled to recover an award of reasonable attorneys' fees and costs incurred herein.

## FIFTH CAUSE OF ACTION

### (Declaratory Relief and Specific Performance)

98.     Dr. Brightman realleges and incorporates each and every one of the allegations contained in the preceding paragraphs as if set forth fully herein.

99.     Dr. Brightman entered into contracts with InMode as set forth more fully above.

100.    For the first agreement, Mizrahy directed that a Written Agreement be sent to Dr. Brightman. However, the Written Agreement provided for 7,000 stock options when in fact it was agreed she would receive 7,500 options and additional, new terms and conditions were included that were not discussed or agreed to by the parties.

101.    Dr. Brightman confronted Mr. Mizrahy about the discrepancy. Mizrahy assured her that he would send a corrected agreement but insisted that she sign it simply as a place-holder pending receipt of the corrected version.

102.    In reliance on his assurance, the written agreement was signed and returned.

103.    Dr. Brightman later provided new services at the requet of Brian Lodwig which were unrelated to the purported Written Agreement.

104.    Mizrahy failed to send a corrected version of the Written Agreement to conform the original agreement of the parties.

105.    As for the other agreements arranged by Brian Lodwig, related to new work Dr. Brightman was asked to perform on matters unrelated to the purported Written Agreement, Dr. Brightman at all times acted in good faith and substantially performed all of the contractual obligations requested of her by InMode.

106.    InMode accepted the benefit of Dr. Brightman's work and never expressed any dissatisfaction with her work.

107.    It is within InMode's power to perform its obligations to deliver stock owed to Dr. Brightman.

108.    InMode has failed and refused without justification to deliver stock options owed and first due to Dr. Brightman as of August 2019 when InMode went public and InMode is in breach of contract.

109.    Dr. Brightman is entitled damages for the highest value since InMode went public the 125,000 shares of InMode stock which she worked to obtain.

110.    Dr. Brightman is alternatively entitled to an order requiring InMode to perform its obligations and deliver the options it previously agreed to provide together with all other damages, attorney fees, costs and interest allowed by law.

111.    There is an actual and substantial controversy between the parties, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment that InMode breached its obligations to Dr. Brightman and, further, order and direct that InMode specifically perform it obligations to Dr. Brightman by delivering the stock she is entitled to recover.

Dr. Brightman has been required to retain the services of Berlandi Nussbaum & Reitzas LLP and Lipson Neilson P.C. to prosecute this action, and is entitled to recover an award of reasonable attorneys' fees and costs incurred herein. **SIXTH CAUSE OF ACTION**

**Breach of Implied Covenants of Good Faith and Fair Dealing**

112.    Dr. Brightman realleges and incorporates each and every one of the allegations contained in the preceding paragraphs as if set forth fully herein.

113.    Every contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement.

114.    New York law recognizes in every contract there an implied covenant that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract, which means that in every contract there exists an implied covenant of good faith and fair dealing.

115.    A party to a contract breaches these duties when their conduct frustrates the purpose

17

of the contract, is often described as bad faith, and for example is identified by, "evasion of the spirit of the bargain," "abuse of a power to specify terms," "interference with or failure to cooperate in the other party's performance," and willful rendering of imperfect performance.

116.    InMode breached the implied covenant of good faith and fair dealing by, among other things, refusing to cooperate with Dr. Brightman's efforts to obtain stock she was promised resulting in a significant diminution of value of the shares.

117.    Dr. Brightman is entitled to recover damages for the highest value since InMode went public the 125,000 shares of InMode stock which she worked to obtain, together with all other consequential damages such as attorney fees, costs and interest allowed by law.

118.    Dr. Brightman has been required to retain the services of Berlandi Nussbaum & Reitzas LLP and Lipson Neilson P.C. to prosecute this action, and is entitled to recover an award of reasonable attorneys' fees and costs incurred herein.

**[THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK]**

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs prays for relief in favor of Plaintiff and against Defendant as follows:

1.      For damages to which Plaintiffs are entitled in an amount in excess of seventy-five thousand dollars ($75,000);

2.      For Declaratory Judgment that InMode breached its obligations to Dr. Brightman;

3.      Specific performance of InMode's contractual obligations to Plaintiffs;

4.      For punitive damages and permitted as otherwise allowed by law;

5.      For pre-and post-judgment interest;

6.      For all attorneys' fees and costs of suit; and / or

7.      For such other and further relief as this Court may deem just and proper.

**JURY DEMAND**

Plaintiffs demand trial by jury of all issues so triable pursuant to Rule 38 of the Federal Rules of Civil Procedure.

Dated:      December 27, 2022
            New York, New York

                              **BERLANDI NUSSBAUM & REITZAS LLP**

                    By:       /s/ Joshua T. Reitzas
                              Joshua T. Reitzas (JR2149)
                              125 Park Avenue, 25th Floor
                              New York, New York 10017
                              (212) 804-6329 (Ph)
                              (646) 461-2312 (fax)
                              *Attorneys for Plaintiff*
                              *Dr. Lori A. Brightman*

## DECLARATION OF BRIAN LODWIG

I, Brian Lodwig, make this Declaration under 28 U.S.C. §1746 and hereby declare as follows:

1.      I am a resident of Sarasota, Florida and I am over eighteen years of age. I have personal knowledge of the facts stated in this Declaration, except as to those matters stated on information and belief, and as to those matters, I believe them to be true. If called upon to testify as to the contents of this Declaration, I could and would competently testify to my statements herein.

2.      Between approximately September 2008 and December 2017, I was employed by Invasix, Ltd. (now known as InMode, Ltd. and hereafter "InMode"). During this time, InMode was not a publicly traded company. I served as President of InMode and I was generally responsible for North America P&L, hiring of management positions, overseeing sales and marketing operations and major decisions for North American operations. I reported to the Board of Directors and in particular Moshe Mizrahy, CEO. I was authorized to negotiate agreements for InMode with input and approval from Mr. Mizrahy.

3.      I first met Lori Brightman, M.D. in approximately 2008 through her work with Syneron where Mr. Mizrahy and I worked before InMode. Lori was highly regarded for her experience helping to develop technology, running clinical trials, and publishing and presenting internationally.

4.      I was aware in approximately 2009, that Mr. Mizrahy had offered InMode stock options to Lori in exchange for her work to perform a clinical trial on 15 patients using InMode technology. She completed the trial and reported her findings. Upon information and belief, for this work, Lori was allocated 7,500 options for shares of stock in InMode to be available if and when InMode went public in the future.

Initials 

5.      I later contacted Lori and asked if she would be interested in providing new services to InMode at upcoming society meetings or by publications she might be able to author or participate in which discussed InMode's Radio Frequency-Assisted Liposuction ("RFAL") technology. With the permission of Mr. Mizrahy and on behalf of InMode, I offered to compensate Lori for this additional work with options for shares of InMode stock to be available if and when InMode went public.

6.      On behalf of InMode, and with the consent and authority of Mr. Mizrahy, Lori was offered options to be provided if and when InMode went public in exchange for her additional work related to RFAL as follows: options for 5,000 shares yearly for: i) attending (live,   virtual, or electronic) meetings (dermatological meetings, society meetings, aesthetic meetings); ii) any publications (print or electronic) she can get will also be options for 5,000 shares per publication; iii) international meetings will also be options for 5,000 shares per international meeting for attending (live, virtual or electronic) international meetings; and iv) options for 5,000 shares per year for taking potential prospect calls/emails answering InMode's questions. These services were vital to InMode's growth and success. Lori accepted this offer.

7.      Lori performed this additional RFAL work for InMode and the stock options authorized by Mr. Mizrahy were her sole compensation to be available if and when InMode went public. Lori's work was valuable to eventual success of InMode.

8.      In approximately October 2011, I met with Lori at her office in Manhattan, New York to discuss her RFAL related work. Chris Yackel, then a Senior Territory Manager at InMode, was also present. Lori and I reviewed the work she had done for InMode. Upon information and belief, for this additional work related to RFAL, Lori was then entitled to options for 45,000 shares of InMode to be available if / when InMode went public. I explained to Lori that Mr. Mizrahy and the Board of Directors had approved of this commitment. I also explained to Lori that Mr. Mizrahy had directly authorized the agreement for InMode and that her options for RFAL work were in place.

Initials 

9.      We next discussed the possibility of Lori providing new work to InMode supporting the Fractora device being developed by InMode. The device was revolutionary. It provided reliable, minimally invasive anti-aging skin and tissue resurfacing. With the consent of Mr. Mizrahy for InMode, for the Fractora work, I offered Lori a similar stock option deal comparable to the RFAL arrangement. Lori was offered additional options for 5,000 shares yearly for meetings (dermatological meetings, society meetings, and aesthetic meetings), options for 5,000 shares for any publications; options for 5,000 shares for international meeting; and options for 5,000 shares for taking potential prospect calls/emails answering their questions. Lori accepted the offer and began working to support the Fractora products.

10.     Lori provided services for InMode such as providing feedback, photographs and information from her non-clinical trials. She also spoke on the phone with others from InMode and other physicians regarding her work with InMode's Fractora technologies. Upon information and belief, Lori is entitled to options for 10,000 additional shares for her work on Fractora for InMode.

11.     I am aware that Dr. F. Victor Rueckl was previously involved in a lawsuit against InMode. Other than knowing that prior case ended, I do not know and have not been informed of the circumstances of how the case prior ended.

12.     I know that I am not obligated to sign this Declaration but I am doing so voluntarily. I understand I am entitled to an attorney but I am proceeding without one. Also, InMode and its attorneys do not represent me.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 3rd day of May, 2022.

BRIAN LODWIG

Date: May 3, 2022

Initials

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------------X
                                       :

DR. LORI A. BRIGHTMAN, an individual,   :

                                   :

               Plaintiff,      :   Case No.: 1:22-cv-05861 MKV

                                   :

                                   :   **NOTICE OF MOTION TO**

   -against-                    :   **DISMISS**

                                   :

                                   :

INMODE LTD., a foreign limited liability   :
corporation;                           :
DOES 1 – 10, INCLUSIVE; AND ROE     :
CORPORATIONS 11-20, INCLUSIVE,    :

                                   :

             Defendants.        :
------------------------------------------------------------------X

       **PLEASE TAKE NOTICE** that, upon the accompanying Memorandum of Law in

Support of Defendant's Motion to Dismiss the First Amended Complaint, the Declaration of Yair

Malca, dated January 9, 2023, and accompanying exhibits, and all other papers and proceedings

herein, Defendant InMode Ltd. ("InMode") will move this Court, before the Honorable Mary

Kay Vyskocil, United States District Court Judge for the Southern District of New York, located

at 500 Pearl Street, New York, New York 10007, on a date and time to be set by the Court, for

an Order dismissing the First Amended Complaint with prejudice pursuant to Rules 12(b)(3) and

12(b)(6) of the Federal Rules of Civil Procedure, and awarding such other and further relief the

Court deems proper.

       **PLEASE TAKE FURTHER NOTICE** that, pursuant to this Court's Order and Briefing

Schedule, dated December 12, 2022 (Dkt. No. 19), Plaintiff's response in opposition is due by

February 9, 2023 and InMode's reply brief is due by February 24, 2023.

K&L GATES LLP

Dated:  January 13, 2023          By:     _/s/ Brian D. Koosed_____

Brian D. Koosed
1601 K Street, NW
Washington, D.C.  20006
Tel  (202) 778-9204
Fax (202) 778-9100
Email: brian.koosed@klgates.com

Kodey D. Haddox
599 Lexington Avenue
New York, New York 10022
Tel.: (212) 536-3900
Fax: (212) 536-3901
Email: kodey.haddox@klgates.com

*Attorneys for Defendant InMode Ltd.*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------------X

DR. LORI A. BRIGHTMAN, an individual,

     Plaintiff,        Case No.: 1:22-cv-05861 MKV

  -against-

INMODE LTD., a foreign limited liability corporation;
DOES 1 – 10, INCLUSIVE; AND ROE
CORPORATIONS 11-20, INCLUSIVE,

     Defendants.
------------------------------------------------------------------X

**DEFENDANT INMODE LTD.'S MEMORANDUM OF LAW IN SUPPORT OF**
**ITS MOTION TO DISMISS THE FIRST AMENDED COMPLAINT**

## **TABLE OF CONTENTS**

Page

PRELIMINARY STATEMENT .................................................................... 1

THE FAC'S ALLEGATIONS........................................................................ 2

    A.    The 2010 Agreement.......................................................................... 2

            1.    The 2010 Notice.................................................................... 3

            2.    The 2010 Agreement............................................................. 4

            3.    The Option Plan .................................................................... 5

    B.    The Alleged 2009 Oral Agreement...................................................... 6

    C.    The Alleged 2011 Oral Agreement ...................................................... 7

    D.    InMode Goes Public in August 2019; Dr. Brightman First Inquires About
        the 2010 Agreement's Options in April 2021, Years After Any Options
        Expired................................................................................................ 7

ARGUMENT .................................................................................................. 8

    A.    The FAC Should Be Dismissed Pursuant To Fed. R. Civ. P. 12(b)(3) and
        The Doctrine of *Forum Non Conveniens* Because This Dispute Is Subject
        to a Valid and Binding  Forum Selection Clause Requiring the Claims to
        be Brought in Israel........................................................................... 8

            1.    The Forum Selection Clause Was Reasonably
                Communicated to Dr. Brightman................................... 9

            2.    The Forum Selection Clause Is Mandatory ................. 10

            3.    Dr. Brightman and Her Claims Are Subject to the Forum
                Selection Clause.............................................................. 11

            4.    Dr. Brightman Cannot Meet Her Burden to Overcome the
                Forum Selection Clause ................................................. 11

    B.    Dr. Brightman's Claims Should Be Dismissed As Time-Barred ....... 13

            1.    The Negligent Misrepresentation And Fraud Claims Are Time-
                Barred.............................................................................. 13

             2.    The Specific Performance and Quasi-Contract Claims Are Time-
                Barred.............................................................................. 16

    C.    The FAC Fails To State Any Plausible Claim For Relief and Should
        Therefore be Dismissed Under Fed. R. Civ. P. 12(b)(6) ..................... 17

            1.    The FAC Fails to State Any Claim Related to the 2010 Agreement....... 17

                a)    The FAC Fails to State a Claim for Specific Performance of
                      the 2010 Agreement ................................................ 18

i

**TABLE OF CONTENTS**
(continued)

**Page**

b)    Dr. Brightman's Quasi-Contract and Tort Claims Are Duplicative or Otherwise Barred by the 2010 Agreement........... 19

2.    The FAC Fails to State a Claim for Specific Performance Related to the Alleged 2009 and 2011 Oral Agreements...................................... 20

3.    The FAC Fails to State a Claim for Fraud ............................................... 23

4.    The FAC Fails to State a Claim for Negligent Misrepresentation........... 24

CONCLUSION........................................................................................................... 25

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*484 Assocs., L.P. v. Moy,*
   2007 WL 683999 (S.D.N.Y. Mar. 5, 2007) ....................................................................23

*Alpha Cap. Anstalt v. Shiftpixy, Inc.,*
   432 F. Supp. 3d 326 (S.D.N.Y. 2020) .........................................................................18

*Ashcroft v. Iqbal,*
   556 U.S. 662 (2009) ....................................................................................................17

*Atl. Marine Const. Co. v. U.S. Dist. Ct. for W. Dist. of Texas,*
   571 U.S. 49 (2013) ...................................................................................................9, 13

*Atlas Partners, LLC v. STMicroelectronics, Int'l N.V.,*
   2015 WL 4940126 (S.D.N.Y. Aug. 10, 2015) ........................................................3, 18, 19

*Auction House 43, Inc. v. Koblence,*
   126 N.Y.S.3d 849 (N.Y. Sup. Ct. 2020) .......................................................................16

*Bahl v. New York Coll. of Osteopathic Med.,*
   2017 WL 5479655 (E.D.N.Y. Mar. 31, 2017) ................................................................10

*Bense v. Interstate Battery Sys., Inc.,*
   683 F.2d 718 (2d Cir. 1982) .........................................................................................10

*Bracken v. MH Pillars Inc.,*
   290 F.Supp.3d 258 (S.D.N.Y. 2017) .............................................................................20

*Brainbuilders LLC v. EmblemHealth, Inc.,*
   2022 WL 3156179, (S.D.N.Y. Aug. 8, 2022), *reconsideration denied,* 2022
   WL 17156714 (S.D.N.Y. Nov. 22, 2022) ......................................................................17

*Clark-Fitzpatrick, Inc. v. Long Island R. Co.,*
   70 N.Y.2d 382 (1987) ..................................................................................................19

*In re Condado Plaza Acquisition LLC,*
   620 B.R. 820 (Bankr. S.D.N.Y. 2020) ..........................................................................19

*Cornhusker Farms, Inc. v. Hunts Point Co-op. Mkt., Inc.,*
   2 A.D.3d 201, 769 N.Y.S.2d 228 (2003) .......................................................................19

iii

*Diatronics, Inc. v. Elbit Computers, Ltd.*,
    649 F. Supp. 122 (S.D.N.Y. 1986), *aff'd sub nom. Diatronics v. Elbit Comp.*,
    812 F.2d 712 (2d Cir. 1987)................................................................................12

*DiPilato v. 7-Eleven, Inc.*,
    662 F. Supp. 2d 333 (S.D.N.Y. 2009)...............................................................22

*Doyle v. MasterCard Int'l Inc.*,
    2016 WL 9649874 (S.D.N.Y. Dec. 15, 2016) .........................................19

*Fandy Corp. v. Lung-Fong Chen*,
    262 A.D.2d 352(2d Dept 1999) .................................................................13

*Firefly Equities, LLC v. Ultimate Combustion Co.*,
    736 F. Supp. 2d 797 (S.D.N.Y. 2010)........................................................11

*Frey v. Rose*,
    51 A.D.3d 859 (2d Dep't 2008) ................................................................19

*Gander Mountain Co. v. Islip U-SlipLLC*,
    923 F. Supp. 2d 351 (N.D.N.Y. 2013), *aff'd*, 561 F. App'x 48 (2d Cir. 2014) ................15, 24

*Gen. Elec. Capital Corp. v. Mehta*,
    2002 WL 511553 (S.D.N.Y. Apr. 4, 2002)...............................................10

*Graham v. HSBC Mortg. Corp.*,
    2021 WL 4392522 (S.D.N.Y. Sept. 24, 2021)................................................13, 15

*Hongxia Wang v. Enlander*,
    2018 WL 1276854 (S.D.N.Y. Mar. 6, 2018) ...........................................16, 17

*HSM Holdings, LLC v. Mantu I.M. Mobile Ltd.*,
    2021 WL 918556 (S.D.N.Y. Mar. 10, 2021) ...................................................9, 10

*Ixe Banco, S.A. v. MBNA America Bank, N.A.*,
    2008 WL 650403 (S.D.N.Y. Mar. 7, 2008) ...............................................20

*J.B. Harris, Inc. v. Razei Bar Indus., Inc.*,
    37 F. Supp. 2d 186 (E.D.N.Y. 1998), *aff'd sub nom. J.B. Harris, Inc. v. Razei
    Bar Indus., Ltd.*, 181 F.3d 82 (2d Cir. 1999) .......................................12

*Kakarla v. Penakalapati*,
    551 F. Supp. 3d 70 (W.D.N.Y. 2021) .....................................................20

*Klotz v. Xerox Corp.*,
    519 F. Supp. 2d 430 (S.D.N.Y. 2007).....................................................10

iv

*Knowyourmeme.com Network v. Nizri*,
    2021 WL 4441523 (S.D.N.Y. Sept. 28, 2021)...............................................................11, 12

*Kotler v. Charming Shoppes Inc.*,
    2012 WL 291512 ...........................................................................................................15, 16

*Kunica v. St. Jean Fin., Inc.*,
    1998 WL 437153 (S.D.N.Y. Aug. 3, 1998)...........................................................................21

*In re Lehman Bros. Holdings, Inc.*,
    541 B.R. 551 (S.D.N.Y. 2015)..........................................................................................23, 24

*LiveIntent, Inc. v. Naples*,
    293 F. Supp. 3d 433 (S.D.N.Y. 2018)...................................................................................15

*Locus Techs. v. Honeywell Int'l Inc.*,
    2022 WL 4592891, at *6 (S.D.N.Y. Sept. 30, 2022) ...........................................................17

*MarketShare Corp. v. Transactis, Inc.*,
    No. 21-CV-750 (JSR), 2021 WL 1948283 (S.D.N.Y. May 12, 2021) ...................................16

*Martinez v. Bloomberg LP*,
    883 F. Supp. 2d 511 (S.D.N.Y. 2012), *aff'd,* 740 F.3d 211 (2d Cir. 2014) ....................3, 9, 12

*Montecosaro Soc. Cooperativa v. Small*,
    852 F. App'x 15 (2d Cir. 2021) .............................................................................................9

*Nahabedian v. Intercloud Sys., Inc.*,
    2016 WL 155084 (S.D.N.Y. Jan. 12, 2016) .........................................................................20

*New Moon Shipping Co. v. MAN B & W Diesel AG*,
    121 F.3d 24 (2d Cir. 1997)...................................................................................................11

*Oddo Asset Mgmt. v. Barclays Bank PLC*,
    973 N.E.2d 735 (2012)........................................................................................................24

*Optanix, Inc. v. Alorica Inc.*,
    2021 WL 2810060 (S.D.N.Y. July 6, 2021) .........................................................................22

*Paulsen v. Stifel, Nicolaus & Co.*,
    2019 WL 2415213 (S.D.N.Y. June 4, 2019) .........................................................................3

*Phillips v. Audio Active Ltd.*,
    494 F.3d 378 (2d Cir. 2007)........................................................................................8, 9, 10

*Pirri v. Cheek*,
    2019 WL 2472438 (S.D.N.Y. June 13, 2019) ......................................................................17

*Rennaker Co. Consulting, v. TLM Grp., LLC*,
   2017 WL 2240235 (S.D.N.Y. Mar. 29, 2017) ..................................................18

*S.K.I. Beer Corp. v. Baltika Brewery*,
   443 F. Supp. 2d 313 (E.D.N.Y. 2006) .........................................................13

*Sahebdin v. Khelawan*,
   2022 WL 4451005 (E.D.N.Y. Sept. 24, 2022) .................................................17

*Seward v. Devine*,
   888 F.2d 957 (2d Cir. 1989)....................................................................10

*Sugerman v. MCY Music World, Inc.*,
   158 F. Supp. 2d 316 (S.D.N.Y. 2001)..........................................................21

*Torchlight Loan Servs., LLC v. Column Fin., Inc.*,
   2012 WL 3065929 (S.D.N.Y. July 25, 2012) .................................................20

*US Express Leasing, Inc. v. Elite Tech. (NY), Inc.*,
   87 A.D.3d 494 (1st Dep't 2011) ...............................................................24

*Vosburgh v. Burnt Hills - Ballston Lake Cent. Sch. Dist.*,
   2019 WL 315054 (N.D.N.Y. Jan. 24, 2019), *aff'd sub nom. McHerron v.*
   *Burnt Hills - Ballston Lake Cent. Sch. Dist.*, 778 F. App'x 54 (2d Cir. 2019) .........................3

**Statutes**

UCC § 8-113(a)....................................................................................20, 22

**Other Authorities**

CPLR § 213(1)....................................................................................14, 16

CPLR § 213(2)........................................................................................16

CPLR § 213(8)................................................................................13, 14, 15

Fed. R. Civ. P. 12(b)(3)..................................................................... *passim*

Fed. R. Civ. P. 12(b)(6)..................................................................... *passim*

Defendant InMode Ltd. ("<u>InMode</u>") respectfully submits this memorandum of law in support of its motion to dismiss the first amended complaint ("<u>FAC</u>") filed by Plaintiff Dr. Lori Brightman ("<u>Dr. Brightman</u>"), pursuant to Fed. R. Civ. P. 12(b)(3) and 12(b)(6).

### PRELIMINARY STATEMENT

This is a dispute over whether Dr. Brightman is entitled to shares of InMode stock pursuant to a written agreement, and two alleged oral agreements, that she allegedly entered into with InMode over a decade ago.  Specifically, in her FAC, Dr. Brightman claims she is entitled to:

- 7,500 shares of InMode stock pursuant to a written Notice of Stock Option Award, dated April 12, 2010 (the "<u>2010 Notice</u>"), and corresponding Stock Option Award Agreement (the "<u>2010 Agreement</u>").

- 45,000 shares of InMode stock allegedly offered to her orally during a 2009 phone call and allegedly earned for work Dr. Brightman performed from 2009-2011 (the "<u>Alleged 2009 Oral Agreement</u>").

- 10,000 shares of InMode stock allegedly offered to her orally during an October 2011 meeting for work in connection with InMode's Fractora product, and that Dr. Brightman allegedly earned from 2011-2012 (the "<u>Alleged 2011 Oral Agreement</u>").

Dr. Brightman nowhere alleges that she tried to exercise any of the options under the Alleged 2009 or 2011 Oral Agreements.  Instead, the FAC admits she only tried to exercise options pursuant to the 2010 Agreement.  That attempt was rejected because Dr. Brightman's options under the 2010 Notice and 2010 Agreement expired by their terms in April 2017.

On these facts—which have not materially changed from her original complaint filed in July 2022—Dr. Brightman's FAC asserts various claims against InMode.  As set forth below, the FAC should be dismissed in its entirety, with prejudice, for three main reasons.

1

*First*, the parties agreed, in their 2010 Option Agreement, that the Israeli courts are the exclusive forum for any claims relating to Dr. Brightman's stock options.  This mandatory forum selection clause is valid and binding under controlling precedent, and alone justifies dismissal of the FAC here pursuant to Fed. R. Civ. P. 12(b)(3) and the doctrine of *forum non conveniens*.

*Second*, Dr. Brightman's claims are subject to, at best, a six-year statute of limitations, but they are based on alleged misconduct by InMode, and work performed by Dr. Brightman, that ended in 2012, more than a decade ago.  These claims are therefore time-barred.

*Third*, all of Dr. Brightman's claims are legally deficient because the FAC fails to state a claim for them under Fed. R. Civ. P. 12(b)(6).

<u>**THE FAC'S ALLEGATIONS**</u>

The FAC is not a model of clarity, so InMode at times is forced to estimate, for example, exactly what Dr. Brightman claims, or when she alleges her claims accrued.  Nevertheless, InMode endeavors to summarize the FAC's allegations as concisely as possible, as follows:

**A.**      **The 2010 Agreement**

Dr. Brightman is a board-certified dermatologist and dermatologic surgeon.  FAC, ¶ 7.  In early 2009, InMode offered Dr. Brightman 7,500 InMode stock options in exchange for conducting a clinical trial for surgical procedures of Radiofrequency-Assisted Liposuction ("RFAL").  FAC, ¶¶ 15-18.  The clinical trial began in June 2009 and concluded by April 2010.  FAC, ¶ 19.

Although Dr. Brightman vaguely suggests she did not want to do so, she admits in her FAC that Dr. Brightman and InMode (by its predecessor, Invasix, Ltd.) both executed the 2010 Notice and 2010 Agreement on or about April 12, 2010 to reflect the grant of these RFAL stock options to Dr. Brightman.  In addition, both documents also incorporated Invasix Ltd.'s 2008 Option Plan ("<u>Option Plan</u>"), which governed any stock option awards made by InMode generally.  Taken

2

together, these three documents are dispositive of Dr. Brightman's suit.[1]

   1. The 2010 Notice

  As noted, Dr. Brightman and InMode executed the 2010 Notice in April 2010.  Pursuant to that 2010 Notice, Dr. Brightman was awarded options for 7,000 "Ordinary Shares" of InMode stock at a purchase price of $1.00 per share.  Malca Dec., Ex. A, p. 1.

  The 2010 Notice further specified that the options had an "Expiration Date," which was defined as "the 7th anniversary following the Date of Award subject always to earlier termination." Malca Dec., Ex. A, p. 1.  The 2010 Notice defined "Date of Award," in turn, as the date the 2010 Notice was signed—April 12, 2010.  *Id.*

  Accordingly, by its terms, Dr. Brightman's options under the 2010 Notice expired on April 12, 2017.

---

[1] Dr. Brightman did not attach the 2010 Notice or the 2010 Agreement to her FAC; accordingly, these documents are attached to the Declaration of Yair Malca, dated January 9, 2023 ("Malca Dec."), as Exhibits A and B, respectively.  The Court may consider these documents because they are integral to the FAC, and Dr. Brightman clearly has actual notice of the information in them.  *See* FAC, ¶¶ 18-21; *see also Atlas Partners, LLC v. STMicroelectronics, Int'l N.V.*, 2015 WL 4940126, at *7 (S.D.N.Y. Aug. 10, 2015); *Vosburgh v. Burnt Hills - Ballston Lake Cent. Sch. Dist.*, 2019 WL 315054, at *4 (N.D.N.Y. Jan. 24, 2019), *aff'd sub nom. McHerron v. Burnt Hills - Ballston Lake Cent. Sch. Dist.*, 778 F. App'x 54 (2d Cir. 2019) (noting a plaintiff cannot prevent a court from considering key documents by failing to attach them to the complaint).

  The Court may similarly take judicial notice of the Option Plan that was part of InMode's SEC filings and referenced throughout the parties' 2010 Notice and 2010 Option Agreement.  *See Paulsen v. Stifel, Nicolaus & Co.*, 2019 WL 2415213, at *6 (S.D.N.Y. June 4, 2019).

  Finally, when "a defendant moves to dismiss for improper venue pursuant to Rule 12(b)(3), a court may consider evidence outside the four corners of the complaint, including affidavits and other documentary evidence."  *Martinez v. Bloomberg LP*, 883 F. Supp. 2d 511, 513 (S.D.N.Y. 2012), *aff'd,* 740 F.3d 211 (2d Cir. 2014).  Accordingly, the Court may properly consider the Malca Declaration and its exhibits on InMode's motion.

The 2010 Notice also expressly stated throughout that Dr. Brightman's options were "subject to the terms and conditions of this Notice . . . the  . . . Option Plan . . . and the [2010 Agreement]."  *See* Malca Dec., Ex. A, p. 1.  Indeed, in executing the 2010 Notice, Dr. Brightman expressly represented to InMode that:  (i) she had received "a copy of the [Option] Plan and the [2010] Agreement"; (ii) she was "familiar with the terms and provisions thereof"; and (iii) she "**accepts the Option subject to all of the terms and provisions hereof and thereof**."  *Id.* at p. 2 (emphasis added).  Dr. Brightman further expressly represented to InMode that she "reviewed this Notice, the [Option] Plan and the [2010] Agreement in their entirety, has had an opportunity to obtain the advice of counsel prior to executing this [2010] Notice and fully understands all provisions of this Notice, the [Option] Plan and the [2010] Agreement."  *Id.*

Finally, Dr. Brightman expressly agreed in the 2010 Notice that any disputes between the parties would be subject to the forum selection clause set forth in the 2010 Agreement:

> The Grantee [Dr. Brightman] **hereby agrees** to the jurisdiction and venue selection and **that all disputes arising out of or relating to this Notice, the [Option] Plan and the [2010] Agreement shall be resolved in accordance with Section 12 of the [2010] Agreement**.

Malca Dec., Ex. A, p. 2 (emphasis added).

2.   The 2010 Agreement

Dr. Brightman and InMode executed the 2010 Agreement simultaneously with the 2010 Notice on April 12, 2010.  *See* Malca Dec., Ex. B.  As with the 2010 Notice, the 2010 Agreement specified that the award of options was "subject to the terms and provisions of the Notice, this Stock Option Award Agreement . . . and the [Option Plan]."  *Id.* at § 1.

The 2010 Agreement also made clear that Dr. Brightman's option award would expire if the options were not exercised by the April 12, 2017 Expiration Date:

4

> The Option may be exercised **no later than the Expiration Date set forth in the Notice** or such earlier date as otherwise provided herein. **After the Expiration Date** or such earlier date, **the Option shall be of no further force or effect and may not be exercised**.

Malca Dec., Ex. B, § 7 (emphasis added).

Finally, the 2010 Agreement contained, as Section 12, the forum-selection clause referenced in the 2010 Notice above. That Section, titled "Governing Law and Jurisdiction," clearly and unambiguously designated the Israeli courts as the exclusive forum for any disputes relating to Dr. Brightman's stock options, stating:

> [T]he [parties] agree that . . . (ii) in such a case of **any suit, action, or proceeding arising out of or relating to the Notice, the [Option] Plan, or this [2010] Agreement, it shall be brought before the competent court in the City of Haifa, Israel**, and that the parties shall submit to **the exclusive jurisdiction** of such court; (iii) **to irrevocably waive, to the fullest extent permitted by law, any objection a party may have to the laying of venue for any such suit, action or proceeding brought in such court**.

Malca Dec., Ex. B, § 12 (emphasis added).

### 3.   The Option Plan

As noted, both the 2010 Notice and 2010 Agreement referred to, and specifically incorporated, the Option Plan, which governed all awards of InMode stock options until 2018, and the terms of which Dr. Brightman expressly represented to InMode that she had reviewed, understood, and accepted. *See* Malca Dec., Ex. A, pp. 1-2; *id.* at Ex. B, p. 1; *id.* at Ex. C, § 1.

Among other things, the Option Plan required that any award of InMode stock options be in a signed writing. Malca Dec., Ex. C, § 2(e) (noting every award "shall be designated in the **Award Agreement**") & *id.* at § 6(b) (defining "Award Agreement" as "**the written agreement** evidencing the grant of an Award **executed by the Company and the Grantee** . . . .") (all emphasis added). Under the Option Plan, the written Award Agreement would set forth the material terms

5

of any option award, including, for example, (a) the type of stock subject to the award, (b) the vesting schedule, (c) the criteria for achieving the options, (d) the procedure for exercising them, and (e) the term of the award.  *See* Malca Dec., Ex. C, §§ 6(a)-(c), 8(a), and 6(g), respectively. The Option Plan also set an outer limit of seven years for exercising any options.  *See id.* at § 6(g) ("The term of each award Shall be the term stated in the Award Agreement, provided, however, that the term of an Award shall be no more than seven (7) years from the date of grant thereof.").

## B.    The Alleged 2009 Oral Agreement

In addition to the 2010 Agreement, Dr. Brightman alleges in her FAC that Brian Lodwig— InMode's former President for its North America Division (FAC, ¶11)—orally "conveyed" to Dr. Brightman, at some unspecified time "[l]ater in 2009," that InMode would "compensate her with additional stock options" if Dr. Brightman provided "new services to InMode at upcoming society meetings or by publications."  FAC, ¶¶ 22-23.

This is the pleaded factual basis for the 2009 Alleged Oral Agreement, pursuant to which Dr. Brightman claims she earned options for 45,000 additional shares of InMode stock—5,000 options each for "[a]ttending and presenting at" five different events, and for "[t]hree (3) publications," all during the period 2009 through 2011.  FAC, ¶¶ 24-27.

Notwithstanding the Option Plan's requirement of a written Award Agreement, the FAC alleges that Mr. Lodwig told Dr. Brightman in an October 13, 2011 meeting that "no further documentation was required."  FAC, ¶¶ 31-32.[2]

---

[2]    InMode disputes that Mr. Lodwig had any authority to grant stock options to Dr. Brightman (or anyone else) without complying with the Option Plan's requirements.  This factual issue is nevertheless rendered moot here because the FAC should be dismissed, in any event.  *See generally infra*, pp. 8 - 25.

**C.     The Alleged 2011 Oral Agreement**

Finally, Dr. Brightman alleges that during the same October 13, 2011 meeting, Mr. Lodwig

again orally offered Dr. Brightman 5,000 stock options annually for performing each of several

categories of work related to InMode's Fractora device including, among other things, "taking

potential calls/emails answering their questions regarding Factora."  FAC, ¶¶ 37-39, 44.  For this

Alleged 2011 Oral Agreement, Dr. Brightman claims she earned options for an additional 10,000

shares of InMode stock for work performed in 2011 and 2012.  FAC, ¶ 46.

**D.     InMode Goes Public in August 2019; Dr. Brightman First Inquires About the 2010
        Agreement's Options in April 2021, Years After Any Options Expired**

InMode made its initial public offering on August 8, 2019.  FAC, ¶ 56.  Even though this

event was, by definition, public knowledge—because anyone could now purchase InMode's

stock—Dr. Brightman claims she did not learn that InMode went public until April 2021.  FAC,

¶ 55.  Thus, the FAC claims, on April 12, 2021, that Dr. Brightman emailed InMode for the first

time **solely** about the options set forth in the 2010 Agreement.  *See* FAC, ¶ 57.

InMode promptly replied two days later, on April 14, 2021, informing Dr. Brightman that,

under the terms of the 2010 Notice and the 2010 Agreement, her options expired in April 2017.

*See* FAC, ¶ 58; *see also* Malca Dec., Ex. A, p. 1; Malca Dec., Ex. B, § 8.

The FAC nowhere alleges that Dr. Brightman ever tried to exercise any of the options

allegedly offered to her pursuant to the Alleged 2009 Oral Agreement or the Alleged 2011 Oral

Agreement.  Nevertheless, Dr. Brightman by this suit seeks 125,000 shares of InMode stock,

representing the 62,500 options she claims she was entitled to under the three alleged written and

oral agreements, which have since split at a 2:1 stock split.  *See* FAC, ¶ 56.

7

## ARGUMENT

The FAC should be dismissed:  (i) under Fed. R. Civ. P. 12(b)(3) and the doctrine of *forum*

*non conveniens*, because it was filed in an improper venue, in contravention of the parties' express

forum selection clause requiring any disputes be resolved in Israel; (ii) under Fed. R. Civ. P.

12(b)(6), because it asserts claims that are time-barred; and (iii) also under Fed. R. Civ. P. 12(b)(6),

because it fails to state any plausible claims for relief.

**A.** **The FAC Should Be Dismissed Pursuant To Fed. R. Civ. P. 12(b)(3) and The Doctrine of *Forum Non Conveniens* Because This Dispute Is Subject to a Valid and Binding Forum Selection Clause Requiring the Claims to be Brought in Israel**

The FAC should be dismissed pursuant to Fed. R. Civ. P. 12(b)(3) and the doctrine of

*forum non conveniens* because all of Dr. Brightman's claims are subject to a valid and binding

forum selection clause designating Israel as the exclusive jurisdiction for any disputes arising out

of or relating to the 2010 Notice, the 2010 Agreement, or the Option Plan generally.

Specifically, Section 12 of the parties' 2010 Agreement provides:

> [T]he [parties] agree that … (ii) in such a case of **any suit, action, or proceeding arising out of or relating to the Notice, the Plan, or this Option Agreement, it shall be brought before the competent court in the City of Haifa, Israel**, and that **the parties shall submit to the exclusive jurisdiction of such court**; (iii) **to irrevocably waive, to the fullest extent permitted by law, any objection a party may have to the laying of venue for any such suit, action or proceeding brought in such court**.

Malca Dec., Ex. B, § 12 (emphasis added).

Courts in this Circuit employ a four-factor, burden-shifting test to determine whether a

claim should be dismissed pursuant to a forum selection clause.  *Phillips v. Audio Active Ltd.*, 494

F.3d 378, 383 (2d Cir. 2007).  Initially, courts examine whether (1) "the clause was reasonably

communicated to the party resisting enforcement"; (2) the clause is "mandatory or permissive, i.e.,

. . . whether the parties are *required* to bring any dispute to the designated forum or simply

*permitted* to do so"; and (3) " the claims and parties involved in the suit are subject to the forum selection clause." *Id.* (emphasis in original); *see also Banca Di Credito Cooperativo di Civitanova Marche e Montecosaro Soc. Cooperativa v. Small*, 852 F. App'x 15, 19 (2d Cir. 2021).

If these factors are met, the forum selection clause is "presumptively enforceable." *Martinez v. Bloomberg LP*, 883 F. Supp. 2d 511, 520 (S.D.N.Y. 2012), *aff'd,* 740 F.3d 211 (2d Cir. 2014).[3]  The burden then shifts to the resisting party to make "a sufficiently strong showing that enforcement would be unreasonable or unjust, or that the clause was invalid for such reasons as fraud or overreaching." *Phillips*, 494 F.3d at 383–84.  As the Supreme Court has noted, "a valid forum-selection clause [should be] given controlling weight in all but the most exceptional cases," and the party resisting enforcement bears the burden to "overwhelmingly" show otherwise.  *Atl. Marine Const. Co. v. U.S. Dist. Ct. for W. Dist. of Texas*, 571 U.S. 49, 63, 67 (2013).

As set forth below, the parties' Israeli forum selection clause meets the first three factors.  Dr. Brightman cannot meet her burden on the fourth one.  The FAC should therefore be dismissed.

1.    <u>The Forum Selection Clause Was Reasonably Communicated to Dr. Brightman</u>

"A forum selection clause may be deemed reasonably communicated where the clause at issue appears as a standard section in the main body of an agreement signed by [the parties] and is phrased in both clear and unambiguous language." *HSM Holdings, LLC v. Mantu I.M. Mobile Ltd.*, 2021 WL 918556, at *6–7 (S.D.N.Y. Mar. 10, 2021) (citation omitted).

The 2010 Agreement's Israeli forum selection clause meets this test.  It was set off in its own Section of the four-page 2010 Agreement, titled "Governing Law and Jurisdiction."  Malca

---

[3]    The parties' 2010 Agreement expressly calls for the application of Israeli law here.  InMode nevertheless briefs these issues under New York law, solely for purposes of this motion to dismiss, because InMode has no reason to believe that New York or Israeli law materially differ.

Dec., Ex. B, § 12.  It was printed in text the same size as every other provision.  And the two-page 2010 Notice—which Dr. Brightman also signed—also made clear she was "agree[ing] . . . that all disputes shall be resolved in accordance with" the Israeli forum selection clause.  *Id.*, Ex. A, p. 2.

Taken together, this meets the requirements for the Israeli forum selection clause to have been "reasonably communicated" to Dr. Brightman.  *See, e.g.*, *HSM Holdings*, 2021 WL 918556, at *6–7 ("The clause was not buried in a lengthy contract; rather, it was set off in its own paragraph . . . and was printed in text at least as large as the rest of the document."); *Bense v. Interstate Battery Sys., Inc.*, 683 F.2d 718, 722 (2d Cir. 1982) (forum selection clause reasonably communicated where it was not "in fine print or hidden in a mass of unrelated verbiage"); *Gen. Elec. Capital Corp. v. Mehta*, 2002 WL 511553, at *2–*3 (S.D.N.Y. Apr. 4, 2002) (same).

    2.    <u>The Forum Selection Clause Is Mandatory</u>

"A forum selection clause is viewed as mandatory when it confers exclusive jurisdiction on the designated forum or incorporates obligatory venue language."  *Phillips,* 494 F.3d at 386.

Here, the parties' forum selection clause explicitly states "any suit . . . **shall be brought** . . . in the City of Haifa, Israel, and that the parties **shall submit** to the **exclusive jurisdiction** of such court . . . ."  Malca Dec., Ex. B, § 12 (emphasis added).  The parties' use of "shall"—twice— makes clear this is a mandatory clause.  *HSM Holdings*, 2021 WL 918556, at *7; *see also Bahl v. New York Coll. of Osteopathic Med.*, 2017 WL 5479655, at *5 (E.D.N.Y. Mar. 31, 2017).  And the use of "exclusive" means what it says:  that any disputes must be resolved in Israel, nowhere else.  *Klotz v. Xerox Corp.*, 519 F. Supp. 2d 430, 434 (S.D.N.Y. 2007) (clause stating suits "may only" be brought in a specific place was mandatory and exclusive); *Phillips*, 494 F.3d at 386 (same, where clause required "any legal proceedings […] be brought in England"); *Seward v. Devine*, 888 F.2d 957, 962 (2d Cir. 1989) (same, where agreements limited "venue . . . solely to" specific court).

3.      Dr. Brightman and Her Claims Are Subject to the Forum Selection Clause

The forum selection clause set forth in the 2010 Agreement applies to "any suit . . . arising out of or relating to the [2010] Notice, the Plan, or this [2010] Option Agreement . . . ."  Malca Dec., Ex. B, § 12.  This covers the parties and all claims pleaded in the FAC.

Specifically, Dr. Brightman alleges she "entered into contracts with InMode" for 62,500 stock options.  FAC, ¶ 99.  But all of those options were allegedly issued either pursuant to the 2010 Agreement (which Dr. Brightman signed) or the Option Plan (which Dr. Brightman agreed to in signing the 2010 Agreement, and which covered all InMode stock options generally).  All of Dr. Brightman's claims thus "aris[e] out of or relat[e] to" the 2010 Notice, the Option Plan, or the 2010 Agreement.  They therefore fall within the parties' forum-selection clause.[4]

4.      Dr. Brightman Cannot Meet Her Burden to Overcome the Forum Selection Clause

Because the Israeli forum selection clause was reasonably communicated to Dr. Brightman, is mandatory, and is applicable to the FAC, Dr. Brightman bears the "heavy burden" of showing that the clause is unreasonable.  *New Moon Shipping Co. v. MAN B & W Diesel AG*, 121 F.3d 24, 32 (2d Cir. 1997).  She can only do so by showing that:  "(1) the forum selection clause is the result of fraud or overreaching; (2) the law to be applied in the selected forum is fundamentally

---

[4]      That Dr. Brightman asserts quasi-contract and tort claims does not change this analysis because those claims, too, "aris[e] out of or relat[e] to" the 2010 Agreement and the Option Plan. *See, e.g., Firefly Equities, LLC v. Ultimate Combustion Co.*, 736 F. Supp. 2d 797, 800 (S.D.N.Y. 2010) ("A forum selection clause cannot be defeated by artful pleading of claims not based on the contract containing the clause if those claims grow out of the contractual relationship, or if the gist of those claims is a breach of that relationship."); *Knowyourmeme.com Network v. Nizri*, 2021 WL 4441523, at *4 (S.D.N.Y. Sept. 28, 2021) (holding that claims for fraudulent misrepresentation, negligent misrepresentation, and unjust enrichment "arise out of," and were covered by, an Israeli forum selection clause).

11

unfair; (3) enforcement would contravene a strong public policy of the forum state; or (4) trial in the selected forum would be so difficult and inconvenient that plaintiffs will effectively be deprived of their day in court." *Martinez*, 883 F. Supp. 2d at 521 (citing *Phillips,* 494 F.3d at 392). Dr. Brightman cannot show any of these exceptions apply here.

*First*, while Dr. Brightman makes general allegations of fraud, the FAC nowhere alleges that the *forum selection clause itself* was the product of fraud, which is what Dr. Brightman would have to allege to meet her burden. *See, e.g.*, *Diatronics, Inc. v. Elbit Computers, Ltd.*, 649 F. Supp. 122, 127 (S.D.N.Y. 1986), *aff'd sub nom. Diatronics v. Elbit Comp.*, 812 F.2d 712 (2d Cir. 1987) ("The allegation that the Purchase Agreement was the product of fraud does not provide grounds for disregarding the [Israeli] forum-selection clause.").

*Second*, Dr. Brightman cannot reasonably argue the law to be applied in Israel is unfair; she expressly agreed, in the 2010 Agreement, that Israeli law would apply here. Further, and not surprisingly, courts in the Second Circuit have consistently enforced forum selection clauses requiring disputes to be heard in Israel. *See, e.g.*, *Diatronics,* 649 F. Supp. at 130; *Knowyourmeme.com Network*, 2021 WL 4441523, at *1; *J.B. Harris, Inc. v. Razei Bar Indus., Inc.*, 37 F. Supp. 2d 186, 190 (E.D.N.Y. 1998), *aff'd sub nom. J.B. Harris, Inc. v. Razei Bar Indus., Ltd.*, 181 F.3d 82 (2d Cir. 1999).

*Third*, and similarly, enforcing the parties' forum selection clause would not deprive Dr. Brightman of her day in court; she would simply have that day in court in Israel, where the parties agreed to resolve their disputes. *See, e.g.*, *Diatronics*, 649 F. Supp. 122 at 126 ("Regardless of whether the case is tried in Israel or New York, one party will be inconvenienced . . . By agreeing to the forum-selection clause, the plaintiff agreed to accept the burden of litigating in Israel."); *J.B. Harris*, 37 F. Supp. 2d at 190 (similar).

*Fourth*, Dr. Brightman cannot show the forum selection clause contravenes any public policy of New York.  In fact, "there is a 'strong public policy in favor of forum selection and arbitration clauses.'"  *S.K.I. Beer Corp. v. Baltika Brewery*, 443 F. Supp. 2d 313, 324 (E.D.N.Y. 2006); *see also Atl. Marine Const. Co.*, 571 U.S. at 66 (noting "'the interest of justice' is served by holding parties to their bargain" and enforcing their forum selection clauses).

For all these reasons, Dr. Brightman cannot meet her burden of showing the parties' forum selection clause is unreasonable.  That clause should be enforced as written, and the FAC should be dismissed, so the parties can resolve their dispute in Israel, as they expressly agreed to do.

**B.      Dr. Brightman's Claims Should Be Dismissed As Time-Barred**

As noted, it is often unclear exactly what the FAC alleges as to each particular claim.  For example, as best as InMode can tell, the FAC alleges InMode made three separate misrepresentations (outlined below), but only alleges two of these were fraudulent.  FAC, ¶¶ 19-21, 31-32, 37-47, 63-65.  Accordingly, it is not always clear what the precise basis for each of Dr. Brightman's claims is.  Nevertheless, based on InMode's best reading of the FAC, all of Dr. Brightman's should be dismissed because they are time-barred.

1.      The Negligent Misrepresentation And Fraud Claims Are Time-Barred

Dr. Brightman's negligent misrepresentation and fraud claims are subject to a six-year statute of limitations.  *See Fandy Corp. v. Lung-Fong Chen*, 262 A.D.2d 352, 352–53(2d Dept 1999) (citing CPLR § 213(1)) (negligent misrepresentation); CPLR § 213(8) (fraud).  Under New York law, both claims accrue—and the statute of limitations begins to run—on the date of the alleged misrepresentation relied upon by the plaintiff.  *Fandy Corp.*, 262 A.D.2d at 352–53; *Graham v. HSBC Mortg. Corp.*, 2021 WL 4392522, at *4 (S.D.N.Y. Sept. 24, 2021).

Here, the FAC alleges InMode made three separate misrepresentations,[5] each of which occurred **more than a decade** before Dr. Brightman filed her original complaint on July 8, 2022:

1.  InMode allegedly misrepresented in April 2010 "that Dr. Brightman needed to sign and return the [2010] Agreement," even though the UCC allegedly "exclud[es] stock options from a writing requirement." *See* FAC, ¶¶ 19-21, 63.

2.  InMode allegedly misrepresented in October 2011 that "Dr. Brightman was to receive 45,000 stock options . . . to promote RFAL, and that no documentation of this arrangement was needed." *See* FAC, ¶¶ 31-32, 64.

3.  InMode allegedly misrepresented at the same October 2011 meeting that "Dr. Brightman was to receive 10,000 stock options . . . to promote Fractora, and that no documentation of this arrangement was needed." *See* FAC, ¶¶ 37-47, 65.

In short, Dr. Brightman's negligent misrepresentation and fraud claims turn on misrepresentations InMode allegedly made to her from April 2010-October 2011.  But, under black-letter New York law, those claims therefore expired, at latest, in October 2017—nearly four years before she filed her complaint.  *See* CPLR §§ 213(1) & 213(8).

To the extent Dr. Brightman intends to rely on CPLR § 213(8)'s two-year discovery rule, her reliance is misplaced.  At bottom, Dr. Brightman apparently alleges that:  (1) she learned for the first time in April 2021 that InMode had gone public in August 2019 (FAC, ¶ 55); (2) she immediately attempted to exercise her options under the 2010 Agreement; and (3) she only discovered InMode's "fraud" when InMode told her, in April 2021, that her options had expired (FAC, ¶ 95).  But these "[g]eneral assertions of ignorance and due diligence without more specific

---

[5]   Dr. Brightman does not appear to allege any fraudulent representation related to the 45,000 shares allegedly owed to her under the Alleged 2009 Oral Agreement.  *See* FAC, ¶¶ 87-97.

14

explanation … will not satisfy the [ ] pleading requirements." *Gander Mountain Co. v. Islip U-SlipLLC*, 923 F. Supp. 2d 351, 364–65 (N.D.N.Y. 2013), *aff'd*, 561 F. App'x 48 (2d Cir. 2014) (dismissing fraud claim as barred by the statute of limitations).

Indeed, the FAC effectively admits the impetus for Dr. Brightman's "discovery" of InMode's purported "fraud" was InMode going public, which the FAC concedes occurred in August 2019, nearly two years before Dr. Brightman contacted InMode.  FAC, ¶ 56.  But Dr. Brightman does not—and cannot—allege that she could not have learned, from August 2019-April 2021, that InMode had gone **public**; a simple Google search would have sufficed.

Accordingly, even giving Dr. Brightman every benefit of the doubt, her fraud claim would have accrued, at the latest, in August 2019, which was when she "could with reasonable diligence have discovered" the purported fraud.  CPLR § 213(8).  Even under the two-year discovery rule, then, her fraud claim expired in August 2021, nearly a year before she filed her complaint.  *See, e.g.*, *Kotler v. Charming Shoppes Inc.*, 2012 WL 291512, at *3 (dismissing fraud claim where plaintiff "would have been able" to discover the purported fraud immediately after the company's acquisition); *LiveIntent, Inc. v. Naples*, 293 F. Supp. 3d 433, 443-44 (S.D.N.Y. 2018) (dismissing fraud claims as time-barred, where plaintiff had inquiry notice of alleged fraud by corporation that promised to pay for plaintiff's services with stock).

For all these reasons, Dr. Brightman cannot rely on CPLR § 213(8)'s two-year discovery rule, and her fraud and negligent misrepresentation claims should be dismissed.  *Graham v. HSBC Mortg. Corp.*, 2021 WL 4392522, at *4 (S.D.N.Y. Sept. 24, 2021) ("[W]here the facts needed for determination of when a reasonable investor of ordinary intelligence would have been aware of the existence of fraud can be gleaned from the complaint and papers integral to the complaint, resolution of the issue on a motion to dismiss is appropriate.").

2. <u>The Specific Performance and Quasi-Contract Claims Are Time-Barred</u>

Dr. Brightman's contract and quasi-contract claims—specifically, those for specific performance, breach of the implied covenant of good faith and fair dealing, declaratory judgment, unjust enrichment, and promissory estoppel—are also governed by, at best, a six-year statute of limitations and similarly time-barred. *See* CPLR § 213(2) (breach of contract); *Auction House 43, Inc. v. Koblence*, 126 N.Y.S.3d 849 (N.Y. Sup. Ct. 2020) (declaratory relief); *MarketShare Corp. v. Transactis, Inc.*, No. 21-CV-750 (JSR), 2021 WL 1948283, at *5 (S.D.N.Y. May 12, 2021) (implied covenant of good faith and fair dealing); *Hongxia Wang v. Enlander*, 2018 WL 1276854, at *8 (S.D.N.Y. Mar. 6, 2018) (unjust enrichment); *Kotler*, 2012 WL 291512, at *2 (S.D.N.Y. Jan. 31, 2012) (promissory estoppel); *see also* CPLR § 213(1).

As noted above, the FAC is not a model of clarity.  As best InMode can tell, Dr. Brightman appears to claim that she was promised stock options in exchange for the work she performed from 2009-2012, which she would then be able to exercise if and when InMode went public, but she never received those promised options or other compensation after completing the alleged work for InMode.  *See* FAC, ¶ 53 ("Dr. Brightman did not receive compensation for, nor was she compensated with, the additional stock options . . . ."); *id.* at ¶ 53 (noting the "value of each share of stock would not be known until the company went public . . . ."); *id.* at ¶¶ 75-76, 79 (promissory estoppel), and *id.* at ¶ 82 (unjust enrichment) (claiming Dr. Brightman performed "valuable services" to promote InMode products, but received no compensation).

But all of the work for which Dr. Brightman allegedly received no compensation was completed by 2012.  *See id.* at ¶¶ 24-27 (RFAL promotion from 2009-2011); *id.* at ¶ 46 (Fractora promotion from 2011-2012).  As such, her contract and quasi-contract claims accrued at the latest in 2012, when InMode allegedly failed to compensate Dr. Brightman with stock options.  These

16

claims therefore expired at the latest in 2018, more than three years before Dr. Brightman filed this action. *See, e.g.*, *Hongxia*, 2018 WL 1276854, at *8 (dismissing unjust enrichment claims for uncompensated work completed more than six years before filing of the action); *Sahebdin v. Khelawan*, 2022 WL 4451005, at *9 (E.D.N.Y. Sept. 24, 2022) (same).[6]

    For these reasons, all of Dr. Brightman's claims should be dismissed as time-barred.

**C.**    **The FAC Fails To State Any Plausible Claim For Relief and Should Therefore be Dismissed Under Fed. R. Civ. P. 12(b)(6)**

    "[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). "[A] plaintiff must provide more than 'an unadorned, the-defendant-unlawfully-harmed-me accusation.'" *Brainbuilders LLC v. EmblemHealth, Inc.*, 2022 WL 3156179, at *4 (S.D.N.Y. Aug. 8, 2022), *reconsideration denied*, 2022 WL 17156714 (S.D.N.Y. Nov. 22, 2022) (internal quotation marks omitted). The factual allegations must be "sufficient to give the defendant fair notice of what the claim is and the grounds upon which it rests." *Locus Techs. v. Honeywell Int'l Inc.*, 2022 WL 4592891, at *6 (S.D.N.Y. Sept. 30, 2022) (internal quotation marks omitted). Even after amending, the FAC fails this test. It should therefore be dismissed, with prejudice, under Fed. R. Civ. P. 12(b)(6).

        1.    <u>The FAC Fails to State Any Claim Related to the 2010 Agreement</u>

    In the first instance, the FAC fails to state any claim—whether tort, contract, or otherwise—relating to the 2010 Agreement.

---

[6]    To the extent Dr. Brightman seeks monetary relief for her unjust enrichment claim, it is subject to an even more stringent three-year limitations period. *See, e.g., Pirri v. Cheek*, 2019 WL 2472438, at *5 (S.D.N.Y. June 13, 2019) ("The limitations period is six years where a plaintiff seeks an equitable remedy, but three years where a plaintiff seeks monetary damages.").

a)     *The FAC Fails to State a Claim for Specific Performance of the 2010 Agreement*

In her FAC, Dr. Brightman asserts a "claim" for specific performance for "damages for the highest value since InMode went public" or "alternatively . . . requiring InMode to . . . deliver the options it previously agreed to provide."  FAC, ¶¶ 109-110.

Initially, this claim should be dismissed because:  (i) specific performance is a remedy for breach of contract, not its own claim, *see Rennaker Co. Consulting, v. TLM Grp., LLC*, 2017 WL 2240235, at *5 (S.D.N.Y. Mar. 29, 2017); and (ii) Dr. Brightman has an adequate remedy at law, as her FAC admits by seeking money damages from InMode.  *See Alpha Cap. Anstalt v. Shiftpixy, Inc.*, 432 F. Supp. 3d 326, 338 n. 12 (S.D.N.Y. 2020); FAC, ¶¶ 109-110.

In any event, to the extent Dr. Brightman intends this claim to be one for breach of the 2010 Agreement, it similarly fails because the FAC cannot plead any such breach.  By the express terms of the 2010 Notice and 2010 Agreement, Dr. Brightman's 7,000 stock options expired on April 12, 2017.  Malca Dec., Ex. A, p. 1 (defining "Expiration Date" as "the 7th anniversary following the Date of Award" of April 12, 2010); *see also id.* at Ex. B, § 7 (stating that, "[a]fter the Expiration Date . . . the Option shall be of no further force or effect and may not be exercised").

The FAC nowhere alleges that Dr. Brightman attempted to exercise these 7,000 options before April 12, 2017; to the contrary, it admits she first tried to do so four years later, in April 2021.  *See* FAC, ¶¶ 57-58.  Because her options expired by that time, InMode had no obligation to allow Dr. Brightman to exercise them in April 2021, and thus did not breach the 2010 Agreement.

In short, Dr. Brightman "is seeking to enforce a purported right that plainly does not exist under the [2010] Agreement[]."  *Atlas Partners, LLC v. STMicroelectronics, Int'l N.V.*, No. 14-CV-7134 VM, 2015 WL 4940126, at *12 (S.D.N.Y. Aug. 10, 2015).  Accordingly, her claim—

18

whether for "specific performance" of the 2010 Agreement, or its breach—fails. *See, e.g.*, *Frey v. Rose*, 51 A.D.3d 859, 860-61 (2d Dep't 2008) (affirming dismissal of specific performance claim seeking to exercise renewal option, where plaintiff failed to timely renew); *In re Condado Plaza Acquisition LLC*, 620 B.R. 820, 838-39 (Bankr. S.D.N.Y. 2020) (effective termination of contract rendered specific performance unavailable); *Doyle v. MasterCard Int'l Inc.*, 2016 WL 9649874, at \*2 (S.D.N.Y. Dec. 15, 2016) (contract claim must actually allege a breach).[7]

> *b)  Dr. Brightman's Quasi-Contract and Tort Claims Are Duplicative or Otherwise Barred by the 2010 Agreement*

Under New York law, "[t]he existence of a valid and enforceable written contract governing a particular subject matter ordinarily precludes recovery in quasi contract for events arising out of the same subject matter." *Clark-Fitzpatrick, Inc. v. Long Island R. Co.*, 70 N.Y.2d 382, 389 (1987). Dr. Brightman's quasi-contractual claims for unjust enrichment, promissory estoppel, and breach of the implied covenant and fair dealing are thus barred by the 2010 Agreement, which governs this dispute as to the 7,000 stock options set forth in the 2010 Agreement. *See id.* at 389 (affirming dismissal of quasi-contract claim); *see also Atlas Partners*,

---

[7]   To the extent Dr. Brightman seeks an additional 500 stock options—7,500 options instead of the 7,000 set forth in the 2010 Agreement—based on a purported oral agreement prior to executing the 2010 Agreement, this fails for two reasons.

*First*, any such claim is precluded by the 2010 Agreement's integration and merger clause, which bars Dr. Brightman's claim for an additional 500 options as a matter of law. *See* Malca Dec., Ex. B, § 11; *see also Cornhusker Farms, Inc. v. Hunts Point Co-op. Mkt., Inc.*, 2 A.D.3d 201, 203–04, 769 N.Y.S.2d 228, 230 (2003).

*Second*, even if Dr. Brightman could demonstrate that the 2010 Agreement was supposed to include these 500 additional shares, the claim would still fail because, again, these options would have expired in April 2017, four years before Dr. Brightman tried to exercise them and five years before she filed this action. *Supra*, pp. 13- 17.

2015 WL 4940126, at *12 (dismissing duplicative unjust enrichment claim); *Bracken v. MH Pillars Inc.*, 290 F.Supp.3d 258, 266 (S.D.N.Y. 2017) (dismissing promissory estoppel and unjust enrichment claims); *Nahabedian v. Intercloud Sys., Inc.*, 2016 WL 155084, at *3 (S.D.N.Y. Jan. 12, 2016) (dismissing duplicative claims for breach of implied covenant and fair dealing).

Dr. Brightman's negligent misrepresentation and fraud claims are also duplicative of her breach of contract claim and should similarly be dismissed to the extent they seek the 7,000 options at issue in the 2010 Agreement. *See, e.g., Torchlight Loan Servs., LLC v. Column Fin., Inc.*, 2012 WL 3065929, at *9 (S.D.N.Y. July 25, 2012) ("Under New York law, a re-styling of contract claims does not create an independent claim for fraud and New York courts have dismissed such claims as duplicative.") (collecting cases); *Ixe Banco, S.A. v. MBNA America Bank, N.A.*, 2008 WL 650403 at *12 (S.D.N.Y. Mar. 7, 2008) (dismissing claim for negligent misrepresentation).

2.   The FAC Fails to State a Claim for Specific Performance Related to the Alleged 2009 and 2011 Oral Agreements

The FAC also appears to assert claims for specific performance of the Alleged 2009 and 2011 Oral Agreements. *See* FAC, ¶¶ 98-111. But specific performance is a remedy, not a claim. *Supra*, p. 18. In any event, any claim as to these Alleged Oral Agreements fails for three reasons.

*First*, as set forth above, the Option Plan—which Dr. Brightman expressly represented she reviewed, understood, and agreed to when she signed the 2010 Notice and the 2010 Agreement— required any options for InMode stock be in a written agreement executed by InMode. *See supra* pp. 3-6; Malca Dec., Ex. C, §§ 2(e). This bars any claim alleging the existence of an oral agreement for InMode stock here. *See, e.g.*, *Kakarla v. Penakalapati*, 551 F. Supp. 3d 70, 82 (W.D.N.Y. 2021) (parties' signed agreement requiring modifications to be in writing trumped UCC § 8-113(a)'s exception from the Statute of Frauds for securities contracts).

20

*Second*, even if an oral agreement was not precluded by the Option Plan (and it is), the FAC nowhere pleads the definite, material terms that are required to allege the existence of an oral contract like these Alleged 2009 and 2011 Oral Agreements.  "Few principles are better settled in the law of contracts than the requirement for definiteness.  If an agreement is not reasonably certain in its material terms, there can be no legally enforceable contract."  *Sugerman v. MCY Music World, Inc.*, 158 F. Supp. 2d 316, 324 (S.D.N.Y. 2001) (citation omitted).

The FAC is completely silent as to essentially all of the key, material terms of the Alleged 2009 and 2011 Oral Agreements.  For example, the FAC *nowhere* alleges (a) the type of stock subject to the award under these Alleged Oral Agreements, (b) the exercise price that Dr. Brightman would pay to acquire each share of InMode stock, (c) the vesting schedule, (d) the performance criteria for achieving the options, (e) the procedure for exercising the options, (f) the term of the award, or (g) the expiration date of these Alleged Oral Agreements.[8]

Each of these terms is laid out expressly in the 2010 Agreement; none is pled as to the Alleged 2009 and 2011 Oral Agreements.  "These omissions, which go to the entire essence of the contemplated transaction, are fatal to the existence of a valid and enforceable oral agreement."  *Kunica v. St. Jean Fin., Inc.*, 1998 WL 437153, at *6 (S.D.N.Y. Aug. 3, 1998) (dismissing claims where alleged oral agreement was silent as to the exercise price of the stock options at issue); *Sugerman*, 158 F. Supp. 2d at 325 (dismissing claim where there was no agreement as to the class of stock, option term, exercise price, or expiration date).

---

[8]     Because the FAC entirely fails to allege any of these material terms, it similarly fails to plead the "clear and unambiguous promise" element of a promissory estoppel claim as to the Alleged 2009 and 2011 Oral Agreements. *Trez Cap. (Fla.) Corp. v. Noroton Heights & Co., LLC*, 2022 WL 16833701, at *17 (S.D.N.Y. Nov. 8, 2022) (citation omitted).

*Third*, even if the FAC had adequately pled these material terms (and it pled none of them), any claims based on the Alleged 2009 and 2011 Oral Agreements would still fail because any options purportedly granted to Dr. Brightman orally in 2009 or 2011 would still be subject to the Option Plan's prohibition on exercising stock options more than seven years after the options were granted. *See* Malca Dec., Ex. C, § 6(g). Indeed, the FAC nowhere explains how the Alleged 2009 or 2011 Oral Agreements could somehow contravene that express prohibition. Nor could the FAC. As such, even setting aside all the FAC's other flaws in pleading the Alleged 2009 and 2011 Oral Agreements, any claims arising out of those Agreements would also have expired in October 2018 (seven years after they were allegedly granted in the October 2011 meeting), or, at the latest, in 2019 (seven years after Dr. Brightman completed all work for InMode).

Because the FAC fails to adequately plead either the existence of a contract, or a breach by InMode, Dr. Brightman's claims arising out of the Alleged 2009 and 2011 Oral Agreements— whether for specific performance, or breach—must be dismissed. *DiPilato v. 7-Eleven, Inc.*, 662 F. Supp. 2d 333, 345 (S.D.N.Y. 2009) (recommending dismissal of request for specific performance where plaintiff had not entered into contract with defendant).[9]

---

[9]     Similarly, because no contract is pled as to the Alleged 2009 and 2011 Oral Agreements, no quasi-contract claims lie as to them. *See* FAC, ¶¶ 71-86, 112-118. Further, to the extent Dr. Brightman seeks a declaratory judgment "that InMode breached its obligations to" her (FAC, p. 19), such a claim merely replicates the issues the Court will resolve on her breach of contract claims. It should thus also be dismissed. *Optanix, Inc. v. Alorica Inc.*, 2021 WL 2810060, at *4 (S.D.N.Y. July 6, 2021) ("The claim for declaratory judgment would not clarify any uncertainty in the parties' legal relations that would otherwise remain unresolved as part of the breach of contract claim. Thus, a declaratory judgment would serve no purpose.").

3.   The FAC Fails to State a Claim for Fraud

Dr. Brightman's fraud claims are a mountain of contradictions.  In an apparent "heads I win, tails you lose" attempt at pleading, Dr. Brightman simultaneously claims that InMode committed fraud by telling her that:  (i) she was required to execute the 2010 Agreement "when, in fact," she did not have to do so; and (ii) she needed "no documentation" of the Alleged 2009 and 2011 Oral Agreements.  *Compare* FAC, ¶ 88, *with* FAC, ¶ 89.  Aside from completely contradicting each other, and in addition to the flaws already outlined above (*supra*, pp. 8-22), Dr. Brightman's fraud allegations fail for three main reasons.

*First*, as to the alleged fraud in entering into the 2010 Agreement, the FAC nowhere explains how InMode's request—that Dr. Brightman sign a written options contract documenting her 7,000 options in InMode—was somehow a knowingly false representation.  *See In re Lehman Bros. Holdings, Inc.*, 541 B.R. 551, 572 (S.D.N.Y. 2015).  To the contrary, the Option Plan did, in fact, **require** a written agreement for any options award.  *See supra* pp. 5-6.  Simply put, this is, at best, a request that a grantee of a stock option comply with the company's then-governing Option Plan, not a plausible allegation of a fraudulent misrepresentation.

*Second*, as to the alleged fraud relating to the Alleged Oral Agreements, even assuming the statement that "no documentation . . . was necessary" is actionable—which is belied by the FAC's own allegations, as noted—the FAC fails to plead that Dr. Brightman reasonably relied on this statement or was "ignoran[t] of its falsity." *In re Lehman Bros.*, 541 B.R. at 574.  To the contrary, as Dr. Brightman also alleges, she was already informed by InMode that a writing was required for the 2010 Agreement.  Moreover, she expressly represented she reviewed, understood, and agreed to the Option Plan, which also required the agreement to be in writing.  *See 484 Assocs., L.P. v. Moy*, 2007 WL 683999, at *3 (S.D.N.Y. Mar. 5, 2007) ("When a party is aware of

circumstances that indicate certain representations may be false, that party cannot reasonably rely on those representations . . . .") (collecting cases dismissing fraud claims).

*Third*, and finally, the FAC fails to adequately allege that either of these alleged misrepresentations related to the form of the alleged agreements were material and induced her into agreeing to perform work for InMode. *In re Lehman Bros.*, 541 B.R. at 574.  As the allegations in the FAC make clear, it was the promise of stock options that did so, not anything to do with the form an alleged agreement may take.  Because the FAC already alleges breach of contract for failure to deliver those options, Dr. Brightman's fraud claim is, again, duplicative and cannot survive.

### 4.   The FAC Fails to State a Claim for Negligent Misrepresentation

A claim for negligent misrepresentation lies "only where there is a special relationship of trust or confidence, which creates a duty for one party to impart correct information to another ... [t]he special relationship requires a closer degree of trust than that in an ordinary business relationship." *Gander Mountain Co.*, 923 F. Supp. 2d at 369 (citation omitted).

Here, the FAC nowhere alleges anything other than an ordinary business relationship between InMode and Dr. Brightman.  Both parties were sophisticated and engaged in arms'-length transactions.  Thus, even assuming the negligent misrepresentation claim was timely (which it is not), Dr. Brightman's negligent misrepresentation claim still fails as a matter of law.  *See, e.g.*, *Oddo Asset Mgmt. v. Barclays Bank PLC*, 973 N.E.2d 735, 741 (2012) ("[T]here is generally 'no fiduciary obligation in a contractual arm's length relationship . . . .'"); *US Express Leasing, Inc. v. Elite Tech. (NY), Inc.*, 87 A.D.3d 494, 497 (1st Dep't 2011) (same); *Gander Mountain Co.*, 923 F. Supp. 2d at 369 (dismissing negligent misrepresentation claim).

<u>**CONCLUSION**</u>

For the foregoing reasons, InMode respectfully requests that the Court:  (i) dismiss Dr. Brightman's First Amended Complaint, with prejudice, pursuant to Fed. R. Civ. P. 12(b)(3) and the doctrine of *forum non conveniens*; or (ii) alternatively, dismiss Dr. Brightman's First Amended Complaint, with prejudice, pursuant to Fed. R. Civ. P. 12(b)(6); and (iii) award InMode such other and further relief as the Court deems just and proper.

K&L GATES LLP

Dated:  January 13, 2023                        By:    */s/ Brian D. Koosed*
                                                              _____

Brian D. Koosed
1601 K Street, NW
Washington, D.C.  20006
Tel  (202) 778-9204
Fax (202) 778-9100
Email: brian.koosed@klgates.com

Kodey D. Haddox
599 Lexington Avenue
New York, New York 10022
Tel.: (212) 536-3900
Fax: (212) 536-3901
Email: kodey.haddox@klgates.com

*Attorneys for Defendant InMode Ltd.*

25

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
----------------------------------------------------------------X
                                                    :

DR. LORI A. BRIGHTMAN, an individual,       :
                                                   :

                     Plaintiff,         :  Case No.: 1:22-cv-05861 MKV
                                                   :

  -against-                             :

                                                   :

INMODE LTD., a foreign limited liability corporation; :
DOES 1 – 10, INCLUSIVE; AND ROE            :
CORPORATIONS 11-20, INCLUSIVE,         :

                        Defendants.      :
----------------------------------------------------------------X

**DECLARATION OF YAIR MALCA IN SUPPORT OF**
**DEFENDANT INMODE LTD.'S MOTION TO DISMISS**

I, Yair Malca, pursuant to 28 U.S.C. § 1746, hereby declare as follows:

      1.     I am the Chief Financial Officer ("CFO") of Defendant InMode Ltd. ("InMode").

      2.     I submit this Declaration in support of InMode's motion to dismiss the first amended complaint filed by Plaintiff Dr. Lori Brightman ("Dr. Brightman").  (Capitalized terms not defined herein have the meaning ascribed to them in InMode's motion to dismiss.)

      3.     I submit this Declaration based upon my personal knowledge and on documents and records that I have reviewed in connection with my responsibilities as CFO of InMode. The information contained herein is true and accurate to the best of my knowledge and belief.

      4.     Attached hereto as **Exhibit A** is a true and correct copy of the Notice of Stock Option Award executed by Dr. Brightman and Invasix Ltd. ("Invasix"), dated April 12, 2010.[1]

---

[1]     Invasix was InMode's predecessor company.

1

5.      Attached hereto as **Exhibit B** is a true and correct copy of the corresponding Stock Option Award Agreement entered into by Dr. Brightman and Invasix on or about April 12, 2010.

6.      Attached hereto as **Exhibit C** is a true and correct copy of Invasix's 2008 Option Plan, which was required to be, and was, filed with the SEC.  The 2008 Option Plan governed all stock options issued by InMode from 2008 until InMode adopted a new option plan in 2018.


I declare under penalty of perjury under the laws of the United States of America (28 U.S.C. § 1746) that the foregoing is true and correct.


Executed:      Irvine, California

                January 9, 2023


                                                        _____
                                                        Yair Malca

# EXHIBIT A

INVASIX LTD. 2008 ROW OPTION PLAN

NOTICE OF STOCK OPTION AWARD

Grantee's Name and Address:     **Dr. Lori Brightman, M.D.**
                                317 East 34 Street
                                New York, NY 10016
                                U.S.A.

Grantee's Social Security Number:   ████████████

You (the "**Grantee**") have been granted an option to purchase Ordinary Shares par value NIS 0.01 each of **Invasix Ltd**. (the "**Company**"), subject to the terms and conditions of this Notice of Stock Option Award (the "**Notice**"), the **Invasix Ltd. 2008 ROW Option Plan**, as amended from time to time (the "**Plan**") and the Stock Option Award Agreement (the "**Option Agreement**") attached hereto. Unless otherwise defined herein, the terms defined in the Plan shall have the same defined meanings in this Notice.

| | |
|---|---|
| Award Number | **20100412** _ _ _ _ *[4 last digits of SS/ID number]* |
| Date of Award | **April 12, 2010** |
| Purchase Price per Share | **US $ 1.00** |
| Total Number of Ordinary Shares Subject to the Option (the "**Shares**") | **7,000** |
| Total Exercise Price | **US $7,000** |
| Type of Option: | **Non-Qualified Stock Option** |
| Expiration Date: | On the 7th anniversary following the Date of Award subject always to earlier termination |

Vesting Schedule:

Subject to the limitations set forth in this Notice, the Plan and the Option Agreement, the Option may be exercised, in whole or in part, in accordance with the following schedule:

**7,000** options fully vested;

U:\Yeshap\I\Invasix\Options\Option Agreement_USA_Lori Brightman_April 12 2010.doc

2

**IN WITNESS WHEREOF**, the Company and the Grantee have executed this Notice and agree that the Option is to be governed by the terms and conditions of this Notice, the Plan and the Option Agreement.

INVASIX LTD
514073618 .פ.ח

Invasix Ltd.
a corporation organized under
the laws of the State of Israel
By:   Moshe Mizrahy
Title: Director & CEO

THE GRANTEE ACKNOWLEDGES AND AGREES THAT NOTHING IN THIS NOTICE, THE OPTION AGREEMENT OR THE PLAN SHALL CONFER UPON THE GRANTEE ANY RIGHT WITH RESPECT TO FUTURE AWARDS OR CONTINUATION OF THE GRANTEE'S CONTINUOUS SERVICE, NOR SHALL IT INTERFERE IN ANY WAY WITH THE GRANTEE'S RIGHT OR THE RIGHT OF THE COMPANY OR RELATED ENTITY TO WHICH THE GRANTEE PROVIDES SERVICES TO TERMINATE THE GRANTEE'S CONTINUOUS SERVICE AT ANY TIME, WITH OR WITHOUT CAUSE, AND WITH OR WITHOUT NOTICE.

The Grantee acknowledges receipt of a copy of the Plan and the Option Agreement, and represents that he or she is familiar with the terms and provisions thereof, and hereby accepts the Option subject to all of the terms and provisions hereof and thereof. The Grantee has reviewed this Notice, the Plan and the Option Agreement in their entirety, has had an opportunity to obtain the advice of counsel prior to executing this Notice and fully understands all provisions of this Notice, the Plan and the Option Agreement. The Grantee hereby agrees that all questions of interpretation and administration relating to this Notice, the Plan and the Option Agreement shall be resolved by the Administrator in accordance with Section 10 of the Option Agreement. The Grantee hereby agrees to the jurisdiction and venue selection and that all disputes arising out of or relating to this Notice, the Plan and the Option Agreement shall be resolved in accordance with Section 12 of the Option Agreement. The Grantee further agrees to notify the Company upon any change in the residence address indicated in this Notice.

Dated: _____        Signed: _____
                                        Dr. Lori Brightman, M.D.

U:\Yeshap\I\Invasix\Options\Option Agreement_USA_Lori Brightman_April 12 2010.doc

# EXHIBIT B

**Award Number: <u>20100412</u> _ _ _**

### INVASIX LTD. 2008 ROW OPTION PLAN

### <u>STOCK OPTION AWARD AGREEMENT</u>

1. <u>Grant of Option</u>. **Invasix Ltd.**, a corporation organized under the laws of the State of Israel (the "**Company**"), hereby grants to the Grantee (the "**Grantee**") named in the Notice of Stock Option Award (the "**Notice**"), an option (the "**Option**") to purchase the Total Number of Ordinary Shares of the Company subject to the Option par value NIS 0.01 each (the "**Shares**") set forth in the Notice, at the Purchase Price per Share set forth in the Notice (the "**Purchase Price**") subject to the terms and provisions of the Notice, this Stock Option Award Agreement (the "**Option Agreement**") and the **Invasix Ltd. 2008 ROW Option Plan**, as amended from time to time (the "**Plan**"), which are incorporated herein by reference. Unless otherwise defined herein, defined terms used in this Option Agreement shall have the same defined meanings setout in the Plan.

2. <u>Exercise of Option</u>.

    (a)    <u>Right to Exercise</u>. The Option shall be exercisable during its term in accordance with the Vesting Schedule set out in the Notice and with the applicable provisions of the Plan and this Option Agreement. The Option shall be subject to the provisions of Section 11 of the Plan, relating to the exercisability or termination of the Option in the event of a Corporate Transaction. The Grantee shall be subject to reasonable limitations on the number of requested exercises during any monthly or weekly period as determined by the Administrator. In no event shall the Company issue fractional Shares.

    (b)    <u>Method of Exercise</u>. The Option shall be exercisable by delivery of an exercise notice or by such other procedure as specified from time to time by the Administrator which shall state the election to exercise the Option, the whole number of Shares in respect of which the Option is being exercised, and such other provisions as may be required by the Administrator. The Exercise Notice shall be signed by the Grantee and shall be delivered in person, by certified mail, or by such other method (including electronic transmission) as determined from time to time by the Administrator, to the Company accompanied by payment of the Purchase Price. The Option shall be deemed to be exercised upon receipt by the Company of such written notice accompanied by the Purchase Price.

    (c)    <u>Taxes</u>. No Shares will be delivered to the Grantee or other person pursuant to the exercise of the Option until the Grantee or other person has made arrangements acceptable to the Administrator for the satisfaction of applicable income tax and capital gains tax withholding obligations, including, without limitation, such other tax or benefit obligations incident to the receipt of Shares (whether such tax or benefit is the obligation of the Grantee or the Company). Upon exercise of the Option, the Company may offset or withhold (from any amount owed by the Company to the Grantee) or collect from the Grantee or other person an amount sufficient to satisfy such tax obligations.

3. <u>Method of Payment</u>. Payment of the Purchase Price shall be made by any of the following, or a combination thereof, at the election of the Grantee; provided, however, that such

2

exercise method does not then violate any applicable law:

      (a)     cash;

      (b)     check; or

      (c)     wire transfer.

4. <u>Restrictions on Exercise</u>. The Option may not be exercised if the issuance of the Shares subject to the Option upon such exercise would constitute a violation of any applicable laws.

5. <u>Termination</u>. The Grantee represents that the Grantee has read and agrees with the terms of Section 8 to the Plan including all sub-sections concerning the effect of Termination or Change of Continuous Service, Disability of Grantee and Death of Grantee.

6. <u>Non-Transferability of Option and Shares</u>. The Option may not be transferred in any manner other than by will or by the laws of descent and may be exercised during the lifetime of the Grantee only by the Grantee.

7. <u>Term of Option</u>. The Option may be exercised no later than the Expiration Date set forth in the Notice or such earlier date as otherwise provided herein. After the Expiration Date or such earlier date, the Option shall be of no further force or effect and may not be exercised.

8. <u>Grantee's Declarations</u>.

      (a)     The Options issued have been neither offered nor sold by any means of general solicitation or general advertising; The Grantee has received no representations or warranties (written or oral) with respect to the Options or the underlying Shares to be issued upon exercise or any other written matter in connection therewith other than set forth in such engagement agreement executed between the Grantee and the Company (if any); and in entering into this Option Agreement, the Grantee is not relying upon any representation or warranty by the Company or any other person or entity or any other information other than set forth herein and as a result of Grantee's own independent investigation.

      (b)     The Grantee has had an opportunity to ask questions of and receive answers from the representatives of the Company concerning the terms and conditions of the Options, and all such questions have been answered to the Grantee's full satisfaction.

      (c)     The Grantee has such knowledge and experience in financial and business matters and that Grantee is capable of evaluating the merits and risks of an exercising the Option and investing in the Shares of the Company.

      (d)     The Grantee recognizes that an investment in the Shares involves a high degree of risk, and the Grantee is able to bear the economic risks of such an investment and does not have an immediate need (and does not contemplate a need) to liquidate the investment in the Shares, and at the present time can afford a complete loss of an investment in the Shares.

      (e)     The Grantee shall exercise the Option and acquire the Shares for the Grantee's own account, for investment purposes only, and not with a view to, or for, resale or other distribution, in whole or in part.

3

(f)     The Grantee understands that the Shares once issued have not been registered under any securities laws, and will be issued in reliance on an exemption thereunder for transactions not involving any public offering.

(g)     The Grantee comprehends and agrees to assume the risks attendant to an investment in the Shares, and is determined that the exercise of the Options and issuance of the Shares is consistent with the Grantee's investment objectives.

(h)     The Grantee understands that: there are restrictions on the transferability of the Shares; investors in the Shares have no right to require the Shares to be registered under the Securities Act of 1933 (the **"Act"**) or applicable state securities laws; there will be no public market for the Shares; and it may not be possible for the Grantee to liquidate the investment in the Shares when desired to do so and, accordingly, the Grantee may need to hold the Shares, and bear the economic risk of an investment in the Shares indefinitely.

(i)     The Grantee further represent that the Grantee is an accredit investor as such term is defined under U.S. securities laws.

(j)     The Grantee has reviewed with his own tax advisors the tax consequences of this grant of Options and the transactions contemplated by the exercise of the Option. The Grantee is relying solely on such advisors and not on any statements or representations of the Company or any of its agents. The Grantee understands that the Grantee (and not the Company) shall be responsible for all the Grantee's own tax liabilities arising as a result of the grant of Options and the exercise of the Option into Shares and Grantee further acknowledges that the issuance of Options hereunder may impose an immediate tax liability on the Grantee's behalf and neither the Plan, the Notice nor this Option Agreement is intended to provide or adhere with any tax relief or tax exemption benefit or conditions.

9.  Construction. The captions used in the Notice and this Option Agreement are inserted for convenience and shall not be deemed a part of the Option for construction or interpretation. Except when otherwise indicated by the context, the singular shall include the plural and the plural shall include the singular. Use of the term "or" is not intended to be exclusive, unless the context clearly requires otherwise.

10. Administration and Interpretation. Any question or dispute regarding the administration or interpretation of the Notice, the Plan or this Option Agreement shall be submitted by the Grantee or by the Company to the Administrator. The resolution of such question or dispute by the Administrator shall be final and binding on all persons.

11. Entire Agreement. The Notice, the Plan and this Option Agreement constitute the entire agreement of the parties with respect to the subject matter hereof and supersede in their entirety all prior undertakings and agreements of the Company and the Grantee with respect to the subject matter hereof, and the Notice and the Option Agreement may not be modified adversely to the Grantee's interest except by means of a writing signed by the Company and the Grantee. Nothing in the Notice, the Plan and this Option Agreement (except as expressly provided therein) is intended to confer any rights or remedies on any persons other than the parties. Should any provision of the Notice, the Plan or this Option Agreement be determined by a court of law to be illegal or unenforceable, such provision shall be enforced to the fullest extent allowed by law and the other provisions shall nevertheless remain effective and shall remain enforceable.

U:\Yeshap\I\Invasix\Options\Option Agreement_USA_Lori Brightman_April 12 2010.doc

4

12. <u>Governing Law and Jurisdiction</u>. The Company, the Grantee, and the Grantee's assignees pursuant to Section 6 of this Option Agreement (the "**parties**") agree that: (i) the Notice, the Plan and this Option Agreement are to be construed in accordance with and governed by the internal laws of the State of Israel without giving effect to any choice of law rule; (ii) in such a case of any suit, action, or proceeding arising out of or relating to the Notice, the Plan or this Option Agreement it shall be brought before the competent court in the City of Haifa, Israel and that the parties shall submit to the exclusive jurisdiction of such court; (iii) to irrevocably waive, to the fullest extent permitted by law, any objection a party may have to the laying of venue for any such suit, action or proceeding brought in such court. If any one or more provisions of this Section 12 shall for any reason be held invalid or unenforceable, it is the specific intent of the parties that such provisions shall be modified to the minimum extent necessary to make it or its application valid and enforceable.

13.     <u>Notices</u>.  Any notice required or permitted hereunder shall be given in writing and shall be deemed effectively given upon personal delivery, upon deposit for delivery by an internationally recognized express mail courier service or upon deposit in the Israeli mail by certified mail (if the parties are within Israel), with postage and fees prepaid, addressed to the other party at its address as shown in these instruments, or to such other address as such party may designate in writing from time to time to the other party.

14. <u>Counterparts; Facsimile Signatures</u>.  This Option Agreement may be executed by the parties in separate counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. Grantee agrees that a facsimile copy of this Agreement that contains Grantee's signature shall be considered the same as the original and shall be binding upon Grantee. Grantee waives the right to challenge the authenticity of a facsimile copy of this Agreement.

15. <u>Additional Terms Regarding Options</u>. Upon the exercise of Vested Options and prior to the issuance of the shares, the Company may require and the Grantee shall sign if so required: (i) an irrevocable proxy of voting powers as to be provided by the Company if so required; (ii) shareholders rights agreement – to the extent existing in the Company; (iii) an undertaking not to sell shares of the Company for a period of up to 12 months after an IPO; and (iv) such other forms as may be necessary in order to issue the shares. The Grantee undertakes to sign such documents as precondition to the issue of shares in the Company as a result of such exercise.

**GRANTEE:**                                          **INVASIX LTD.**

**Dr. Lori Brightman, M.D.**                      By: Moshe Mizrahy

Signature: _____              Signature: _____

<u>Address:</u>                                          <u>Address:</u>
Dr. Lori Brightman, M.D.                       Invasix Ltd.
317 East 34 Street                                 P.O. Box 533, Apollo Building
New York, NY 10016                            Industrial Zone, Yokneam Ilit
<u>U.S.A.</u>                                              <u>Israel</u>

U:\Yeshap\I\Invasix\Options\Option Agreement_USA_Lori Brightman_April 12 2010.doc

# EXHIBIT C

EX-10.1 6 tv524581_ex10-1.htm EXHIBIT 10.1

**Exhibit 10.1**

**INVASIX LTD.**

**2008 ROW OPTION PLAN**

**<u>TABLE OF CONTENTS</u>**

| | | |
|---|---|---|
| 1. | PURPOSE | 2 |
| 2. | DEFINITIONS | 2 |
| 3. | STOCK SUBJECT TO THE PLAN | 5 |
| 4. | ADMINISTRATION OF THE PLAN | 5 |
| 5. | ELIGIBILITY | 6 |
| 6. | TERMS AND CONDITIONS OF AWARDS | 7 |
| 7. | AWARD EXERCISE OR PURCHASE PRICE | 8 |
| 8. | EXERCISE OF AWARD | 9 |
| 9. | CONDITIONS UPON ISSUANCE OF SHARES | 10 |
| 10. | ADJUSTMENTS UPON CHANGES IN CAPITALIZATION | 10 |
| 11. | CORPORATE TRANSACTIONS | 11 |
| 12. | EFFECTIVE DATE AND TERM OF PLAN | 11 |
| 13. | AMENDMENT, SUSPENSION OR TERMINATION OF THE PLAN | 11 |
| 14. | RESERVATION OF SHARES | 12 |
| 15. | NO EFFECT ON TERMS OF EMPLOYMENT/CONSULTING | 12 |
| 16. | NO EFFECT ON RETIREMENT AND OTHER BENEFIT PLANS | 12 |
| 17. | STOCKHOLDER APPROVAL | 12 |

1. <u>Purposes of the Plan</u>. The Plan is intended to provide an incentive to retain, in the employ of the Company and its Related Entities, persons of training, experience, and ability, to attract new Employees, Directors, and Consultants which the Board shall decide their services are considered valuable to the Company, to encourage the sense of proprietorship of such persons, and to stimulate the active interest of such persons in the development and financial success of the Company by providing them with opportunities to purchase shares in the Company, pursuant to the Plan.

2. <u>Definitions</u>. As used herein, the following definitions shall apply:

(a) "<u>Administrator</u>" means the Board or any of the Committees appointed to administer the Plan.

(b) "<u>Applicable Laws</u>" means the legal requirements relating to the administration of stock incentive plans, if any, under applicable provisions of Israel, United States, Canada and other applicable countries tax including the Code and securities laws, Israeli Companies Law, the rules of any applicable stock exchange or national market system, and the rules of any jurisdiction applicable to Awards granted to residents therein.

(c) "<u>Assumed</u>" means that pursuant to a Corporate Transaction either (i) the Award is expressly affirmed by the Company or (ii) the contractual obligations represented by the Award are expressly assumed (and not simply by operation of law) by the successor entity or its Parent in connection with the Corporate Transaction with appropriate adjustments to the number and type of securities of the successor entity or its Parent subject to the Award and the exercise or purchase price thereof which at least preserves the compensation element of the Award existing at the time of the Corporate Transaction as determined in accordance with the instruments evidencing the agreement to assume the Award.

(d) "<u>Award</u>" means the grant of an Option, Restricted Stock, or other right or benefit under the Plan.

(e) "<u>Award Agreement</u>" means the written agreement evidencing the grant of an Award executed by the Company and the Grantee, including any amendments thereto.

(f) "<u>Board</u>" means the Board of Directors of the Company.

(g) "<u>Cause</u>" means, with respect to the termination by the Company, or a Related Entity of the Grantee's Continuous Service, that such termination is for "Cause" as such term is expressly defined in a then-effective written agreement between the Grantee and the Company, or such Related Entity, or in the absence of such then-effective written agreement and definition, shall mean: (i) conviction of any felony involving moral turpitude or affecting the Company or a Related Entity; (ii) any refusal to carry out a reasonable directive of the chief executive officer, the Board or the Optionee's direct supervisor, which involves the business of the Company or a Related Entity and was capable of being lawfully performed; (iii) embezzlement of funds of the Company or a Related Entity; (iv) any breach of the Optionee's fiduciary duties or duties of care of the Company or a Related Entity; including without limitation disclosure of confidential information of the Company or a Related Entity; and (v) any conduct (other than conduct in good faith) reasonably determined by the Board to be materially detrimental to the Company or a Related Entity.

(h) "<u>Code</u>" means the USA Internal Revenue Code of 1986, as amended.

(i) "<u>Committee</u>" means any committee appointed by the Board to administer the Plan.

(j) "<u>Company</u>" means Invasix Ltd., a corporation organized under the laws of the State of Israel.

(k) "<u>Consultant</u>" means any person (other than an Employee or a Director, solely with respect to rendering services in such person's capacity as a Director) who is engaged by the Company or any Related Entity to render consulting or advisory services to the Company or such Related Entity.

(l)  "<u>Continuous Service</u>" means that the provision of services to the Company or a Related Entity in any capacity of Employee, Director or Consultant, is not interrupted or terminated. Continuous Service shall not be considered interrupted in the case of (i) any approved leave of absence, (ii) transfers among the Company, any Related Entity, or any successor, in any capacity of Employee, Director or Consultant, or (iii) any change in status as long as the individual remains in the service of the Company or a Related Entity in any capacity of Employee, Director or Consultant (except as otherwise provided in the Award Agreement). An approved leave of absence shall include sick leave, military leave, or any other authorized personal leave. For purposes of each Incentive Stock Option granted under the Plan, if such leave exceeds ninety (90) days, and reemployment upon expiration of such leave is not guaranteed by statute or contract, then the Incentive Stock Option shall be treated as a Non-Qualified Stock Option on the day three (3) months and one (1) day following the expiration of such ninety (90) day period.

(m)  "<u>Corporate Transaction</u>" means any of the following transactions:

(i)  a merger or consolidation in which the Company is not the surviving entity, except for a transaction the principal purpose of which is to change the jurisdiction in which the Company is incorporated;

(ii)  the sale, transfer or other disposition of all or substantially all of the assets of the Company (including the capital stock of the Company's subsidiary corporations);

(iii)  the complete liquidation or dissolution of the Company;

(iv)  any reverse merger in which the Company is the surviving entity but in which securities possessing more than fifty percent (50%) of the total combined voting power of the Company's outstanding securities are transferred to a person or persons different from those who held such securities immediately prior to such merger; or

(v)  acquisition by any person or related group of persons (other than the Company or by a Company-sponsored employee benefit plan) of beneficial ownership (within the meaning of Rule 13d-3 of the Exchange Act) of securities possessing more than fifty percent (50%) of the total combined voting power of the Company's outstanding securities.

(n)  "<u>Director</u>" means a member of the Board or the board of directors of any Related Entity.

(o)  "<u>Disability</u>" means as defined under the long-term disability policy of the Company or the Related Entity to which the Grantee provides services regardless of whether the Grantee is covered by such policy. If the Company or the Related Entity to which the Grantee provides service does not have a long-term disability plan in place, "Disability" means that a Grantee is unable to carry out the responsibilities and functions of the position held by the Grantee by reason of any medically determinable physical or mental impairment. A Grantee will not be considered to have incurred a Disability unless he or she furnishes proof of such impairment sufficient to satisfy the Administrator in its discretion.

(p)  "<u>Employee</u>" means any person, including an Officer or Director, who is an employee of the Company or any Related Entity. The payment of a director's fee by the Company or a Related Entity shall not be sufficient to constitute "employment" by the Company.

(q)  "<u>Exchange Act</u>" means the Securities Exchange Act of 1934, as amended.

(r)  "<u>Fair Market Value</u>" means, as of any date, the value of the Ordinary Shares determined as follows:

(i)    If the Shares are listed on any established stock exchange or a national market system, the Fair Market Value shall be the closing sales price for such Shares (or the closing bid, if no sales were reported), as quoted on such exchange or system on the date of determination, as reported in the Wall Street Journal, or such other source as the Board deems reliable;

(ii)    If the Shares are regularly quoted by a recognized securities dealer but selling prices are not reported, the Fair Market Value shall be the mean between the high bid and low asked prices for the Shares on the date of determination, or;

(iii)    In the absence of an established market for the Shares, the Fair Market Value thereof shall be determined in good faith by the Administrator.

(s)    "Grantee" means an Employee, Director or Consultant who receives an Award under the Plan.

(t)    "Incentive Stock Option" means an Option intended to qualify as an incentive stock option within the meaning of Section 422 of the Code.

(u)    "Israeli Companies Law" means the Israeli Companies Law 1999, as amended or replaced from time to time.

(v)    "Non-Qualified Stock Option" means an Option not intended to qualify as an Incentive Stock Option.

(w)    "Officer" means a person who is an officer of the Company or a Related Entity within the meaning of Section 16 of the Exchange Act and the rules and regulations promulgated thereunder.

(x)    "Option" means an option to purchase one (1) Ordinary Shares pursuant to an Award Agreement granted under the Plan.

(y)    "Ordinary Shares" means the ordinary shares par value NIS 0.01 per share of the Company.

(z)    "Parent" means a "parent corporation," whether now or hereafter existing, as defined in Section 424(e) of the Code.

(aa)    "Plan" means this 2008 ROW Option Plan.

(bb)    "Post-Termination Exercise Period" means the period specified in the Award Agreement (or if not mentioned therein – as specified in this Plan) commencing on the date of termination (other than termination by the Company or any Related Entity for Cause) of the Grantee's Continuous Service.

(cc)    "Related Entity" means any Parent or Subsidiary of the Company and any business, corporation, partnership, limited liability company or other entity in which the Company or a Parent or a Subsidiary of the Company holds a substantial ownership interest, directly or indirectly.

(dd)    "Replaced" means that pursuant to a Corporate Transaction the Award is replaced with a comparable stock award or a cash incentive program of the Company, the successor entity (if applicable) or Parent of either of them which at least preserves the compensation element of such Award existing at the time of the Corporate Transaction and provides for subsequent payout in accordance with the same (or a more favorable) vesting schedule applicable to such Award. The determination of Award comparability shall be made by the Administrator and its determination shall be final, binding and conclusive.

(ee)    "Restricted Stock" means Shares issued under the Plan to the Grantee for such consideration, if any, and subject to such restrictions on transfer, rights of first refusal, repurchase provisions, forfeiture provisions, and other terms and conditions as established by the Administrator.

(ff)    "Rule 16b-3" means Rule 16b-3 promulgated under the Exchange Act or any successor thereto.

(gg)    "Share" means a share of the Ordinary Shares.

(hh)  "Subsidiary" means a "subsidiary corporation," whether now or hereafter existing, as defined in Section 424(f) of the Code.

3.  Stock Subject to the Plan.

(a)  Subject to the provisions of Section 10, below, the maximum aggregate number of Shares which may be issued pursuant to all Awards is 180,000 Shares, plus any increase to be added from time to time as determined by the Board. Out of such maximum aggregate number of Shares (as may be increased from time to time), any number of Shares may be issued pursuant to Incentive Stock Options arrangements. The Shares to be issued pursuant to Awards may be authorized, but unissued, or reacquired Ordinary Shares.

(b)  Any Shares covered by an Award (or portion of an Award) which is forfeited, canceled or expires (whether voluntarily or involuntarily) shall be deemed not to have been issued for purposes of determining the maximum aggregate number of Shares which may be issued under the Plan. Shares that actually have been issued under the Plan pursuant to an Award shall not be returned to the Plan and shall not become available for future issuance under the Plan, except that if unvested Shares are forfeited, or repurchased by the Company at the lower of their original purchase price or their Fair Market Value at the time of repurchase, such Shares shall become available for future grant under the Plan. To the extent not prohibited by Section 422(b)(1) of the Code (and the corresponding regulations thereunder), the listing requirements of The Nasdaq National Market (or other established stock exchange or national market system on which the Common Stock is traded) and Applicable Law, any Shares covered by an Award which are surrendered (i) in payment of the Award exercise or purchase price or (ii) in satisfaction of tax withholding obligations incident to the exercise of an Award shall be deemed not to have been issued for purposes of determining the maximum number of Shares which may be issued pursuant to all Awards under the Plan, unless otherwise determined by the Administrator.

4.  Administration of the Plan.

(a)  Plan Administrator.

(i)  Administration with Respect to Directors and Officers. With respect to grants of Awards to Directors or Employees who are also Officers or Directors of the Company, the Plan shall be administered by (A) the Board or (B) a Committee designated by the Board, which Committee shall be constituted in such a manner as to satisfy the Applicable Laws and to permit such grants and related transactions under the Plan to be exempt from Section 16(b) of the Exchange Act in accordance with Rule 16b-3. Once appointed, such Committee shall continue to serve in its designated capacity until otherwise directed by the Board.

(ii)  Administration With Respect to Consultants and Other Employees. With respect to grants of Awards to Employees or Consultants who are neither Directors nor Officers of the Company, the Plan shall be administered by (A) the Board or (B) a Committee designated by the Board, which Committee shall be constituted in such a manner as to satisfy the Applicable Laws. Once appointed, such Committee shall continue to serve in its designated capacity until otherwise directed by the Board. The Board may authorize one or more Officers to grant such Awards and may limit such authority as the Board determines from time to time.

(iii)  Administration Errors. In the event an Award is granted in a manner inconsistent with the provisions of this subsection (a), such Award shall be presumptively valid as of its grant date to the extent permitted by the Applicable Laws.

5

(b)  <u>Powers of the Administrator</u>. Subject to Applicable Laws and the provisions of the Plan (including any other powers given to the Administrator hereunder), and except as otherwise provided by the Board, the Administrator shall have the authority, in its discretion:

(i)  to select the Employees, Directors and Consultants to whom Awards may be granted from time to time hereunder;

(ii)  to determine whether and to what extent Awards are granted hereunder;

(iii)  to determine the number of Shares or the amount of other consideration to be covered by each Award granted hereunder;

(iv)  to approve forms of Award Agreements for use under the Plan;

(v)  to determine the terms and conditions of any Award granted hereunder;

(vi)  to amend the terms of any outstanding Award granted under the Plan, provided that any amendment that would adversely affect the Grantee's rights under an outstanding Award shall not be made without the Grantee's written consent;

(vii)  to construe and interpret the terms of the Plan and Awards, including without limitation, any notice of award or Award Agreement, granted pursuant to the Plan;

(viii) to establish additional terms, conditions, rules or procedures, to accommodate the rules or laws of applicable foreign jurisdictions and to afford Grantees favorable treatment under such rules or laws; provided, however, that no Award shall be granted under any such additional terms, conditions, rules or procedures with terms or conditions which are inconsistent with the provisions of the Plan; and

(ix) to take such other action, not inconsistent with the terms of the Plan, as the Administrator deems appropriate.

(c)  <u>Indemnification</u>. In addition to such other rights of indemnification as they may have as members of the Board or as Officers or Employees of the Company or a Related Entity, members of the Board and any Officers or Employees of the Company or a Related Entity to whom authority to act for the Board, the Administrator or the Company is delegated shall be defended and indemnified by the Company to the extent permitted by law on an after-tax basis against all reasonable expenses, including attorneys' fees, actually and necessarily incurred in connection with the defense of any claim, investigation, action, suit or proceeding, or in connection with any appeal therein, to which they or any of them may be a party by reason of any action taken or failure to act under or in connection with the Plan, or any Award granted hereunder, and against all amounts paid by them in settlement thereof (provided such settlement is approved by the Company) or paid by them in satisfaction of a judgment in any such claim, investigation, action, suit or proceeding, except in relation to matters as to which it shall be adjudged in such claim, investigation, action, suit or proceeding that such person is liable for gross negligence, bad faith or intentional misconduct; provided, however, that within thirty (30) days after the institution of such claim, investigation, action, suit or proceeding, such person shall offer to the Company, in writing, the opportunity at the Company's expense to defend the same.

5.  <u>Eligibility</u>. Awards other than Incentive Stock Options may be granted to Employees, Directors and Consultants. Incentive Stock Options may be granted only to Employees of the Company or a Parent or a Subsidiary of the Company. An Employee, Director or Consultant who has been granted an Award may, if otherwise eligible, be granted additional Awards. Awards may be granted to such Employees, Directors or Consultants who are residing in foreign jurisdictions as the Administrator may determine from time to time.

6. <u>Terms and Conditions of Awards</u>.

(a)   <u>Type of Awards</u>. The Administrator is authorized under the Plan to award any type of arrangement to an Employee, Director or Consultant that is not inconsistent with the provisions of the Plan and that by its terms involves or might involve the issuance of (i) Shares, (ii) an Option or similar right with a fixed or variable price related to the Fair Market Value of the Shares and with an exercise or conversion privilege related to the passage of time, the occurrence of one or more events, or the satisfaction of performance criteria or other conditions, or (iii) any other security with the value derived from the value of the Shares. Such awards include, without limitation, Options or sales or bonuses of Restricted Stock, and an Award may consist of one such security or benefit, or two (2) or more of them in any combination or alternative.

(b)   <u>Designation of Award</u>. Each Award shall be designated in the Award Agreement. In the case of an Option, the Option shall be designated as either an Incentive Stock Option or a Non-Qualified Stock Option. However, notwithstanding such designation, to the extent that the aggregate Fair Market Value of Shares subject to Options designated as Incentive Stock Options which become exercisable for the first time by a Grantee during any calendar year (under all plans of the Company or any Parent or Subsidiary of the Company) exceeds $100,000, such excess Options, to the extent of the Shares covered thereby in excess of the foregoing limitation, shall be treated as Non-Qualified Stock Options. For this purpose, Incentive Stock Options shall be taken into account in the order in which they were granted, and the Fair Market Value of the Shares shall be determined as of the grant date of the relevant Option.

(c)   <u>Conditions of Award</u>. Subject to the terms of the Plan, the Administrator shall determine the provisions, terms, and conditions of each Award including, but not limited to, the Award vesting schedule, repurchase provisions, rights of first refusal, forfeiture provisions, form of payment (cash, Shares, or other consideration) upon settlement of the Award, payment contingencies, and satisfaction of any performance criteria. The performance criteria established by the Administrator may be based on any one of, or combination of, increase in share price, earnings per share, total stockholder return, return on equity, return on assets, return on investment, net operating income, cash flow, revenue, economic value added, personal management objectives, or other measure of performance selected by the Administrator. Partial achievement of the specified criteria may result in a payment or vesting corresponding to the degree of achievement as specified in the Award Agreement.

(d)   <u>Acquisitions and Other Transactions</u>. The Administrator may issue Awards under the Plan in settlement, assumption or substitution for, outstanding awards or obligations to grant future awards in connection with the Company or a Related Entity acquiring another entity, an interest in another entity or an additional interest in a Related Entity whether by merger, stock purchase, asset purchase or other form of transaction.

(e)   <u>Separate Programs</u>. The Administrator may establish one or more separate programs under the Plan for the purpose of issuing particular forms of Awards to one or more classes of Grantees on such terms and conditions as determined by the Administrator from time to time.

(f)   <u>Early Exercise</u>. The Award Agreement may, but need not, include a provision whereby the Grantee may elect at any time while an Employee, Director or Consultant to exercise any part or all of the Award prior to full vesting of the Award. Any unvested Shares received pursuant to such exercise may be subject to a repurchase right in favor of the Company or a Related Entity or to any other restriction the Administrator determines to be appropriate.

(g)  Term of Award. The term of each Award shall be the term stated in the Award Agreement, provided, however, that the term of an Award shall be no more than seven (7) years from the date of grant thereof. However, in the case of an Incentive Stock Option granted to a Grantee who, at the time the Option is granted, owns stock representing more than ten percent (10%) of the voting power of all classes of stock of the Company or any Parent or Subsidiary of the Company, the term of the Incentive Stock Option shall be five (5) years from the date of grant thereof or such shorter term as may be provided in the Award Agreement.

(h)  Transferability of Awards. No Option or any right with respect thereto, purchasable hereunder, whether fully paid or not, shall be assignable, transferable or given as collateral, or any right with respect to it given to any third party whatsoever, except as specifically allowed under the Plan. During the lifetime of the Grantee, each and all of such Grantee's rights to purchase Shares hereunder shall be exercisable only by the Grantee. Vested options are transferable by will or by law of descent and distribution. Any such action made directly or indirectly, for an immediate validation or for a future one, shall be void.

(i)  Time of Granting Awards. The date of grant of an Award shall for all purposes be the date on which the Administrator makes the determination to grant such Award, or such other date as is determined by the Administrator. Notice of the grant determination shall be given to each Employee, Director or Consultant to whom an Award is so granted within a reasonable time after the date of such grant.

7.  Award Exercise or Purchase Price, Consideration and Taxes.

(a)  Exercise or Purchase Price. The exercise or purchase price, if any, for an Award shall be as follows:

(i)  In the case of an Incentive Stock Option:

(A)  granted to an Employee who, at the time of the grant of such Incentive Stock Option owns stock representing more than ten percent (10%) of the voting power of all classes of stock of the Company or any Parent or Subsidiary of the Company, the per Share exercise price shall be not less than one hundred ten percent (110%) of the Fair Market Value per Share on the date of grant; or

(B)  granted to any Employee other than an Employee described in the preceding paragraph, the per Share exercise price shall be not less than one hundred percent (100%) of the Fair Market Value per Share on the date of grant.

(ii)  In the case of a Non-Qualified Stock Option, the per Share exercise price shall be not less than one hundred percent (100%) of the Fair Market Value per Share on the date of grant.

(iii)  In the case of other Awards, such price as is determined by the Administrator.

(iv)  Notwithstanding the foregoing provisions of this Section 7(a), in the case of an Award issued pursuant to Section 6(d), above, the exercise or purchase price for the Award shall be determined in accordance with the principles of Section 424(a) of the Code.

(b)  Consideration. Subject to Applicable Laws, the consideration to be paid for the Shares to be issued upon exercise or purchase of an Award including the method of payment, shall be determined by the Administrator (and, in the case of an Incentive Stock Option, shall be determined at the time of grant). In addition to any other types of consideration the Administrator may determine, the Administrator is authorized to accept as consideration for Shares issued under the Plan the following:

(i)  cash;

(ii)  check;

(iii)  wire transfer.

The Administrator may at any time or from time to time, by adoption of or by amendment to the standard forms of Award Agreement described in Section 4(b)(iv), or by other means, grant Awards which do not permit all of the foregoing forms of consideration to be used in payment for the Shares or which otherwise restrict one or more forms of consideration.

(c)  Taxes. No Shares shall be delivered under the Plan to any Grantee or other person until such Grantee or other person has made arrangements acceptable to the Administrator for the satisfaction of any foreign, federal, state, or local income and employment tax withholding obligations, including, without limitation, obligations incident to the receipt of Shares or the disqualifying disposition of Shares received on exercise of an Incentive Stock Option. Upon exercise of an Award the Company shall withhold or collect from Grantee an amount sufficient to satisfy such tax obligations.

8.  Exercise of Award.

(a)  Procedure for Exercise; Rights as a Stockholder.

(i)  Any Award granted hereunder shall be exercisable at such times and under such conditions as determined by the Administrator under the terms of the Plan and specified in the Award Agreement.

(ii)  An Award shall be deemed to be exercised when written notice of such exercise has been given to the Company in accordance with the terms of the Award by the person entitled to exercise the Award and full payment for the Shares with respect to which the Award is exercised is actually received and cleared.

(b)  Exercise of Award Following Termination of Continuous Service. In the event of termination of a Grantee's Continuous Service for any reason other than Disability or death (but not in the event of a Grantee's change of status from Employee to Consultant or from Consultant to Employee), such Grantee may, but only during the Post-Termination Exercise Period (but in no event later than the expiration date of the term of such Award as set forth in the Award Agreement), exercise the portion of the Grantee's Award that was vested at the date of such termination or such other portion of the Grantee's Award as may be determined by the Administrator. The Grantee's Award Agreement may provide that upon the termination of the Grantee's Continuous Service for Cause, the Grantee's right to exercise the Award shall terminate concurrently with the termination of Grantee's Continuous Service. In the event of a Grantee's change of status from Employee to Consultant, an Employee's Incentive Stock Option shall convert automatically to a Non-Qualified Stock Option on the day three (3) months and one day following such change of status. To the extent that the Grantee's Award was unvested at the date of termination, or if the Grantee does not exercise the vested portion of the Grantee's Award within the Post-Termination Exercise Period, the Award shall terminate.

(c)  Disability of Grantee. In the event of termination of a Grantee's Continuous Service as a result of his or her Disability, such Grantee may, but only within twelve (12) months from the date of such termination (or such longer or shorter period as specified in the Award Agreement but in no event later than the expiration date of the term of such Award as set forth in the Award Agreement), exercise the portion of the Grantee's Award that was vested at the date of such termination; provided, however, that if such Disability is not a "disability" as such term is defined in Section 22(e)(3) of the Code, in the case of an Incentive Stock Option such Incentive Stock Option shall automatically convert to a Non-Qualified Stock Option on the day three (3) months and one day following such termination. To the extent that the Grantee's Award was unvested at the date of termination, or if Grantee does not exercise the vested portion of the Grantee's Award within the time specified herein, the Award shall terminate.

(d) <u>Death of Grantee</u>. In the event of a termination of the Grantee's Continuous Service as a result of his or her death, or in the event of the death of the Grantee during the Post-Termination Exercise Period or during the twelve (12) month period following the Grantee's termination of Continuous Service as a result of his or her Disability, the Grantee's estate or a person who acquired the right to exercise the Award by bequest or inheritance may exercise the portion of the Grantee's Award that was vested as of the date of termination, within twelve (12) months from the date of death (or such longer or shorter period as specified in the Award Agreement but in no event later than the expiration of the term of such Award as set forth in the Award Agreement). To the extent that, at the time of death, the Grantee's Award was unvested, or if the Grantee's estate or a person who acquired the right to exercise the Award by bequest or inheritance does not exercise the vested portion of the Grantee's Award within the time specified herein, the Award shall terminate.

(e) <u>Extension if Exercise Prevented by Law</u>. Notwithstanding the foregoing, if the exercise of an Award within the applicable time periods set forth in this Section 8 is prevented by the provisions of Section 9 below, the Award shall remain exercisable until one (1) month after the date the Grantee is notified by the Company that the Award is exercisable, but in any event no later than the expiration of the term of such Award as set forth in the Award Agreement.

(f) <u>Post Termination Forfeiture</u>. The reason of termination of Continuous Service notwithstanding, if during the Post-Termination Exercise Period, the Grantee breaches the confidentiality, non-competition, non-solicitation, non-use or assignment of intellectual property undertakings binding upon such Grantee, the Company shall have the right to effect a forfeiture of all of the Grantee's then outstanding Awards (whether vested or non-vested).

9. <u>Conditions Upon Issuance of Shares</u>.

(a) Shares shall not be issued pursuant to the exercise of an Award unless the exercise of such Award and the issuance and delivery of such Shares pursuant thereto shall comply with all Applicable Laws, and shall be further subject to the approval of counsel for the Company with respect to such compliance.

(b) As a condition to the exercise of an Award, the Company may require the person exercising such Award to represent and warrant at the time of any such exercise that the Shares are being purchased only for investment and without any present intention to sell or distribute such Shares if, in the opinion of counsel for the Company, such a representation is required by any Applicable Laws.

10. <u>Adjustments Upon Changes in Capitalization</u>. Subject to any required action by the stockholders of the Company, the number of Shares covered by each outstanding Award, and the number of Shares which have been authorized for issuance under the Plan but as to which no Awards have yet been granted or which have been returned to the Plan, the exercise or purchase price of each such outstanding Award, as well as any other terms that the Administrator determines require adjustment shall be proportionately adjusted for (i) any increase or decrease in the number of issued Shares resulting from a stock split, reverse stock split, stock dividend, combination or reclassification of the Shares, or similar transaction affecting the Shares, (ii) any other increase or decrease in the number of issued Shares effected without receipt of consideration by the Company, or (iii) as the Administrator may determine in its discretion, any other transaction with respect to Common Stock including a corporate merger, consolidation, acquisition of property or stock, separation (including a spin-off or other distribution of stock or property), reorganization, liquidation (whether partial or complete) or any similar transaction; provided, however that conversion of any convertible securities of the Company shall not be deemed to have been "effected without receipt of consideration." Such adjustment shall be made by the Administrator and its determination shall be final, binding and conclusive. Except as the Administrator determines, no issuance by the Company of shares of stock of any class, or securities convertible into shares of stock of any class, shall affect, and no adjustment by reason hereof shall be made with respect to, the number or price of Shares subject to an Award.

11. <u>Corporate Transactions.</u>

(a) <u>Termination of Award to Extent Not Assumed.</u> Effective upon the consummation of a Corporate Transaction, all outstanding Awards under the Plan shall terminate. However, all such Awards shall not terminate to the extent they are Assumed in connection with the Corporate Transaction.

(b) <u>Acceleration of Award Upon Corporate Transaction.</u> Except as provided otherwise in an individual Award Agreement, in the event of a Corporate Transaction, for the portion of each Award that is neither Assumed nor Replaced, such proportional part of the Award, calculated by dividing the sum of the then vested Options by the total Options granted to a Grantee time the total number of un-vested Options (see example below), shall automatically become fully vested and exercisable and be released from any repurchase or forfeiture rights (other than repurchase rights exercisable at Fair Market Value) for all of the Shares at the time represented by such portion of the Award, immediately prior to the specified effective date of such Corporate Transaction, provided that the Grantee's Continuous Service has not terminated prior to such date. The portion of the Award that is not Assumed shall terminate under subsection (a) of this Section 11 to the extent not exercised prior to the consummation of such Corporate Transaction.

Example for proportional acceleration of Options:

| Example | Options Awarded | Vested Options | Un-vested Options | Formula | Total |
|---|---|---|---|---|---|
| 1 | 400 | 100 | 300 | 100 + (300 x 100/400) | 175 |
| 2 | 400 | 200 | 200 | 200 + (200 x 200/400) | 300 |
| 3 | 400 | 300 | 100 | 300 + (100 x 300/400) | 175 |

(c) <u>Effect of Acceleration on Incentive Stock Options.</u> The portion of any Incentive Stock Option accelerated under this Section 11 in connection with a Corporate Transaction shall remain exercisable as an Incentive Stock Option under the Code only to the extent the $100,000 dollar limitation of Section 422(d) of the Code is not exceeded. To the extent such dollar limitation is exceeded, the accelerated excess portion of such Option shall be exercisable as a Non-Qualified Stock Option.

12. <u>Effective Date and Term of Plan.</u> The Plan shall become effective upon the earlier to occur of its adoption by the Board or its approval by the stockholders of the Company. It shall continue in effect for a term of ten (10) years unless sooner terminated. Subject to Section 17, below, and Applicable Laws, Awards may be granted under the Plan upon its becoming effective.

13. <u>Amendment, Suspension or Termination of the Plan.</u>

(a) The Board may at any time amend, suspend or terminate the Plan; provided, however, that no such amendment shall be made without the approval of the Company's stockholders to the extent such approval is required by Applicable Laws, or if such amendment would change any of the provisions of Section 4(b)(vi) or this Section 13(a).

11

**A-108**

(b)  No Award may be granted during any suspension of the Plan or after termination of the Plan.

(c)  Any amendment, suspension or termination of the Plan (including termination of the Plan under Section 12, above) shall not affect Awards already granted, and such Awards shall remain in full force and effect as if the Plan had not been amended, suspended or terminated, unless mutually agreed otherwise between the Grantee and the Administrator, which agreement must be in writing and signed by the Grantee and the Company.

14.  <u>Reservation of Shares</u>.

(a)  The Company, during the term of the Plan, will at all times reserve and keep available such number of Shares as shall be sufficient to satisfy the requirements of the Plan.

(b)  The inability of the Company to obtain authority from any regulatory body having jurisdiction, which authority is deemed by the Company's counsel to be necessary to the lawful issuance and sale of any Shares hereunder, shall relieve the Company of any liability in respect of the failure to issue or sell such Shares as to which such requisite authority shall not have been obtained.

15.  <u>No Effect on Terms of Employment/Consulting Relationship</u>. The Plan shall not confer upon any Grantee any right with respect to the Grantee's Continuous Service, nor shall it interfere in any way with his or her right or the Company's right to terminate the Grantee's Continuous Service at any time, with or without Cause, and with or without notice. The Company's ability to terminate the employment of a Grantee who is employed at will is in no way affected by its determination that the Grantee's Continuous Service has been terminated for Cause for the purposes of this Plan.

16.  <u>No Effect on Retirement and Other Benefit Plans</u>. Except as specifically provided in a retirement or other benefit plan of the Company or a Related Entity, Awards shall not be deemed compensation for purposes of computing benefits or contributions under any retirement plan of the Company or a Related Entity, and shall not affect any benefits under any other benefit plan of any kind or any benefit plan subsequently instituted under which the availability or amount of benefits is related to level of compensation. The Plan is not a "Retirement Plan" or "Welfare Plan" under the U.S. Employee Retirement Income Security Act of 1974, as amended.

17.  <u>Stockholder Approval</u>. The grant of Incentive Stock Options under the Plan shall be subject to approval by the stockholders of the Company within twelve (12) months before or after the date the Plan is adopted excluding Incentive Stock Options issued in substitution for outstanding Incentive Stock Options pursuant to Section 424(a) of the Code. Such stockholder approval shall be obtained in the degree and manner required under Applicable Laws. The Administrator may grant Incentive Stock Options under the Plan prior to approval by the stockholders, but until such approval is obtained, no such Incentive Stock Option shall be exercisable. In the event that stockholder approval is not obtained within the twelve (12) month period provided above, all Incentive Stock Options previously granted under the Plan shall be exercisable as Non-Qualified Stock Options.

*****************************************

**BERLANDI NUSSBAUM & REITZAS LLP**
125 Park Avenue, 25th Floor
New York, New York 10017
(212) 804-6329 (Ph)
(646) 461-2312 (fax)
*Attorneys for Plaintiff Dr. Lori A. Brightman*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| DR. LORI A. BRIGHTMAN, an individual, | **Case No.: 1:22-cv-05861-MKV** |
| Plaintiff, | |
| v. | |
| INMODE LTD., a foreign limited liability corporation; DOES 1 – 10, INCLUSIVE; AND ROE CORPORATIONS 11-20, INCLUSIVE, | |
| Defendants. | |

**PLAINTIFF LORI A. BRIGHTMAN'S RESPONSE TO DEFENDANT INMODE LTD.'S MOTION TO DISMISS THE FIRST AMENDED COMPLAINT**

## **TABLE OF CONTENTS**

INTRODUCTION......................................................................................................... 1

STATEMENT OF RELEVANT FACTS ..................................................................... 2

    A.  Dr. Brightman's Existing Relationship with Invasix/InMode .......................... 2

    B.  Dr. Brightman Enters into a Written Agreement with InMode to Perform
        Clinical Trial Work in Exchange for 7,500 InMode Stock Options ................. 2

    C.  Mizrahy Asks Dr. Brightman to Sign a "Placeholder" Contract for the
        Clinical Trial Work................................................................................................. 4

    D.  Dr. Brightman Agrees to Provide Additional RFAL Services to InMode,
        Outside of the Clinical Trial Work.  ................................................................... 4

    E.  Dr. Brightman Agrees to Provide Additional Services to Promote Fractora
        Device for InMode in Exchange for New and Additional Stock Options ....... 5

    F.  InMode Makes its Initial Public Offering ……................................................... 6

RELEVANT PROCEDURAL HISTORY…………............................................... 7

STANDARD OF REVIEW............................................................................................ 7

    A.  Dismissal for improper Venue…………………………….................................. 7

    B.  Dismissal For Failure to State A Claim Upon Which Relief Can Be Granted. 8

ARGUMENT…………................................................................................................... 9

    A.  Dismissal Pursuant to Fed. R. Civ. P. 12(b)(3) is Improper. .......................... 9

        i.      InMode Failed to Give Dr. Brightman Consideration to Support
              Modification of the September 5, 2009 Terms ….................................... 9

        ii.     The Incorporation of the Forum Selection Clause was the Result of
              Inmode's Fraud ….………... ....................................................................... 11

        iii.    The Forum Selection Clause in Unreasonable and Unfair……………. 13

    B.  Dismissal is Improper Because Dr. Brightman's Claims for Negligent
        Misrepresentation and Fraud are Timely Filed................................................... 14

    C.  Dr. Brightman's Claims for Specific Performance, Breach of the Implied
        Covenant of Good Faith and Fair Dealing, Declaratory Judgment, Unjust
        Enrichment, and Promissory Estoppel were Timely Filed. .......................... 16

    D.  Dismissal Pursuant to Fed. R. Civ. P. 12(b)(6) is Improper. .......................... 16

i

**A-111**

i.   The Fifth Cause of Action is one for Breach of Contract and Survives Scrutiny under FRCP 12(b)(6). ……………………………………… 17

ii.  Dr. Brightman's Claims for Quasi-Contractual and Tort Claims are Not Duplicative or Barred by the 2010 Agreement Because They Address Services Performed Outside of the Clinical Trial that are Subject to Disputed Oral Contracts. ………………………………….. 18

iii. The FAC, in Conjunction with Lodwig's Declaration, Sufficiently States a Claim for Relief Arising from the 2009 and 2011 Oral Agreements……………………………………………………………… 19

iv.  The FAC Sufficiently States a Claims for Fraud……………………... 20

v.   The FAC Sufficiently States a Claim for Negligent Misrepresentation. 21

CONCLUSION….......................................................................................................... 23

<u>**TABLE OF AUTHORITIES**</u>

<u>**CASES**</u>

*Abercrombie v. College*,
    438 F. Supp. 2d 243, 266 (S.D.N.Y. 2006)........................................................................ 15

*Alaska Dep't of Revenue v. Manku*,
    No. 20-1759-cv, 2021 U.S. App. LEXIS 21219, at *9 (2d Cir. July 19, 2021)................. 8

*Arista Records, LLC v. Doe 3*,
    604 F.3d 110, 120 (2d Cir. 2010).......................................................................................... 8

*Ashcroft v. Iqbal*, 556 U.S. 662,
    556 U.S. 662, 678 (2009).....................................................................................................8, 15

*Ball v. Metallurgie Hoboken-Overpelt, S.A.*,
    902 F.2d 194, 197 (2d. Cir. 1990)........................................................................................ 7

*Bank v. Laptop & Desktop Repair LLC*,
    206 F. Supp. 3d 772, 775 (E.D.N.Y. 2016). ................................................................... 12

*Bell Atlantic Corp. v. Twombly*,
    550 U.S. 544, 555 (2007)........................................................................................................ 8

*Berkson v. Gogo LLC*,
    97 F. Supp. 3d 359, 364 (E.D.N.Y. 2015) ...................................................................... 10

*Brennen v. Phyto-Riker Pharm., Ltd.*,,
    01 CIV. 11815 (DLC), 2002 U.S. Dist. LEXIS 10910,
    at *2 n.2 (S.D.N.Y. June 20, 2002)...................................................................................... 8

*c.f. Couvertier v. Convourse Rehabilitation & Nursing, Inc.*,
    117 A.D.3d 772, 773 (2d Dep't 2014) ............................................................................ 13

*Chung v. Igloo Prods. Corp.*, No. 20-CV-4926 (MKB),
    2022 U.S. Dist. LEXIS 120825, at *54 (E.D.N.Y. July 8, 2022) ................................. 20

*Citizens United v. Schneiderman*,
    882 F.3d 374, 380 (2d Cir. 2018)......................................................................................... 8

*Cohen v. S.A.C. Trading Corp.*,
    711 F.3d 353, 364 (2d Cir. 2013)......................................................................................... 16

*Crigger v. Fahnestock & Co.*,
    443 F.3d 230, 232 (2d Cir. 2006) ........................................................................................ 20

*Daisy Indus., Inc. v. Kmart Corp.*,
   No. 96-CV-4211,  1997 U.S. Dist. LEXIS 16135, 1997 WL 642553,
   at \*3-4 (S.D.N.Y. Oct.17, 1997) 648 F.3d 98, 104 (2d Cir. 2011). ................................ 10

*Daisy Indus., Inc. v. Kmart Corp.*,
   96 Civ. 4211 (AGS) (RLE), 1997 U.S. Dist. LEXIS 16135,
   at \*11 (S.D.N.Y. Oct. 15, 1997) (2d Cir. 2011)................................................................. 10

*DeSola Grp. v. Coors Brewing Co.*,
   199 A.D.2d 141, 141, 605 N.Y.S.2d 83, 84 (App. Div. 1993) ...................................... 12

*D.H. Blair & Co. v. Gottdiener*
   462 F.3d 95, 103 (2d Cir. 2006)....................................................................................... 11

*Di Ruocco v. Flamingo Beach Hotel & Casino*,
   163 A.D.2d 270, 271-272 (2d Dep't 1990)...................................................................... 13

*Faber v. Metro. Life Ins. Co.*,
   648 F.3d 98, 104 (2d Cir. 2011)...................................................................................8, 9

*Fasano v. Yu Yu*,
   921 F.3d 333, 336 2d Cir. 2019. ...................................................................................... 13

*Fleet Bank v. Pine Knoll Corp.*,
   290 A.D.2d 792, 796, 736 N.Y.S.2d 737, 741 (App. Div. 2002) .................................. 22

*Fromer v. Vogel*,
   50 F.Supp. 2d 227, 242 (S.D.N.Y. 1999). ...................................................................... 14

*Gander Mt. Co. v. Islip U-Slip LLC,*,
   923 F. Supp. 2d 351, 364 (N.D.N.Y. 2013)...............................................................15, 21

*General Instrument Corp. v. Tie Manufacturing, Inc.*,
   517 F. Supp. 1231, 1235 (S.D.N.Y. 1981)...................................................................... 10

*Hardwire, LLC v. Zero Int'l, Inc.*,
   No. 14-CV-54, 2014 U.S. Dist. LEXIS 146364,
   2014 WL 5144610, at \*8 n.8 (D. Del. Oct. 14, 2014) ................................................... 10

*Hobart v. Schuler*, 5
   5 N.Y.2d 1023, 1024, 449 N.Y.S.2d 479, 480, 434 N.E.2d 715, 716 (1982) ………… 18

*Hydro Inv'rs, Inc. v. Trafalgar Power, Inc.*,
  227 F.3d 8, 11 (2d Cir. 2000) ........................................................... 21

*In re A.*, 2015 NYLJ LEXIS 5068, *8,
  citing *DeSola Grp. v. Coors Brewing Co.*, 199 A.D.2d 141, 141,
  605 N.Y.S.2d 83, 84 (App. Div. 1993) ........................................... 12

*Iqbal*,
  556 U.S. at 678 (2009), ................................................................. 16

*J.B. Harris, Inc. v. Razel Bar Indust., Ltd.*
  37 F.Supp. 2d 186, 191 (E.D.N.Y. 1998) ...................................... 12

*Jazini v. Nissan Motor Co., Ltd.*,
  148 F.3d 181, 184 (2d. Cir. 1998) .................................................... 7

*Kakarla v. Penakalapati*,
  551 F. Supp. 3d 70, 74 (W.D.N.Y. 2021) ), ................................... 10

*Knight Securities, LP v. Fiduciary Trust Co.*,
  5 A.D. 3d 172, 774 N.Y.S. 2d 488 (1st Dept. 2004) ..................... 22

*Koch Erecting Co. v. New York Convention Ctr. Dev. Corp.*,
  656 F.Supp. 464, 467 (S.D.N.Y. 1987). ........................................ 13

*Kotler v. Charming Shoppes, Inc.*,
  2012 U.S. Dist. LEXIS 11577, at *1 (S.D.N.Y. Jan. 31, 2012) ...... 16

*Lamb v. Emhart Corp.*,
  47 F.3d 551, 554 (2d.Cir. 1995), .................................................... 10

*Lou v. Belzberg*,
  834 F.2d 730, 739 (9th Cir. 1987). ................................................. 14

*Lorbrook Corp. v. G & T Indus., Inc.*,,
  162 A.D.2d 69, 73, 562 N.Y.S.2d 978, 980 (App. Div. 1990) ....... 10

*M&T Bank Corp. v. LaSalle Bank Nat'l Ass'n*,
  852 F. Supp. 2d 324, 336 (W.D.N.Y. 2012) .................................. 21

*Manku*,
  2021 U.S. App. LEXIS 21219, at *9, ......................................... 8, 16

*Marchig v. Christie's Inc*,
  430 F. App'x 22, 25 (2d Cir. 2011). ......................................... 14, 15

*Mayborn (UK) Ltd. v. Comotomo Inc.*,
    2023 U.S. Dist. LEXIS 451, at *4 (S.D.N.Y. Jan. 3, 2023).................................7

*Minnette v. Time Warner*,
    997 F.2d 1023, 1026 (2d Cir. 1993)............................................................8

*National Machinery Exchange, Inc. v. Peninsular Equipment Corp.*,
    106 Misc. 2d 458, 459, 431 N.Y.S.2d 948, 949,  (Sup. Ct. N.Y. Co. 1980) ...............10

*Ny Metro Radio Korea v. Jin & Won Musicworks*,,
    2016 U.S. Dist. LEXIS 200513, at *7 (E.D.N.Y. Aug. 10, 2016)..................................12

*Optionality Consulting Pte. Ltd. v. Nekos*, No. 18-cv-5393 (ALC),
    2019 U.S. Dist. LEXIS 160493, at *18-19 (S.D.N.Y. Sep. 18, 2019) ..........................19

*Pacamor Bearings, Inc. v. Molon Motors & Coil, In*c.,
    102 A.D.2d 355, 357, 477 N.Y.S.2d 856, 858 (3d Dep't 1984).....................................10

*Pers v. Google, Inc.*,
    456 Supp.2d 488, 493 (S.D.N.Y. 2006.).............................................................7

*Petkanas v. Petkanas*, 2021 NY Slip Op. 00581, ¶¶ 1-2,
    191 A.D.3d 708, 709, 140 N.Y.S.3d 586, 588..................................................9

*Phillips v. Audio Active, Ltd.*,
    494 F.3d 378, 383 (2d Cir. 2007)...................................................................11

*R.H. Damon & Co. v. Softkey Software Prods., Inc.*,
    811 F. Supp. 986, 992 (S.D.N.Y. 1993) ........................................................19

*Rolon v. Henneman.*,
    517 F.3d 140, 149 (2d. Cir. 2008)...................................................................9

*Sebastian Holdings, Inc. v. Deutsche Bank, AG*,
    2009 NY Slip Op 52835(U), ¶ 9, 35 Misc. 3d 1227(A),
    1227A, 953 N.Y.S.2d 553 (Sup. Ct.);................................................................19

*Societe Nationale D'Exploitation Industrielle Des Tabacs Et Allumettes v.Salomon Bros. Int'l*,
    251 A.D.2d 137, 138, 674 N.Y.S.2d 648 (1998) .........................................22

*Stein v. United Wind, Inc.*,
    2021 NY Misc.  LEXIS 472 (Suff. Cnty. Feb 8, 2021). ...............................13

*Thar Process, Inc. v. Sound Wellness, LLC*,
    No. 21-CV-422S, 2022 U.S. Dist. LEXIS 8789,
    at *45-46 (W.D.N.Y. Jan. 18, 2022). ............................................................16

*Thermoglaze, Inc. v. Morningside Gardens Co*,
    23 Conn. App. 741, 745, 583 A.2d 1331, 1333, *cert. denied*, 217 Conn. 811,
    587 A.2d 153 (1991) ..................................................................................................... 10

*Thibodeau v. Pinnacle FX Invs*,
    No. 08-CV-1662 (JFB) (ARL), 2008 U.S. Dist. LEXIS 90440,
    at *12 (E.D.N.Y. Nov. 6, 2008); ................................................................................11, 13

*Tiki Boatworks, LLC v. Crusin' Tikis*,
    *LLC*, No. 1:20-cv-907 (TJM/DJS), 2021 U.S. Dist. LEXIS 60145,
    at *1 (N.D.N.Y. Mar. 30, 2021)..................................................................................... 12

*Torchlight Loan Servs., LLC v. Column Fin., Inc.*,
    2012 U.S. Dist. LEXIS 105895, at *24 (S.D.N.Y. July 22, 2012) ................................. 19

*Trans-Tec Asia v. M/V Harmony Container*,
    435 F.Supp.2d 1015, 1025 (C.D. Cal. 2005); *aff'd*, 518 F.3d 1120 (9th Cir. 2008). ....... 10

*United States EPA ex rel. McKeown v. Port Auth.*,
    162 F. Supp. 2d 173, 183 (S.D.N.Y. 2001)...................................................................... 7

*United States v. Jackson*,
    No. 21-CR-537-LTS, 2022 U.S. Dist. LEXIS 112285,
    at *7 (S.D.N.Y. June 24, 2022).................................................................................... 10

*Viania v. Zimmer, Inc.*, No. 2:17-cv-1641 (ADS)(AYS),
    2017 U.S. Dist. LEXIS 195183, at *7 (E.D.N.Y. Nov. 27, 2017*), citing*
    *Fromer v. Vogel*, 50 F.Supp.2d 227, 242 (S.D.N.Y. 1999). .......................................... 14

*Von Hoffmann v. Prudential Ins. Co. of Am.*,
    202 F. Supp. 2d 252, 263-64 (S.D.N.Y. 2002). .............................................................. 14

*Whitaker v. Am. Telecasting, Inc.*,
    261 F.3d 196, 198 (2d Cir. 2001)..................................................................................... 7


## STATUTES

CPLR § 213(1) ...................................................................................................................... 14

CPLR § 213(8) ...................................................................................................................... 14

FRCP 9(b) ............................................................................................................................. 19

FRCP 12(b)(3) ....................................................................................................................7, 9

FRCP 12(b)(6)   ..............................................................................8, 16, 17, 20, 23

FRCP 15(a)   ..............................................................................................17, 23

UCC § 2-207(2) ...................................................................................... 10

UCC § 8-113(a)......................................................................................... 9

## **OTHER RESOURCES**

5A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure*:
   Civil 2d § 1352 (1990 & Supp. 1999). ........................................... 7

17A Am.Jur.2d Contracts § 183 (2022)...................................... 10

*Restat 2d of Contracts, § 80*............................................................. 9

## <u>INTRODUCTION</u>

This lawsuit is about trust, hard work, deception, betrayal, and a fight for what is rightfully owed. Between 2009 and 2012, Plaintiff Lori A. Brightman ("Dr. Brightman"), a widely renowned, board certified dermatologist and dermatologic surgeon agreed to perform various services for Defendant InMode, Ltd. ("InMode") in exchange for stock options once InMode went public. At the time, Dr. Brightman was pleased to assist InMode with clinical trials of new technology, as well as publicity through conferences and publications in exchange for stock options. She had a prior existing business relationship with two of InMode's executives, Brian Lodwig ("Lodwig") and Moshe Mizrahy ("Mizrahy") based on their work at a prior company.  Dr. Brightman trusted both men and relied on their authority to act for InMode.

Unfortunately, her trust was misplaced. Within a year of the parties' initial written agreement and after Dr. Brightman had substantially performed her work under the existing contract, Mizrahy presented a new written agreement that unilaterally decreased her stock options, and added new terms and conditions that the parties had never discussed or negotiated. For example, the new terms included a forum selection clause that required Dr. Brightman to litigate disputes in Israel. Dr. Brightman protested stock option reduction and the new terms, but Mizrahy fraudulently induced her to sign the revised contract based on his assurance that it was merely a placeholder and that the parties would execute a corrected version later. The corrected version never followed.

Over the next two years, InMode solicited Lori to perform new discrete services for the company in exchange for stock options. When Dr. Brightman would inquire as to whether the agreements needed to be in writing, Lodwig and Mizrahy assured her that they "had her back," that no additional documentation was necessary, and that she was "all set."  Despite these promises, no one notified Dr. Brightman when InMode made its initial public offering in August 2019. In fact, Dr. Brightman did not learn of InMode having gone public until Lodwig called to brag about the enormous financial windfall he received and his pending retirement. When Dr. Brightman contacted Mizrahy to inquire as to the stock options that InMode has promised her, Mizrahy

1

informed her that her stock options had expired and given no recourse. The stock options were the only compensation InMode gave Dr. Brightman for her hard work over three years including clinical trials, conferences, publications, and handling prospective calls from other physicians and emails. Dr. Brightman filed suit against InMode accordingly.

InMode now seeks to dismiss Dr. Brightman's lawsuit pursuant to Fed. R. Civ. P. 12(b)(3) and (12)(b)(5). Dr. Brightman is a victim of greed and misconduct. InMode profited enormously at Dr. Brightman's expense. Her fight for justice against Defendants' fraudulent conduct should not be denied, particularly at this early stage of litigation with numerous disputed facts at issue. For the reasons discussed below, dismissal is improper under both subsections of the rule and Dr. Brightman respectfully requests that the Court deny the motion to dismiss accordingly.

## STATEMENT OF RELEVANT FACTS

### A. Dr. Brightman's Existing Relationship with Invasix/InMode

Dr. Brightman first met InMode CEO Mizrahy and former InMode President Lodwig in 2008. *Id*. at ¶ 13. Mizrahy was the CEO of a company called Syneron at that time. *Id.* Mizrahy and Lodwig eventually left Syneron to found Invasix, and Mizrahy began discussing Invasix technology with Dr. Brightman. *Id*. at ¶ 14. Invasix later changed its corporate name to InMode. *Id*. at ¶ 11.

### B. Dr. Brightman Enters into a Written Agreement with InMode to Perform Clinical Trial Work in Exchange for 7,500 InMode Stock Options.

In early 2009, Dr. Brightman traveled to Toronto, Canada for Invasix's Radiofrequency-Assisted Liposuction ("RFAL") training. *Id.* at ¶ 15. After completing the training, Dr. Brightman received a written offer from InMode for 7,500 InMode stock options (to be available when InMode went public) in exchange for Dr. Brightman's performance of RFAL procedures on 15 patients in a clinical trial ("Clinical Trial Work"). *Id*. at ¶ 15. Specifically, on April 5, 2009, Mizrahy wrote as follows:

Dear Lori,

Again, I would like to take this opportunity to thank you for making

2

the trip to Toronto. I hope you enjoyed the training.

In this e-mail I would like to summarize the discussion that you, Dr. Michael Kreindel, and I had in Toronto.

You will conduct a study for Invasix that will include 15 patients to be divided into two groups: 7-8 patients will be treated on the neck and the other 7-8 patients will be treated on the upper arms (see enclosed some pictures that we took of the first neck treatment conducted by Dr. Steve Mulholland in Toronto, using the 12 cm. handpiece we showed you in Toronto).

Yang will help with the site approval. If she needs anything from you, she will contact you directly.

The study that you will conduct is very important to us - it will serve us to communicate the message of small area shaping and tightening to the dermatologist community. As we told you, we do not intend to work with other dermatologists on Invasix (we are currently concentrating on the plastic surgeon community) so we see you as our opinion leaders in the derm community.

In this study, we would like to prove the mechanism of operation of our technology as a superior mechanism vis a vis other methods of laser and ultrasound. Therefore, as we discussed, the study will include 3 venues of gold-standard clinical proof: before and after 3 D pictures using the Canfield Vectra system, histologies and skin tightening and laxity analysis. As you told us, you are capable of analyzing the results throughout these 3 venues. We are therefore willing to add as per your request the $ 500 per patient in addition to what is specified in our contract.

In addition, I would like to tell you that the Board of Directors of Invasix has approved allocating 7,500 options to you, to be vested over 3 years, as of January 1st, 2009.

I look forward to working closely with you and to beginning our study. Once we receive site approval - we will ship you a system and Dr. Michael Kreindel will come to work with you on the first case.

*Id.*

Dr. Brightman recognized that Mizrahy was the CEO of Invasix (which later became InMode) and relied on his actual or apparent authority to bind the company to the terms set forth in the April 5, 2009 agreement. *Id.* at ¶ 16.   Dr. Brightman therefore agreed to perform the Clinical Trial Work in her New York office in exchange for the 7,500 stock options offered. Dr. Brightman

3

believed the April 5, 2009 email represented the full scope of the parties' agreement. *Id.* Mizrahy

did not advise her there would be additional terms. *Id.*; *see also* Decl. of Lori A. Brightman,

attached hereto as **Exhibit A** at ¶ 5**.**

### C.  Mizrahy Asks Dr. Brightman to Sign a "Placeholder" Contract for the Clinical Trial Work.

In April 2010, <u>*after Dr. Brightman had substantially completed the Clinical Trial Work*</u>,

Mizrahy sent Dr. Brightman a Notice of Stock Option Award ("2010 Agreement"), in

consideration of the aforesaid specific services viz., clinical trial surgery and data collection for

the Clinical Trial. *Id*. at ¶ 18. When Dr. Brightman received the 2010 Agreement, she noted it

incorrectly identified 7,000 shares of stock and not the 7,500 shares promised by Mizrahy on behalf

of InMode. *Id*. at ¶ 19. She further noted that the 2010 Agreement included new terms and

conditions which were not even discussed or agreed to by the parties. *Id*. at ¶ 20. These new terms,

which included a forum selection clause that forced Dr. Brightman to litigate all disputes in Israel,

were inconsistent with the parties' April 5, 2009 agreement and unsupported by separate or new

consideration. *Id.*

Dr. Brightman objected to the 2010 Agreement and asked for revisions before signature.

*Id*. at ¶ 21; *see also* Ex. A at ¶ 6. Mizrahy assured Dr.  Brightman that he would send a corrected

agreement, but insisted that Dr. Brightman sign the 2010 Agreement as a "placeholder" pending

receipt of the final, corrected contract. *Id.;* Ex. A at ¶ 7. In reliance on Mizrahy's assurances, Dr.

Brightman executed the 2010 Agreement. *Id.*; Ex. A at ¶ 8. Ultimately, however, Mizrahy never

provided Dr. Brightman with the corrected version. *Id.*, Ex. A at ¶ 9.

### D.  Dr. Brightman Agrees to Provide Additional RFAL Services to InMode, Outside of the Clinical Trial Work.

After Dr. Brightman had completed the RFAL Clinical Trial Work, Lodwig asked if Dr.

Brightman would be interested in providing new services to InMode at upcoming society meetings

or by writing in publications she might be able to author or participate in. *Id.* at 22; Ex. A at ¶ 10.

Lodwig represented to Dr. Brightman that if she performed the new work, InMode would

compensate her with additional stock options to be provided and available when Defendant went public. *Id*. at ¶ 24; Ex. A at ¶ 10. Specifically, Lodwig represented that he was authorized by InMode's Board of Directors to offer Dr. Brightman: (1) 5,000 shares yearly for attending meetings (derm meetings, society meetings, aesthetic meetings); (2) 5,000 shares per any publications (print or electronic); (3) 5,000 shares per international meeting; and (4) 5,000 shares per year for taking potential prospect calls/emails answering InMode's questions. *Id*. at ¶ 24. Lodwig advised Dr. Brightman that the options were to be of the same kind that Lodwig himself would receive as an InMode executive, though the precise value of each share of stock would not be known until the company went public.  *Id.* at ¶ 29.

Dr. Brightman agreed to perform these services. *Id*. at ¶ 25; Ex. A at ¶ 11. Thereafter, Dr. Brightman received several emails from InMode with various requests consistent with Lodwig's verbal commitments and representations. *Id*. On October 13, 2011, Dr. Brightman met with Lodwig in her office with Chris Yackel, Senior Territory Manager at Invasix. *Id.* at ¶ 31; Ex. A at ¶ 12. During this meeting, Lodwig reviewed with Dr. Brightman all the additional work she had done for RFAL promotion, which by then had reached the equivalent of 45,000 stock options. *Id.* at ¶¶ 27, 31.

When Dr. Brightman asked Lodwig about any necessary paperwork, Lodwig assured her as follows: "Lori, do not worry about that, no, this is coming from Moshe (Mizrahy) directly." Id. at ¶ 31, 32; Ex. A at ¶¶ 12, 13. "We know the extra work you have done for us (of course outside of the RFAL clinical trial). This is all set." *Id*. Both Yackel and Lodwig have an independent recollection of this meeting and both have confirmed these discussions occurred. *Id*.; *see also* ECF No. 9. The 45,000 earned stock options were Dr. Brightman's only compensation for the extra services she provided.  *Id.* at ¶ 34.

### E.  Dr. Brightman Agrees to Provide Additional Services to Promote Fractora Device for InMode in Exchange for New and Additional Stock Options

During the same October 13, 2011 meeting between Lodwig and Dr. Brightman, Lodwig informed Dr. Brightman that Mizrahy wanted Dr. Brightman to also work with the Fractora device,

which is for minimally invasive anti-aging skin and tissue resurfacing. *Id*. at ¶ 37; Ex. A at ¶ 13. He said, "We have spoken about this, this is coming from Moshe, he would like for you to do with Fractora what you did for RFAL, we know what you can do with this." *Id*. at ¶ 38. Lodwig further advised Dr. Brightman, "We, myself and Moshe (for the Company), are willing to do the same stock option deal we have done with RFAL with Fractora. So, 5,000 yearly for meetings (derm meetings, society meetings, aesthetic meetings), any publications you can get will also be 5,000 and of course international meetings are very important to us so we will also continue to do 5,000 per international meeting and 5,000 for taking potential prospect calls/emails answering their questions." *Id*. at ¶ 39.

Dr. Brightman agreed to perform the new work for the same compensation arrangement as she had received with RFAL. *Id*. at ¶ 40; Ex. A at ¶ 13. Dr. Brightman again asked whether additional paperwork was needed for the Fractora work and was assured by Lodwig, "Lori, this is coming from Moshe (Mizrahy) directly (for InMode)." *Id*. at ¶ 41. "We know the work you have done for us of course. This is all set." Based upon these past fulfilled promises, Dr. Brightman believed Lodwig was a person of his word and agreed to continue to do this extra work. She knew this is a very common practice in their industry. *Id.* at ¶¶ 42-43.

For the scope of additional works that Dr. Brightman provided to InMode to develop with a goal of promoting Fractora from 2011 through 2012, she was to receive 5,000 options per year for a total of 10,000 stock options. *Id*. at ¶ 44. Dr. Brightman performed her part of the contract relating to Fractora, but received no additional monetary compensation for any of the foregoing services, in violation of the parties' industry-standard agreement, which Dr. Brightman understood to include compensation with stock options as promised on multiple occasions by Lodwig with Mizrahy's approval. *Id*. at ¶¶ 49 – 50.

**F. InMode Makes its Initial Public Offering**

On or around August 8, 2019, InMode made its initial public offering.  The stock subsequently split in 2021 on a 2:1 basis. *Id*. at ¶ 56. On or about April 12, 2021, Dr. Brightman learned of InMode having gone public when Lodwig called her to advise that he had received such

6

an enormous financial windfall that he was able to retire. Dr. Brightman advised Lodwig that she had no idea the IPO had occurred. Ex. A at ¶ 15. On April 12, 2021, Dr. Brightman emailed Mizrahy inquiring as to the 7,500 stock options she had been promised pursuant to the parties' April 5, 2009 agreement. *Id*. at ¶ 57; Ex. A at ¶ 16. On or around April 14, 2021, Mizrahy responded that Dr. Brightman's options were expired. *Id*.; Ex. A at ¶ 17.

## RELEVANT PROCEDURAL HISTORY

On July 8, 2022, Dr. Brightman filed the instant action against InMode. ECF No. 1. On December 29, 2022, Dr. Brightman filed a First Amended Complaint against InMode, alleging causes of action for Negligent Misrepresentation, Promissory Estoppel, Unjust Enrichment, Fraud, Declaratory Relief and Specific Performance, and Breach of the Implied Covenants of Good Faith and Fair Dealing. ECF No. 21. On January 13, 2023, InMode filed the instant motion to dismiss. ECF Nos. 22 – 24.

## STANDARD OF REVIEW

### A. Dismissal for Improper Venue

A defendant may move to dismiss a complaint for improper venue under FRCP 12(b)(3). *See* Fed. R. Civ. P. 12(b)(3).  Once the motion is made, the plaintiff has the burden of pleading venue. *Mayborn (UK) Ltd. v. Comotomo Inc.*, 2023 U.S. Dist. LEXIS 451, at \*4 (S.D.N.Y. Jan. 3, 2023), citing *Pers v. Google, Inc.*, 456 Supp.2d 488, 493 (S.D.N.Y. 2006.) A plaintiff carries this burden "by pleading in good faith …legally sufficient allegations of jurisdiction, i.e., by making a 'prima facie showing' of jurisdiction." *Whitaker v. Am. Telecasting, Inc.*, 261 F.3d 196, 198 (2d Cir. 2001), *citing Jazini v. Nissan Motor Co., Ltd*., 148 F.3d 181, 184 (2d. Cir. 1998) (quoting *Ball v. Metallurgie Hoboken-Overpelt, S.A*., 902 F.2d 194, 197 (2d. Cir. 1990). This prime facie showing can be made "through [plaintiff's] own affidavits and supporting materials containing an averment of fact that, if credited, would suffice to establish jurisdiction over the defendant." *Id*.

In considering the motion, "[t]he court must take all allegations in the complaint as true, unless contradicted by the defendants' affidavits." *United States EPA ex rel. McKeown v. Port Auth.*, 162 F. Supp. 2d 173, 183 (S.D.N.Y. 2001), citing 5A Charles Alan Wright & Arthur R.

Miller, *Federal Practice and Procedure*: Civil 2d § 1352 (1990 & Supp. 1999). "When an allegation in the complaint is so challenged, a court may examine facts outside the complaint to determine whether venue is proper." *Id*.; see also *Brennen v. Phyto-Riker Pharm., Ltd.*, 01 CIV. 11815 (DLC), 2002 U.S. Dist. LEXIS 10910, at *2 n.2 (S.D.N.Y. June 20, 2002) (courts may consider materials outside of the pleadings when deciding a motion to dismiss for improper venue). However, "[t]he court must draw all reasonable inferences and resolve all factual conflicts in favor of the plaintiff." *Id.* "Whether dismissal or transfer is appropriate lies within the sound discretion of the district court." *Minnette v. Time Warner*, 997 F.2d 1023, 1026 (2d Cir. 1993) (internal citations omitted).

**B. Dismissal For Failure to State A Claim Upon Which Relief Can Be Granted.**

A court may dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). To survive a motion to dismiss, a plaintiff must plead sufficient factual allegations to "state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *see also* Fed. R. Civ. P. 8(a)(2). A claim is plausible on its face "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citations omitted).

"The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* In short, it requires a simple showing of "enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of illegality … even if it strikes a savvy judge that actual proof of those facts is improbable." *Alaska Dep't of Revenue v. Manku*, No. 20-1759-cv, 2021 U.S. App. LEXIS 21219, at *9 (2d Cir. July 19, 2021) (quoting *Arista Records, LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010) and *Citizens United v. Schneiderman*, 882 F.3d 374, 380 (2d Cir. 2018)).

In considering a motion to dismiss, the court "must draw all reasonable inferences in Plaintiff's favor, assume all well-plead allegations to be true, and determine whether they plausibly give rise to an entitlement to relief." *Faber v. Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011).

However, courts are not "bound to accept conclusory allegations or legal conclusions masquerading as factual conclusions." *Id.*, citing *Rolon v. Henneman*, 517 F.3d 140, 149 (2d. Cir. 2008).

## **ARGUMENT**

### **A. Dismissal Pursuant to Fed. R. Civ. P. 12(b)(3) is Improper.**

There is substantial disagreement between the parties over the facts relevant to this Court's consideration of the forum selection clause set forth in the 2010 Agreement. Dr. Brightman had substantially completed the required Clinical Trial Work by the time InMode presented the forum selection clause for her review. She completed the Clinical Trial Work under the good faith belief that InMode would honor the terms set forth in Mizrahy's April 5, 2009 email, which made no mention of litigating claims in Israel.

The April 5, 2009 email represented the full scope of the parties' agreement. Ex. A at ¶ 5. More importantly, however, InMode failed to offer Dr. Brightman additional consideration to support this substantial modification of the parties' existing agreement. Further, Dr. Brightman signed the 2010 Agreement under protest and in reliance on Mizrahy's assurance that the non-negotiated and undiscussed terms contained therein, including the forum selection clause, would be modified and that this agreement was merely a required place-holder.[1] For these reasons, discussed further below, Dr. Brightman respectfully requests that the Court deny InMode's motion to dismiss pursuant to FRCP 12(b)(3).

### **i. InMode Failed to Give Dr. Brightman Consideration to Support Modification of the September 5, 2009 Terms.**

Though it is well-settled law that each provision in a contract need not be supported by independent consideration, see *Restat 2d of Contracts, § 80,* courts have routinely recognized that *material modification* of a contract requires additional consideration "as evidence that the parties

---

[1] In fact, it was not a required place holder as an agreement for the sale of options is not required to be in writing per UCC 8-113(a). *See Petkanas v. Petkanas*, 2021 NY Slip Op. 00581, ¶¶ 1-2, 191 A.D.3d 708, 709, 140 N.Y.S.3d 586, 588.

have in fact bargained for and agreed upon what is essentially a new contract." *Lamb v. Emhart Corp.*, 47 F.3d. 551, 554 (2d.Cir. 1995), citing *Thermoglaze, Inc. v. Morningside Gardens Co.*, 23 Conn. App. 741, 745, 583 A.2d 1331, 1333, *cert. denied*, 217 Conn. 811, 587 A.2d 153 (1991) (recognizing that a mate); *see also Kakarla v. Penakalapati*, 551 F. Supp. 3d 70, 74 (W.D.N.Y. 2021) (Under New York law, a modification to a contractual agreement is unenforceable unless supported by consideration.) Material modification typically encompasses any contractual provision that deals with a significant legal issue and includes any term "which a party would reasonably regard as a vitally important element of their bargain." *United States v. Jackson*, No. 21-CR-537-LTS, 2022 U.S. Dist. LEXIS 112285, at *7 (S.D.N.Y. June 24, 2022), citing *Berkson v. Gogo LLC*, 97 F. Supp. 3d 359, 364 (E.D.N.Y. 2015) and 17A Am.Jur.2d Contracts § 183 (2022).

Relative to the instant matter, many courts (including the New York Southern District) have held that "a proposal to add a forum selection clause to the terms of an already existing agreement amounts to a proposal to materially alter that agreement." *Berkson*, 97 F. Supp. 3d at 393.[2] In fact, trial courts in this district have specifically held that a "forum selection clause constitute[s] additional terms under § 2-207(2) of the UCC," and therefore, the addition of a forum selection clause constitutes a material alteration that "requires the express consent of the other party." *Daisy Indus. v. Kmart Corp.*, 96 Civ. 4211 (AGS) (RLE), 1997 U.S. Dist. LEXIS 16135, at *11 (S.D.N.Y. Oct. 15, 1997).[3]

---

[2] Citing *Hardwire, LLC v. Zero Int'l, Inc.*, No. 14-CV-54, 2014 U.S. Dist. LEXIS 146364, 2014 WL 5144610, at *8 n.8 (D. Del. Oct. 14, 2014); *Trans-Tec Asia v. M/V Harmony Container*, 435 F.Supp.2d 1015, 1025 (C.D. Cal. 2005) ("[C]ourts have generally found forum-selection clauses to be material alterations." (collecting cases)), *aff'd*, 518 F.3d 1120 (9th Cir. 2008); *Daisy Indus., Inc. v. Kmart Corp.*, No. 96-CV-4211, 1997 U.S. Dist. LEXIS 16135, 1997 WL 642553, at *3-4 (S.D.N.Y. Oct.17, 1997) (finding that forum selection clause must be specifically consented to).

[3] Citing *Lorbrook Corp. v. G & T Indus., Inc.*, 162 A.D.2d 69, 73, 562 N.Y.S.2d 978, 980 (App. Div. 1990); *General Instrument Corp. v. Tie Manufacturing, Inc.*, 517 F. Supp. 1231, 1235 (S.D.N.Y. 1981); *Pacamor Bearings, Inc. v. Molon Motors & Coil, In*c., 102 A.D.2d 355, 357, 477 N.Y.S.2d 856, 858 (3d Dep't 1984); National Machinery Exchange, Inc. v. Peninsular Equipment Corp. [*12] , 106 Misc. 2d 458, 459, 431 N.Y.S.2d 948, 949 (Sup. Ct. N.Y. Co. 1980).

This matter is no exception. A forum selection clause was not part of the parties' April 5, 2009 contract. Though Dr. Brightman executed the 2010 Agreement, she was fraudulently induced to do so based upon Mizrahy's assurance that the contract was merely a required placeholder, and that the forum selection clause and other non-negotiated terms would be removed later. Dr. Brightman never gave her express consent to litigate in Israel. Further, Dr. Brightman did not receive any additional consideration for this unilateral and material modification of the parties' existing April 5, 2009 agreement. To the contrary, the 2010 Agreement offered Dr. Brightman 500 less shares than InMode had agreed to when the parties first contracted. Because a limitation on a party's right to sue is a significant legal issue and a vitally important element of a bargain, InMode was required to provide additional consideration for the term. Its failure to do so renders the forum selection clause unenforceable as a matter of law.

### ii. The Incorporation of the Forum Selection Clause was the Result of InMode's Fraud.

The moving party carries the initial burden to provide evidence of a valid forum selection clause and meets this burden by demonstrating to the court that the clause was: (1) reasonably communicated to the resisting party; (2) mandatory, not permissive; and (3) covers the claims and parties involved in the dispute. *Thibodeau v. Pinnacle FX Invs.*, No. 08-CV-1662 (JFB) (ARL), 2008 U.S. Dist. LEXIS 90440, at *12 (E.D.N.Y. Nov. 6, 2008); *see also Phillips v. Audio Active, Ltd.*, 494 F.3d 378, 383 (2d Cir. 2007), citing *D.H. Blair & Co. v. Gottdiener*, 462 F.3d 95, 103 (2d Cir. 2006).

If the movant meets these criteria, the forum selection clause is presumptively enforceable, and the burden shifts to the non-moving party to make strong showing "that enforcement [of the forum selection clause] would be unreasonable or unjust, or that the clause is invalid for such reasons as fraud or overreaching." *Thibodeau*, 2008 U.S. Dist. LEXIS 90440, at *12 (internal quotations omitted), citing *Phillips,* 494 F.3d at 384.

Relative to fraud, the non-moving party must allege there was fraud in connection with the inclusion of the forum selection clause itself. *See Bank v. Laptop & Desktop Repair LLC*, 206 F. Supp. 3d 772, 775 (E.D.N.Y. 2016); *see also J.B. Harris, Inc. v. Razel Bar Indust., Ltd.,* 37 F.Supp. 2d 186, 191 (E.D.N.Y. 1998) and *Ny Metro Radio Korea v. Jin & Won Musicworks*, 2016 U.S. Dist. LEXIS 200513, at *7 (E.D.N.Y. Aug. 10, 2016). Notably, however, New York state courts have held when all of the non-moving party's allegations are rested in fraud - in other words, the complaint is "permeated with allegations of fraud" and the fraud "encompass[es] the entire case before the court," a court may find that the "even if the forum-selection clause is applicable, it is unenforceable." *In re A*., 2015 NYLJ LEXIS 5068, *8, citing *DeSola Grp. v. Coors Brewing Co.*, 199 A.D.2d 141, 141, 605 N.Y.S.2d 83, 84 (App. Div. 1993) (forum selection clause unforceable because the record was replete with allegations of fraud). Federal courts have made similar findings. See e.g. *Tiki Boatworks, LLC v. Crusin' Tikis, LLC*, No. 1:20-cv-907 (TJM/DJS), 2021 U.S. Dist. LEXIS 60145, at *1 (N.D.N.Y. Mar. 30, 2021) (consideration of arbitration agreement not separated from substantive contractual provisions where there is a grand scheme to defraud that permeates the entire contract).

Here, InMode argues that it met its initial burden by establishing that the forum selection clause was reasonably communicated to Dr. Brightman, is mandatory, and covers all claims and disputes at issue. ECF No. 23, p. 19. InMode further argues that Dr. Brightman cannot overcome the presumptive enforceability of the clause because the FAC does not allege that the forum selection clause itself was the product of fraud. *Id*. This is simply untrue.

The FAC specifically references the fact that Dr. Brightman objected to the incorporation of the forum selection clause in the April Agreement, but Mizrahy fraudulently induced her to agree to the clause by assuring her that the agreement was just a "placeholder." ECF No. 21 ¶¶ 20 – 21; Ex. A at ¶ 8.

Dr. Brightman originally agreed to conduct the Clinical Trial Work based solely upon the terms presented in Mizrahy's April 5, 2009 email, which undisputedly made no mention of a forum selection clause. She was unaware that, a year later, after she had substantially performed under

the contract, InMode would demand she agree to litigate all disputes in Israel. Dr. Brightman objected to the incorporation of the forum selection clause accordingly. In response to her objection, Mizrahy verbally assured Dr. Brightman that he would send a corrected agreement after she signed what he referred to as a "placeholder." Based upon Mizrahy's assurances, Dr. Brightman executed the 2010 Agreement. The corrected agreement never followed.

### iii.    The Forum Selection Clause is Unreasonable and Unfair to Dr. Brightman.

Under both New York and federal law, forum selection clauses are not enforceable if "result from fraud or overreaching," "are unreasonable or unfair," or "their enforcement would contravene some strong public policy." *Di Ruocco v. Flamingo Beach Hotel & Casino*, 163 A.D.2d 270, 271-272 (2d Dep't 1990); see also *Fasano v. Yu Yu*, 921 F.3d 333, 336 (2d Cir. 2019) and *Thibodeau*, 2008 U.S. Dist. LEXIS 90440, at *12. Unreasonableness is normally gauged by: 1) inequality of power; 2) public policy; 3) injustice; 4) availability of remedies in the chosen forum; 5) the governing law; 6) inconvenience, and 7) conduct of the parties. *Koch Erecting Co. v. New York Convention Ctr. Dev. Corp.*, 656 F.Supp. 464, 467 (S.D.N.Y. 1987).

Forum selection clauses should not be enforced where the selected forum would be so gravely difficult that the opposing party would, for all practical purposes, be deprived of his day in court. *Stein v. United Wind, Inc.*, 2021 NY Misc. LEXIS 472 (Suff. Cnty. Feb 8, 2021). Further, tort claims separate from the contract aren't necessarily controlled by a forum selection clause. It depends on the language in the clause. *See, c.f. Couvertier v. Convourse Rehabilitation & Nursing, Inc.*, 117 A.D.3d 772, 773 (2d Dep't 2014) (upholding forum selection where it read "any and all actions arising out of or related to the agreement." Contrast with "any suit, action, or proceeding arising out of or relating to the Notice, the Plan, or *this* Option Agreement…" (emphasis added)).

The forum selection clause at issue is unreasonable and effectively will deprive Dr. Brightman of her day in court. Dr. Brightman never agreed to litigate in Israel. She objected to the incorporation of the forum selection clause and believed Mizrahy's representation that the clause would ultimately be removed. Further, notwithstanding Dr. Brightman's fraud allegations, any deference afforded to InMode's choice of forum should be minimized when the operative facts

have not occurred within the forum and the forum has no interest in the parties or the subject matter. See *Lou v. Belzberg*, 834 F.2d 730, 739 (9th Cir. 1987). Dr. Brightman is a resident of Massachusetts and the work she performed for InMode took place at her office in New York. Outside of the training in Toronto, her substantive communications with Lodwig and Mizrahy took place in the United States, and primarily in New York. It would be difficult, if not impossible, for Dr. Brightman to afford to travel to Israel or retain an Israeli attorney, and it makes little sense when many of the key witnesses are stateside, including Lodwig who resides in Sarasota, Florida, ECF No. 9, Yair Malca whose declaration was executed in Irvine, California. ECF No. 24, and Chris Yackel who is believed to reside in New York.

### B. Dismissal is Improper Because Dr. Brightman's Claims for Negligent Misrepresentation and Fraud are Timely Filed.

InMode argues that Dr. Brightman's claims for negligent misrepresentation and fraud are time-barred because the events that gave rise to the allegations occurred between 2010 – 2011, and thus the claims expired "at the latest, in October 2017…" ECF No. 23, p. 14. InMode further argues that the two-year discovery rule set forth in CPLR § 213(8) is inapplicable when Dr. Brightman could have "with due diligence," discovered InMode's fraud when provided sufficient facts to place her on inquiry notice. *Id.* InMode requests this Court dismiss both claims accordingly.

InMode's arguments are misplaced at best. First, there remains "some dispute concerning the proper statute of limitations for negligent misrepresentation." *Viania v. Zimmer, Inc.*, No. 2:17-cv-1641 (ADS)(AYS), 2017 U.S. Dist. LEXIS 195183, at *7 (E.D.N.Y. Nov. 27, 2017), citing *Fromer v. Vogel*, 50 F.Supp. 2d 227, 242 (S.D.N.Y. 1999). Some courts have applied the six year statute set forth in CPLR § 213(1) while others have relied on the six year statute and two-year discovery period set forth in CPLR § 213 (8). *Id.* Most courts have held that when the "essence of the case sound[s] in fraud," the six year statute and two-year discovery period set forth in CPLR § 213(8) apply to the negligent misrepresentation claim. *Id.* (internal citations omitted); *see also Von Hoffmann v. Prudential Ins. Co. of Am.*, 202 F. Supp. 2d 252, 263-64 (S.D.N.Y. 2002) and *Marchig*

*v. Christie's Inc.*, 430 F. App'x 22, 25 (2d Cir. 2011).  Here, Dr. Brightman's complaint against InMode is grounded in allegations of fraud and her claim for negligent misrepresentation arises from the same factual allegations as the fraud claim. Therefore, her cause of action for negligent misrepresentation is subject to the two-year discovery rule set forth in CPLR § 213 (8).

Second, "as a factual finding is required," it is typically inappropriate to determine whether plaintiff's claims were brought within a reasonable time frame on a motion to dismiss. *Abercrombie v. College*, 438 F. Supp. 2d 243, 266 (S.D.N.Y. 2006); *see also Gander Mt. Co. v. Islip U-Slip LLC*, 923 F. Supp. 2d 351, 364 (N.D.N.Y. 2013). Nonetheless, InMode would have this Court believe that the fraud and negligent misrepresentation claims in this matter are time-barred because Dr. Brightman could have, with due diligence, discovered that the company went public in August 2019.  The "impetus" of Dr. Brightman's discovery was not, as InMode suggests, the fact that InMode went public, but rather a call from Ludwig in April 2021. ECF No. 21 at ¶ 55 (It was not until April 2021 that Dr. Brightman heard from Ludwig … Dr. Brightman was shocked to learn from Ludwig that InMode had gone public."); Ex. A at ¶ 15. Prior to Lodwig's call in April 2021, no one at InMode had provided Dr. Brightman with any information on a proposed or actual timeline for the company to go public. Ex. A at ¶ 15.

It is patently unreasonable for InMode to argue that a person of reasonable intelligence would have searched the internet every day for over a decade, just in case the company went public, instead of relying on updates and communications from Lodwig, who had been her primary point of contact at InMode for many years. Moreover, during the relevant time-period, Dr. Brightman was confronted with life-altering and life-threatening medical diagnosis that consumed her daily life. She was not working and not in regular contact with other colleagues who may have alerted her that InMode went public. Ex. A at ¶ 14. InMode's request to dismiss the fraud claim as time-barred at this early stage of litigation must be dismissed accordingly.

**C. Dr. Brightman's Claims for Specific Performance, Breach of the Implied Covenant of Good Faith and Fair Dealing, Declaratory Judgment, Unjust Enrichment, and Promissory Estoppel were Timely Filed.**

Similar to its arguments regarding negligent misrepresentation and fraud, InMode asserts that Dr. Brightman's claims for Specific Performance, Breach of the Implied Covenant of Good Faith and Fair Dealing, Declaratory Judgment, Unjust Enrichment, and Estoppel are subject to a six-year statute of limitations and are therefore time-barred. ECF No. 23, p. 16. In each case, InMode argues that the claim accrues upon occurrence of the wrongful act or breach, and therefore, the statute began to run on Dr. Brightman's claims "at the latest in 2012"and expired "at the latest in 2018." *Id*. at p. 16-17. InMode bases this calculation on the fact that Dr. Brightman completed her work for InMode in or around 2012. However, the quasi-contractual claims did not accrue based upon the completion of Dr. Brightman's work. They accrue based "upon the occurrence of the wrongful act giving rise to the duty of restitution," *Cohen v. S.A.C. Trading Corp.*, 711 F.3d 353, 364 (2d Cir. 2013) or "when the promise is broken," *Kotler v. Charming Shoppes, Inc.*, 2012 U.S. Dist. LEXIS 11577, at *1 (S.D.N.Y. Jan. 31, 2012) - which in this case was InMode's initial public offering in August 2019 or Mizrahy's April 14, 2021 notification to Dr. Brightman that InMode would not pay her the shares she was promised. Since the complaint was filed within the 6 year period of these events, , the quasi-contractual claims are timely.

**D. Dismissal Pursuant to Fed. R. Civ. P. 12(b)(6) is Improper.**

InMode asserts a variety of arguments in support of its request for the FAC to be dismissed for failure to state a claim upon which relief can be granted. ECF No. 23, pgs. 17 – 24. Each of these arguments summarily ignores that a plaintiff must only plead factual content sufficient to allow the court "to draw a reasonable inference that the defendant is liable for the misconduct alleged," *Iqbal*, 556 U.S. at 678 (2009), that even a simple showing of facts sufficient to raise a "reasonable expectation that discovery will reveal evidence of illegality" will defeat a motion to dismiss, *Manku*, 2021 U.S. App. LEXIS 21219, at *9, and that "at the pleading stage, a party "may generally simultaneously plead and attempt to prove alternative causes of action seeking damages through inconsistent remedies supported by the same factual scenario." *Thar Process, Inc. v.*

16

*Sound Wellness, LLC*, No. 21-CV-422S, 2022 U.S. Dist. LEXIS 8789, at *45-46 (W.D.N.Y. Jan. 18, 2022). For these reasons, discussed further below, Dr. Brightman requests that this Court deny InMode's motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6). To the extent there are deficiencies in the descriptions of any of the causes of action, Dr. Brightman requests leave to amend the FAC pursuant to Fed. R. Civ. P. 15(a).

        **i.   The Fifth Cause of Action is one for Breach of Contract and Survives Scrutiny under FRCP 12(b)(6).**

InMode argues that Dr. Brightman's Fifth Cause of Action for Declaratory Relief and Specific Performance must be dismissed because both declaratory relief and specific performance are remedies arising from a claim for breach of contract, and not causes of action unto themselves. ECF No. 23, p. 16. Further, because InMode does not believe that Dr. Brightman will ultimately prevail on a breach of contract claim, it argues that Dr. Brightman seeks to enforce a right that does not exist under the 2010 Agreement, and her request for these remedies fails accordingly. *Id*.

As a preliminary matter, the Fifth Cause of Action expressly alleges that InMode is in breach of contract, and requests a declaratory judgment that InMode breached its obligations, as well as order requiring InMode to perform the same. ECF No. 21 at ¶¶ 108, 110-111.  To the extent that the Fifth Cause of Action is more appropriately titled Breach of Contract, Dr. Brightman requests leave to amend pursuant to Fed. R. Civ. P. 15(a).

Notwithstanding the above paragraph, InMode misinterprets the scope and nature of the Breach of Contract claim, and the basis for requesting declaratory judgment and specific performance thereunder. It is undisputed that the plain language of the 2010 Agreement indicates that Dr. Brightman's shares expired on the 7th anniversary following the Date of Award. ECF No. 24-1. However, the parties did not negotiate this term. The April 5, 2009 agreement under which Dr. Brightman substantially performed the Clinical Trial Work made no mention of an expiration date. Dr. Brightman expressly objected to the terms set forth in the 2010 Agreement and Mizrahy assured her that InMode would revise the erroneous number of shares and all other disputed terms,

but Inmode never provided a revised agreement. [4]   The first breach of contract is therefore InMode's failure to honor its April 5, 2009 agreement, which Dr. Brightman alleges is the only valid written agreement in effect.

The second breach of contract arises from InMode's failure to compensate Dr. Brightman for services performed outside of the Clinical Trial Work. ECF No. 21 at ¶¶ 22 – 54. The allegations describing the scope of these services are supported by the Declaration of Brian Lodwig, ECF No. 9, who declared that he made numerous oral representations and commitments to Dr. Brightman regarding compensation for additional work performed, all of which were approved by Mizrahy and the Board of Directors for InMode, despite the lack of any written agreement documenting the same. *Id*. at ¶¶ 6, 8. These allegations, which must be accepted as true, are sufficient to allow this Court to draw a reasonable inference that InMode is liable for the breaches alleged.

> ### ii. Dr. Brightman's Claims for Quasi-Contractual and Tort Claims are Not Duplicative or Barred by the 2010 Agreement Because They Address Services Performed Outside of the Clinical Trial Work that are Subject to Disputed Oral Contracts.

InMode asserts that Dr. Brightman's claims for unjust enrichment, promissory estoppel, and breach of the implied covenant of good faith and fair dealing are barred by the highly disputed 2010 agreement, which Dr. Brightman alleges she was fraudulently induced to sign. InMode's arguments on this point are misguided at best. Even at this early stage of litigation, it is clear that Dr. Brightman's quasi-contractual claims are based on a number of different facts than the facts underlying the 2010 agreement (although the validity of the 2010 agreement in and of itself is highly disputed, too). Namely, Dr. Brightman performed new, different services for InMode beyond the Clinical Trial Work.

Dr. Brightman conducted the new, different services pursuant to a series of oral

---

[4] Contrary to the representations in Footnote 7 of InMode's Motion, "a general merger clause is generally ineffective to bar parol evidence of a fraudulent misrepresentation." *Hobart v. Schuler*, 55 N.Y.2d 1023, 1024, 449 N.Y.S.2d 479, 480, 434 N.E.2d 715, 716 (1982).

commitments made to Dr. Brightman by Lodwig. InMode disputes the existence and validity of these subsequent oral commitments. Against this factual background, the general rule that "the existence of a governing written contract bars recovery in a quasi-contract for events arising out of the same subject matter, is inapplicable ...." *Sebastian Holdings, Inc. v. Deutsche Bank, AG.*, 2009 NY Slip Op 52835(U), ¶ 9, 35 Misc. 3d 1227(A), 1227A, 953 N.Y.S.2d 553 (Sup. Ct.); see also *Optionality Consulting Pte. Ltd. v. Nekos*, No. 18-cv-5393 (ALC), 2019 U.S. Dist. LEXIS 160493, at *18-19 (S.D.N.Y. Sep. 18, 2019) (quasi-contractual claims and breach of contract claims may coexist where there is a bona fide dispute as to the existence of a valid and enforceable contract or where the contract does not cover the dispute in issue).

Similarly, Dr. Brightman's tort claims are not duplicative of her Fifth Cause of Action for Breach of Contract. Dr. Brightman is not merely asserting that InMode failed to perform under the terms of the April 2010 agreement; she is alleging facts that are extraneous and collateral to the contract. *R.H. Damon & Co. v. Softkey Software Prods., Inc.*, 811 F. Supp. 986, 992 (S.D.N.Y. 1993); see also *Torchlight Loan Servs., LLC v. Column Fin., Inc.*, 2012 U.S. Dist. LEXIS 105895, at *24 (S.D.N.Y. July 22, 2012). Specifically, Dr. Brightman alleges the April 5, 2009 email represents the parties' initial contract and the only valid written agreement in existence, that the 2010 Agreement is fraudulent and unenforceable, and that InMode fraudulently induced Dr. Brightman to perform additional services with oral commitments that InMode now claims it never made, or alternatively, that are unenforceable in light of the terms set forth in the 2010 Notice and Agreement. She further seeks punitive damages arising from InMode's fraudulent conduct. ECF No. 21 at ¶  96. Dismissal based upon duplication of claims is therefore not warranted.

### iii.  The FAC, in Conjunction with Lodwig's Declaration, Sufficiently States a Claim for Relief Arising from the 2009 and 2011 Oral Agreements.

InMode continues to assert that Dr. Brightman knew or should have known that any options for InMode stock were required to be in a written agreement executed by InMode pursuant to the terms of the April 2010 Notice and April 2010 Agreement. Here again, InMode ignores that Dr. Brightman has challenged the validity of the 2010 agreement and asserted that she was

19

fraudulently induced to sign the same. Moreover, the 2010 Agreement does not bar claims premised upon the new and separate oral representations made by Lodwig in 2009 and 2011. The definite, material terms of Lodwig's oral agreements with Dr. Brightman, which he declared were made with the authority and commitment of the company, are set forth in his declaration. ECF No. 9 at ¶¶ 6 – 10.

### iv.  The FAC Sufficiently States a Claim for Fraud.

To prevail on a fraud claim, a plaintiff must establish by clear and convincing evidence: (1) a material misrepresentation or omission of fact (2) made by defendant with knowledge of its falsity (3) and intent to defraud; (4) reasonable reliance on the part of the plaintiff; and (5) resulting damage to the plaintiff. *Crigger v. Fahnestock & Co.*, 443 F.3d 230, 232 (2d Cir. 2006). However, "[a] the pleading stage, to withstand a Rule 12(b)(6) challenge," plaintiffs are only required to "assert facts that plausibly support the inference of fraud" and to satisfy the "heightened pleading standard set forth in Rule 9(b)." *Chung v. Igloo Prods. Corp.*, No. 20-CV-4926 (MKB), 2022 U.S. Dist. LEXIS 120825, at *54 (E.D.N.Y. July 8, 2022); *see also* Fed. R. Civ. P. 9(b).

The allegations in the FAC meet this burden. *See* ECF No. 21 at ¶ 87 – 97. First, when Dr. Brightman objected to the new, non-negotiated terms set forth in the April 2010 agreement, Mr. Mizrahy assured her that the agreement was merely a placeholder and that he would send a corrected agreement shortly thereafter. Mizrahy's assurances spoke directly to the form of the agreement, not just the promise of stock options. Based upon his assurances, Dr. Brightman signed the agreement. Ultimately, however, Mizrahy never provided Dr. Brightman with a corrected version or otherwise modified the terms as he promised.

Second, in both 2009 and 2011, Lodwig represented and committed to Dr. Brightman that InMode would compensate her with additional stock options in exchange for her services to InMode pertaining to services outside of the Clinical Trial Work, including services related to InMode's RFAL technology and Fractora device. Like Mizrahy, Lodwig engaged in these communications with actual or apparent authority to bind the company. When Dr. Brightman questioned whether she needed to sign any paperwork to finalize their arrangement, Lodwig

assured her she would be taken care of and that she was "all set."

Both Mizrahy and Lodwig knew or should have known that their representations to Dr. Brightman were false. Despite the plausible inference of their fraud, however, InMode argues that Dr. Brightman's fraud allegations fail because 1) the FAC does not explain how InMode's request for Dr. Brightman to sign the 2010 Agreement was a false representation, given that the Option Plan required a written agreement for any option award; and 2) Dr. Brightman was not justified in relying on Lodwig's representations because she had the 2010 Agreement and Option Plan in her possession at the time the representations were made. Both arguments miss the mark.

The crux of the fraud allegation arising from Mr. Mizrahy's 2010 assurances is not that the agreement had to be in writing, but rather that the agreement was a *placeholder*, and that a corrected version would accurately reflect Dr. Brightman's objections and the terms of the parties' April 5, 2009 agreement. In light of her belief that the terms and conditions in the 2010 Agreement were not final, Dr. Brightman was justified in relying on Lodwig's fraudulent oral commitments to her regarding an award of additional shares for additional services performed. InMode's motion to dismiss the fraud claim at the pleading stage fails accordingly.

### v. The FAC Sufficiently States a Claim for Negligent Misrepresentation.

To prevail on a claim for negligent misrepresentation, a plaintiff must establish that (1) the defendant had a duty, as a result of a special relationship to give correct information; (2) the defendant made a false representation that he or she should have known was incorrect; (3) the information supplied in the representation was known by the defendant to be desired by the plaintiff for a serious purpose; (4) the plaintiff intended to rely and act upon it; and (5) the plaintiff reasonably relied on it to his or her detriment. *Hydro Inv'rs, Inc. v. Trafalgar Power, Inc.*, 227 F.3d 8, 11 (2d Cir. 2000) (internal citations omitted).

A "special relationship requires a closer degree of trust than that in an ordinary business relationship." *Gander Mt. Co.*, 923 F. Supp. 2d at 369, citing *M&T Bank Corp. v. LaSalle Bank Nat'l Ass'n*, 852 F. Supp. 2d 324, 336 (W.D.N.Y. 2012). However, an ordinary business relationship can give rise to a special relationship "where the requisite high degree of dominance

and reliance existed *prior* to the transaction giving rise to the alleged wrong, and not as a result of it." *Id*. (emphasis in the original), citing *Societe Nationale D'Exploitation Industrielle Des Tabacs Et Allumettes v. Salomon Bros. Int'l*, 251 A.D.2d 137, 138, 674 N.Y.S.2d 648 (1998).

"In determining whether a special relationship exists in the commercial context … a fact finder should consider whether the person making the representation held or appeared to hold unique or special expertise; whether a special relationship of trust or confidence existed between the parties; and whether the speaker was aware of the use to which the information would be put and supplied it for that purpose." *Fleet Bank v. Pine Knoll Corp.*, 290 A.D.2d 792, 796, 736 N.Y.S.2d 737, 741 (App. Div. 2002). Typically, a determination of whether a special relationship exists is highly fact-specific and not resolvable at the pleading stage. See *Knight Securities, LP v. Fiduciary Trust Co.,* 5 A.D. 3d 172, 774 N.Y.S. 2d 488 (1st Dept. 2004).

Nonetheless, applying these principles to the instant matter, Dr. Brightman has provided this Court with sufficient evidence to raise a question of material fact as to the existence of a special relationship between the parties, sufficient to survive a motion to dismiss. Dr. Brightman had been acquainted with Lodwig and Mizrahy for many years. She relied on their existing relationship and their apparent authority to bind InMode to the terms of the parties' various agreements. The record reflects that when Dr. Brightman objected to certain contract terms, she was assured Mizrahy would revise the terms and that the contract was just a placeholder. The record further reflects that when Dr. Brightman asked Lodwig about "any necessary paperwork," she was informed that his authority to enter into the oral agreements came directly from Mizrahy and that she was "all set." Her reliance on the information conveyed was therefore reasonable, and this Court should decline to dismiss the negligent misrepresentation claim accordingly.

///

///

///

///

22

## <u>CONCLUSION</u>

For the foregoing reasons, Plaintiff Lori A. Brightman respectfully requests that this Court deny InMode's motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(3) and 12(b)(6). To the extent this Court believes there are any deficiencies in the allegations plead in the First Amended Complaint, and specifically the Fifth Cause of Action for Breach of Contract, Declaratory Judgment, and Specific Performance, Dr. Brightman respectfully requests leave to amend pursuant to Fed. R. Civ. P. 15(a).

Dated:       February 9, 2023
             New York, New York

**BERLANDI NUSSBAUM & REITZAS LLP**

By:      /s/ Joshua T. Reitzas
         Joshua T. Reitzas (JR2149)
         125 Park Avenue, 25th Floor
         New York, New York 10017
         (212) 804-6329 (Ph)
         (646) 461-2312 (fax)
         *Attorneys for Plaintiff*
         *Dr. Lori A. Brightman*

23

DocuSign Envelope ID: 79031974-1BDC-4499-BE6E-AE065EBF5EB3

## DECLARATION OF LORI A. BRIGHTMAN

I, Lori A. Brightman, make this Declaration under 28 U.S.C. §1746 and hereby declare as follows:

1. I am a resident of the State of Massachusetts. I am over eighteen years of age. I have personal knowledge of the facts stated in this Declaration, except as to those matters stated on information and belief, and as to those matters, I believe them to be true. If called upon to testify as to the contents of this Declaration, I could and would competently testify to my statements herein.

2. I first met Moshe Mizrahy and Brian Lodwig when they worked for a different company known as Syneron, prior to their starting work at Invasix, now known as InMode.  I worked with Brian and Moshe while they were at Syneron. I performed clinical trial work, taught webinars, and provided instruction to physicians about how to work with Syneron products.  My services to Syneron were performed without written agreements and I received compensation for my work.

3. On or about January 29, 2009, Moshe met me in New York office to discuss his new company Invasix, now known as InMode. During this meeting, we discussed Moshe's desire for me to be involved with clinical trial work for InMode. I told him that I wanted to first experience the current training provided by the company before agreeing. We discussed my attendance at a training in March 2009.

4. In or around March 2009, I traveled to Toronto, Canada to attend a Radiofrequency-Assisted Liposuction ("RFAL") training with another physician, Dr. Mulholland, as previously discussed with Moshe. At that time, Moshe brought up providing me stock as compensation for clinical trial work. He expressed to

DocuSign Envelope ID: 79031974-1BDC-4499-BFCE-AE065EBF5EB3

me that I was InMode's only dermatology key opinion leader and that my work with them was paramount.

5.      On April 5, 2009, I received an e-mail offer from Moshe on behalf of InMode to pay me 7,500 stock options in exchange for my performance of clinical trial surgery and data collection on 15 patients in my New York office ("Clinical Trial Work"). The offer did not mention any terms beyond my performance of the Clinical Trial Work and the 7,500 stock options. The April 5, 2009 email represented the full scope of our agreement and I provided services based on this agreement.

6.      In or around April 2010, Moshe sent me A Notice of Stock Option Award ("2010 Agreement"). The 2010 Agreement incorrectly identified that I was only entitled to 7,000 shares instead of 7,500. It also included new terms that I had never agreed to, including a forum selection clause.

7.      By the time Moshe presented me with the new terms, I had already substantially completed the Clinical Trial Work on the 15 patients. I cannot recall the exact date that I treated the last patient, but I believe it was in or around November 2009.

8.      I contacted Moshe, objecting to the scope of this new 2010 Agreement and requesting revisions consistent with the April 5, 2009 email. Moshe assured me that he would send a corrected agreement, but insisted that I sign the 2010 Agreement as a "placeholder."  I was not given any new consideration from InMode in exchange for signing the new 2010 Agreement.

9.      I trusted Moshe and believed he would send a revised agreement to me. I signed the 2010 Agreement accordingly. Moshe never sent me a revised contract.

DocuSign Envelope ID: 79031974-1BDC-4499-BFCE-AE065FBF5EB3

10.    In approximately July 2009, at the request of Brian Lodwig, I spoke with another physician who had questions about RFAL. Later, in a follow up telephone call and then at an October 2009 dinner, Brian and I spoke in more detail about my performing new work in exchange for InMode stock. In my experience, this was a common practice in our industry and the offer was not unusual. Brian offered to compensate me with additional stock to be provided and available when InMode went public. Brian told me he was authorized by Moshe and by InMode's Board of Directors to offer me the stock options, and that they were the same kind of stock that he would receive as an InMode executive.

11.    I accepted Brian's offer; I would receive more stock if I agreed to submit abstracts for acceptance and later presentation at national and international meetings.  Additionally, I agreed to take calls or review and respond to emails from other potential InMode clients.  I agreed and I performed all the services I was asked to perform.

12.    On October 13, 2011, I met with Brian and Chris Yackel, the Senior Territory manager at Invasix in my New York office. During this meeting, we calculated that I had reached an equivalent of 45,000 stock options based upon the new work I had completed for Invasix. I asked Brian if there was any paperwork to sign to secure my stock options. Brian told me, "Lori, do not worry about that, no, this is coming from Moshe directly." Brian further told me, "We know the extra work you have done for us. This is all set."

13.    In the same October 13, 2011 meeting, Brian asked me to work with the Fractora device, which is a device for minimally invasive anti-aging skin and tissue resurfacing. InMode, through Brian, asked me to provide clinical experience to further clinically expand the device indications.  He also asked me to handle telephone calls and emails with other prospective InMode clients.

DocuSign Envelope ID: 79031974-1BDC-4499-BFCE-AE065EBF5EB3

Finally, he requested that I prepare abstracts for acceptance and later presented at national and international deliver presentations at meetings.  Again, Brian offered me the same stock option deal where I would provide services and stock would be made available to me when InMode went public. I asked again whether I needed a written agreement for the new terms. Brian again told me no, "We know the work you have done for us outside of the RFAL trial. This is all set."  I agreed to perform the Fractora work accordingly.

14.     In the beginning of April 2021, Brian Lodwig called me on my cell phone to tell me he had retired and that he had made a significant amount of money on InMode stock following InMode's initial public offering. I told Brian I was unaware InMode had gone public. Brian provided Moshe's current email address so that I could follow up. Notably, beginning approximately June 2013 I began to experience serious medical symptoms that severely limited my physical abilities.  I was repeatedly hospitalized, and medically required to leave my practice and go out on medical disability.  I did not stay in contact with medical colleagues about, or otherwise stay informed of, developments in the industry.

15.     On April 12, 2021, I emailed Moshe Mizrahy to inquire as to my stock options. In my email, I specifically referenced the 7,500 shares that I was entitled to receive for the Clinical Trial Work. I anticipated I would have an on-going dialogue with Moshe and Brian to get all of the shares I earned working on projects for InMode as requested by Brian Lodwig.

16.     On April 14, 2021, Moshe emailed me indicating that all of the stock options granted to me in 2009 expired in 2019 and could not be renewed.  This is the first time I learned that InMode would not compensate me.

17.     To date, I have not received any compensation for the work I performed for InMode.

DocuSign Envelope ID: 79031974-1BDC-4499-BFCE-AE065EBF5EB3

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 9th day of February, 2023.

LORI A. BRIGHTMAN

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| DR. LORI A. BRIGHTMAN, an individual, | : **Case No.: 1:22-cv-05861-MKV** |
| | : |
| Plaintiff, | : |
| | : |
| v. | : **CERTIFICATE OF SERVICE** |
| | : |
| INMODE LTD., a foreign limited liability corporation; DOES 1 – 10, INCLUSIVE; AND ROE CORPORATIONS 11-20, INCLUSIVE, | : |
| | : |
| Defendants. | : |

I, Joshua T. Reitzas, hereby certify as follows:

1.      I am a partner at Berlandi Nussbaum & Reitzas LLP ("BNR"), counsel for Plaintiff

Lori A. Brightman ("Dr. Brightman").  On February 9th, 2023, my office served a true and correct

copy of the *PLAINTIFF LORI A. BRIGHTMAN'S RESPONSE TO DEFENDANT INMODE*

*LTD.'S MOTION TO DISMISS THE FIRST AMENDED COMPLAINT* and the DECLARATION

OF LORI A. BRIGHTMAN electronically on Defendant InMode, Ltd.'s counsel, Brian Koosed at

Brian.Koosed@klgates.com.

2.      This Certificate of Service to be electronically filed and served via the Court's

CM/ECF system.

3.      Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing

is true and correct.

Dated: New York, New York
       February 9, 2023

                                        /s/ Joshua T. Reitzas
                                        Joshua T. Reitzas

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------------X
                                                                :
DR. LORI A. BRIGHTMAN, an individual,                           :
                                                                :
                              Plaintiff,                        :   Case No.: 1:22-cv-05861 MKV
                                                                :
                                                                :
-against-                                                       :
                                                                :
                                                                :
                                                                :
INMODE LTD., a foreign limited liability corporation;           :
DOES 1 – 10, INCLUSIVE; AND ROE                                 :
CORPORATIONS 11-20, INCLUSIVE,                                  :
                                                                :
                              Defendants.                       :
                                                                :
-----------------------------------------------------------------X


**DEFENDANT INMODE LTD.'S REPLY MEMORANDUM OF LAW**
**IN FURTHER SUPPORT OF ITS MOTION**
**TO DISMISS THE FIRST AMENDED COMPLAINT**

## <u>TABLE OF CONTENTS</u>

**Page**

PRELIMINARY STATEMENT ................................................................................... 1

ARGUMENT ............................................................................................................. 2

    A.    The Parties' Israeli Forum Selection Clause Should Be Enforced ...................... 2

        1.    No Additional Consideration Was Required For the 2010 Agreement Because Dr. Brightman Signed It................................ 2

        2.    Dr. Brightman's Conclusory Allegations Of Fraud Fail As A Matter of Law................................................................ 4

        3.    The Forum Selection Clause is Not Unreasonable ....................... 6

    B.    The Negligent Misrepresentation And Fraud Claims Are Time-Barred .............. 6

    C.    The FAC Fails To State A Claim For Breach of Contract.................................... 7

    D.    The FAC Fails To State A Claim For Fraud or Negligent Misrepresentation................................................................................... 8

    E.    Leave to Amend Should Be Denied.................................................................... 10

<u>**TABLE OF AUTHORITIES**</u>

**Page(s)**

**Cases**

*AGL Indus., Inc. v. Cont'l Indem. Co.*,
  2018 WL 3510387 (E.D.N.Y. July 19, 2018) ..........................................................5

*Bank v. Laptop & Desktop Repair LLC*,
  206 F. Supp. 3d 772 (E.D.N.Y. 2016) ....................................................................5

*Berkson v. Gogo, LLC*,
  97 F. Supp. 3d 359 (E.D.N.Y. 2015) ......................................................................3

*DeSola Grp. v. Coors Brewing Co.*,
  199 A.D.2d 141 (1st Dep't 1993) ...........................................................................5

*Deutsche Bank Sec., Inc. v. Rhodes*,
  578 F. Supp. 2d 652 (S.D.N.Y. 2008) ....................................................................3

*Diatronics, Inc. v. Elbit Computers, Ltd.*,
  649 F. Supp. 122 (S.D.N.Y. 1986), *aff'd sub nom.*, *Diatronics v. Elbit Comp.*,
  812 F.2d 712 (2d Cir. 1987).....................................................................................4

*Gander Mountain Co. v. Islip U-Slip LLC*,
  923 F. Supp. 2d 351 (N.D.N.Y. 2013), *aff'd*, 561 F. App'x 48 (2d Cir. 2014) .....................10

*Hobart v. Schuler*,
  55 N.Y.2d 1023 (1982) ............................................................................................9

*J.B. Harris, Inc. v. Razei Bar Indus., Ltd.*,
  37 F. Supp. 2d 186 (E.D.N.Y. 1998), *aff'd*, 181 F.3d 82 (2d Cir. 1999)...............................4

*Jalee Consulting Grp., Inc. v. XenoOne, Inc.*,
  908 F. Supp. 2d 387 (S.D.N.Y. 2012)......................................................................4

*Jeanty v. Newburgh Beacon Bus Corp.*,
  2018 WL 6047832 (S.D.N.Y. Nov. 19, 2018) .......................................................10

*Kakarla v. Penakalapati*,
  551 F. Supp. 3d 70 (W.D.N.Y. 2021) .....................................................................3

*Lamb v. Emhart Corp.*,
  47 F.3d 551 (2d Cir. 1995)........................................................................................3

ii

*Longo v. Ortiz,*
　2016 WL 5376212 (S.D.N.Y. Sep. 26, 2016)..................................................6

*Mercury W. A.G., Inc. v. R.J. Reynolds Tobacco Co.,*
　2004 WL 421793 (S.D.N.Y. Mar. 5, 2004) ................................................4, 6

*Milgrim v. Backroads, Inc.,*
　91 F. App'x 702 (2d Cir. 2002) ...................................................................3

*Presnall v. Analogic Corp.,*
　2018 WL 4473337 (S.D.N.Y. Sept. 18, 2018)...........................................10

*Russo v. United Recovery Sys., LP,*
　2014 WL 7140498 (E.D.N.Y. Dec. 12, 2014) ..............................................3

*Scherk v. Alberto-Culver Co.,*
　417 U.S. 506 (1973)......................................................................................4

*Sun Forest Corp. v. Shvili,*
　152 F. Supp. 2d 367 (S.D.N.Y. 2001).........................................................5

*Tiki Boatworks, LLC v. Crusin'Tikis, LLC,*
　2021 WL 1198256 (N.D.N.Y. Mar. 30, 2021) (cited at Opp.) ..................5

*W. Intermodal Services, Ltd. v. Singamas Container Indus. Co.,*
　2000 WL 343780 (S.D.N.Y. Mar. 31, 2000) ............................................10

*Warner Theatre Associates Ltd. P'ship v. Metro. Life Ins. Co.,*
　149 F.3d 134 (2d Cir. 1998)...................................................................9, 10

**Statutes**

N.Y. Gen. Oblig. Law § 5-1103.........................................................................2, 3

UCC 8-113(a)..........................................................................................................4

**Other Authorities**

CPLR § 213(8)........................................................................................................7

Fed. R. Civ. P. 9(b) ...............................................................................................4

Fed. R. Civ. P. 12(b)(3).........................................................................................1

Fed. R. Civ. P. 12(b)(6).........................................................................................1

Defendant InMode respectfully submits this reply memorandum of law in further support of its motion to dismiss the FAC,[1] pursuant to Fed. R. Civ. P. 12(b)(3) and 12(b)(6).

## PRELIMINARY STATEMENT

In its Opening Brief, InMode showed that all of Dr. Brightman's claims are subject to a valid and binding Israeli forum selection clause. Opening Br., pp. 8-13. InMode further showed that, notwithstanding that forum selection clause, Dr. Brightman's claims are time-barred, insufficiently pleaded, or both. *Id.* at pp. 11-24.

In her opposition brief (the "Opposition"), Dr. Brightman does not dispute that she signed the 2010 Notice or the 2010 Agreement, or that the forum selection clause contained in those contracts covers her claims. Instead, she alleges for the first time that an "April 5, 2009 email [from InMode to Dr. Brightman] represented the full scope of the parties' agreement," and further claims that she was somehow tricked into signing the 2010 Notice and 2010 Agreement without receiving new consideration for them. *See* Opp., pp., 4, 9-14.

As set forth below, black-letter New York law, and binding precedent applying it, forecloses Dr. Brightman's arguments and requires enforcing the parties' Israeli forum selection clause. And, as also set forth below, Dr. Brightman's efforts to save her time-barred and poorly pleaded claims are unavailing. The FAC should therefore be dismissed, with prejudice, and the parties should be forced to litigate this dispute where they agreed to do so over a decade ago – in Israel, under Israeli law.

---

[1]     Capitalized terms not otherwise defined herein have the meaning ascribed to them in InMode's opening memorandum of law, filed January 13, 2023 ("Opening Brief") [ECF No. 23].

1

<u>ARGUMENT</u>

**A.** **The Parties' Israeli Forum Selection Clause Should Be Enforced**

In her Opposition, Dr. Brightman does not dispute that the Israeli forum selection clause set forth in the 2010 Agreement:  (1) was reasonably communicated to her; (2) is mandatory; and (3) covers her claims.  *Compare* Opening Br., pp. 8-11 *with* Opp., pp. 9-14.  As such, it is "presumptively enforceable" under binding Second Circuit precedent.  *See* Opening Br., pp. 8-9.

The Opposition nevertheless argues the forum selection clause is invalid for three reasons, each of which fails to meet Dr. Brightman's "overwhelming" burden to resist the forum selection clause here.  *See* Opening Br., pp. 8-9 (citing *Atl. Marine Const. Co. v. U.S. Dist. Ct. for W. Dist. of Texas*, 571 U.S. 49, 63, 67 (2013)).

1.   <u>No Additional Consideration Was Required For the 2010 Agreement Because Dr. Brightman Signed It</u>

Initially, Dr. Brightman argues the Israeli forum selection clause is invalid because, "**[t]hough Dr. Brightman executed the 2010 Agreement**," she "did not receive any additional consideration for this unilateral and material modification of the parties' existing April 5, 2009 agreement."  Opp., p. 10 (emphasis added).  But, even accepting this argument as true (and it is not), Dr. Brightman's argument fails because no additional consideration was required.

Specifically, and though the Opposition conspicuously fails to mention it, New York General Obligations Law § 5-1103 is dispositive here.  It provides:

> An agreement, promise or undertaking to change or modify . . . any contract . . . **shall not be invalid because of the absence of consideration, provided that the agreement** . . . changing [or] modifying . . . **shall be in writing and signed by the party against whom it is sought to enforce the change [or] modification** . . . .

N.Y. Gen. Oblig. Law § 5-1103 (McKinney) (emphasis added).

In short, Dr. Brightman admits she executed the 2010 Agreement.  *See* Opp., pp. 4, 10.

That ends the inquiry under Dr. Brightman's theory; no additional consideration was required for

the 2010 Agreement, or the forum selection clause contained therein.  *See, e.g.*, *Milgrim v.

Backroads, Inc.*, 91 F. App'x 702, 704 (2d Cir. 2002) (rejecting plaintiff's challenge that an

arbitration clause failed for lack of consideration, citing § 5-1103); *Deutsche Bank Sec., Inc. v.

Rhodes*, 578 F. Supp. 2d 652, 660 (S.D.N.Y. 2008) ("As a matter of law, even assuming the

Addendum was not supported by consideration, the lack of consideration does not preclude

enforcement . . . ."); *Russo v. United Recovery Sys., LP*, 2014 WL 7140498, at *3 (E.D.N.Y. Dec.

12, 2014) ("[D]efendants argue that consideration is required to make a contract modification

enforceable.  Not so under New York law.").

For this reason alone, the cases that Dr. Brightman relies upon in her Opposition are

inapposite.  None of them involved enforcement of an admittedly **signed, written modification,**

let alone the applicability of N.Y. Gen. Oblig. Law § 5-1103 thereto.  *See, e.g.*, *Lamb v. Emhart

Corp.*, 47 F.3d 551, 554-56, 559 (2d Cir. 1995) (plaintiffs argued a letter they *never even received*

was an unenforceable modification under *Connecticut law*); *Kakarla v. Penakalapati*, 551 F. Supp.

3d 70, 81-83 (W.D.N.Y. 2021) (dismissing plaintiff's breach of contract claim based on an alleged

subsequent *oral agreement*); *Berkson v. Gogo, LLC*, 97 F. Supp. 3d 359, 393 (E.D.N.Y. 2015)

(plaintiffs argued the terms of service of an online "sign-in-wrap" agreement did not provide

sufficient notice to be enforceable).[2]

---

[2]      The Opposition also relies on a number of decisions applying the UCC's "battle of the forms" analysis to determine whether an added forum selection clause is an enforceable modification.  *See* Opp., p. 10 & n.3.  But, setting aside the inapplicability of the UCC here, none of these cases dealt with a signed modification under N.Y. Gen. Oblig. Law § 5-1103.  *See id.*

2.      Dr. Brightman's Conclusory Allegations Of Fraud Fail As A Matter of Law

Dr. Brightman next argues that the forum selection clause is unenforceable because InMode "fraudulently induced her to agree to the clause" by telling her that the 2010 Agreement was "just a 'placeholder.'"  *See* Opp., pp. 11-12.  This argument fails for three reasons.

*First*, neither the FAC nor the Opposition alleges any fraud relating to the Israeli forum selection clause ***itself***.  Indeed, the FAC's only allegation of this kind relates to the statute of frauds.  *See* FAC, ¶¶ 21, 63, 88 (claiming the 2010 Agreement was "a place-holder despite UCC 8-113(a) excluding stock options from . . . [the] statute of frauds").   And Dr. Brightman's blanket allegation—that she was fraudulently induced into entering the 2010 Agreement—cannot invalidate the forum selection clause as a matter of law.  *See, e.g.*, *Scherk v. Alberto-Culver Co.,* 417 U.S. 506, 519 n.14 (1973) (noting a "forum-selection clause in a contract is not enforceable if the *inclusion of that clause in the contract* was the product of fraud or coercion") (emphasis added); *Diatronics, Inc. v. Elbit Computers, Ltd.*, 649 F. Supp. 122, 127 (S.D.N.Y. 1986), *aff'd sub nom.*, *Diatronics v. Elbit Comp.*, 812 F.2d 712 (2d Cir. 1987) ("The allegation that the Purchase Agreement was the product of fraud does not provide grounds for disregarding the [Israeli] forum-selection clause."); *J.B. Harris, Inc. v. Razei Bar Indus., Ltd.*, 37 F. Supp. 2d 186, 190-91 (E.D.N.Y. 1998) (same), *aff'd*, 181 F.3d 82 (2d Cir. 1999).

*Second*, and relatedly, neither the Opposition's conclusory assertion that Dr. Brightman was "fraudulently induced" by being told "the [2010 A]greement was just a 'placeholder'" (Opp., p. 12), nor the vague assertion that she "objected to the [2010] Agreement" (FAC, ¶ 21; Brightman Dec., ¶ 8), meet the heightened pleading requirements of Rule 9(b).  *See Jalee Consulting Grp., Inc. v. XenoOne, Inc.*, 908 F. Supp. 2d 387, 394–95 (S.D.N.Y. 2012) (alleging plaintiff was "'forced' to accept inclusion of the clause" insufficient); *Mercury W. A.G., Inc. v. R.J. Reynolds Tobacco Co.*, 2004 WL 421793, at *4 (S.D.N.Y. Mar. 5, 2004) (alleging "company was directed

4

to sign the contract as a mere 'formality'" insufficient); *Bank v. Laptop & Desktop Repair LLC*, 206 F. Supp. 3d 772, 780 (E.D.N.Y. 2016) ("general and conclusory allegations" of being fraudulently induced into clause to make it "burdensome…to seek legal redress" insufficient).

*Third*, Dr. Brightman's reliance on a New York State Court case suggesting that a forum selection clause may be invalidated where "the complaint is 'permeated with allegations of fraud'" is misplaced. *See* Opp., p. 12 (citing *DeSola Grp. v. Coors Brewing Co.*, 199 A.D.2d 141 (1st Dep't 1993)). Initially, federal courts in this Circuit have repeatedly refused to apply this proposition in diversity cases like this one. *See, e.g.*, *Sun Forest Corp. v. Shvili*, 152 F. Supp. 2d 367, 381 n.24 (S.D.N.Y. 2001) ("Federal forum-selection law governs in diversity actions. Accordingly, [defendants'] argument that the clauses are invalid under the laws of New York . . . is misplaced.") (internal citation omitted); *AGL Indus., Inc. v. Cont'l Indem. Co.*, 2018 WL 3510387, at *3 (E.D.N.Y. July 19, 2018) (rejecting similar argument).

Further, the FAC only has, at best, one substantive allegation of fraud, which one of Dr. Brightman's own cases admits is insufficient to qualify for this exception. *See* FAC, ¶¶ 63, 88; *see also Tiki Boatworks, LLC v. Crusin'Tikis, LLC*, 2021 WL 1198256, at *3-4 (N.D.N.Y. Mar. 30, 2021) (cited at Opp., p. 12) (rejecting plaintiff's argument that a lone allegation of fraud in the inducement meant that fraud permeated an agreement enough to invalidate an arbitration clause). Finally, and in any event, the *DeSola* decision is easily distinguishable.[3]

In sum, Dr. Brightman's conclusory assertions that the 2010 Agreement was the product of fraud cannot invalidate the parties' valid and binding Israeli forum selection clause here.

---

[3]     The complaint there made "absolutely no reference to the [a]greement which contains the forum selection clause."*DeSola Grp.*, 199 A.D.2d at 141. Only then did the First Department state, in dicta, the agreement would be void for fraud because it did not even relate to the services for which the plaintiff had purportedly been hired. *Id.* at 141-42. This is a far cry from the 2010 Agreement, which specifically addresses Dr. Brightman's services and any potential stock options.

3. The Forum Selection Clause is Not Unreasonable

In a last ditch effort to avoid the forum selection clause to which she agreed, Dr. Brightman argues that "[i]t would be difficult, if not impossible, for Dr. Brightman to afford to travel to Israel or retain an Israeli attorney." Opp., p. 14. This, too, fails.

Initially, Dr. Brightman's own Declaration contains no such assertion, and the Opposition's unsupported allegations are insufficient, standing alone. *See Longo v. Ortiz*, 2016 WL 5376212, at *4 (S.D.N.Y. Sep. 26, 2016) (refusing to consider "factual allegations that Plaintiff raised for the first time in his opposition brief to Defendants' Motion to Dismiss" because "it is 'axiomatic that the Complaint cannot be amended by briefs in opposition to a motion to dismiss'") (citation omitted). Even if her Declaration had included such assertions, however, that would still be insufficient. *See Mercury W. A.G.*, 2004 WL 421793, at *4 ("Simply claiming financial distress does not warrant setting aside a valid forum selection clause.").

Dr. Brightman's assertion that Israel "has no interest in the parties or the subject matter" is also incorrect. Opp., p. 14. As Dr. Brightman admits, InMode is an Israeli company. *See* FAC, ¶ 9. It is thus eminently reasonable for InMode to require disputes over ownership of its stock to be litigated in its place of incorporation. Not surprisingly, then, courts in the Second Circuit have consistently rejected these kinds of arguments and enforced Israeli forum selection clauses. *See* Opening Br., p. 12 (collecting cases). This Court should do so, too. Simply put, Dr. Brightman has not, and cannot, meet her burden of proving that the parties' Israeli forum selection clause should be ignored here.

**B.** **The Negligent Misrepresentation And Fraud Claims Are Time-Barred**

The Opposition admits that: (i) all of the alleged misrepresentations underlying Dr. Brightman's fraud and negligent misrepresentation claims occurred **more than a decade ago**; and

(ii) Dr. Brightman's only argument that these claims are not time-barred relies on CPLR § 213(8)'s two-year discovery rule.  *See* Opp., p. 14.  To invoke CPLR § 213(8)'s discovery rule, the Opposition argues it "is patently unreasonable for InMode to argue that a person of reasonable intelligence would have searched the internet every day for over a decade." *Id.* at p. 15.  Of course, this is neither the law nor an accurate characterization of InMode's argument.

*First*, the Opposition relies on only two cases to invoke CPLR § 213(8), both of which make clear that the FAC's bare assertion—that Dr. Brightman only discovered InMode's purported misrepresentations after InMode went public—fails because it is devoid of any **specific** factual allegations that she could not have discovered InMode going public with reasonable diligence.  *See* Opp., p. 15 (citing *Gander Mountain Co. v. Islip U-Slip LLC*, 923 F. Supp. 2d 351, 364–65 (N.D.N.Y. 2013), *aff'd*, 561 F. App'x 48 (2d Cir. 2014) ("General assertions of ignorance and due diligence without more specific explanation … will not satisfy the [ ] pleading requirements.") and *Abercrombie v. Andrew Coll.*, 438 F. Supp. 2d 243, 266 (S.D.N.Y. 2006) (same, granting motion to dismiss)); *see also* Opening Br., p. 15.

*Second*, and in any event, it is "patently unreasonable" for Dr. Brightman to suggest that InMode **going public** was somehow hidden from her, or that a reasonable investor in Dr. Brightman's shoes, who claimed to be owed 45,000 stock options exercisable when a company went public, was nevertheless incapable of discovering that a company went public.  For these reasons and those set forth in the Opening Brief, Dr. Brightman's fraud and negligent misrepresentation claims are time-barred.  *See* Opening Br., pp. 14-15 (collecting cases).

**C.**     **The FAC Fails To State A Claim For Breach of Contract**

Neither the Opposition nor Dr. Brightman's Declaration does anything to correct the material legal deficiencies in the FAC's breach of contract claims.

To be sure, the Opposition clarifies that the three "operative" contracts allegedly breached were an April 5, 2009 email, the Alleged 2009 Oral Agreement, and the Alleged 2011 Oral Agreement. *See* Opp., pp. 18-19. But, setting aside that the FAC nowhere actually pleads that the April 5, 2009 email is, as the Opposition claims, "the only valid written agreement in effect" (Opp., p. 18), neither the FAC, nor the Brightman Declaration, nor the Opposition alleges **any** of the material terms necessary to plead the existence of these agreements. Opening Br., p. 21.

Indeed, the Opposition repeatedly seems to treat stock options as an automatic grant of stock, rather than an **option** that must be exercised by purchasing stock at an agreed-upon price and within a set period of time. *See* Opp., pp. 2, 7. But the Opposition nowhere even attempts to address the FAC's failure to plead these essential terms. Nor does the Opposition cite a single case in support of its breach of contract claims, let alone any precedent that suggests a party can plead the existence of a stock option agreement devoid of all material terms. *See* Opp., pp. 18-19.

Further, the Opposition nowhere cites any precedent that would allow a court to ignore **multiple, signed writings** that explicitly address the subject of the plaintiff's claims in favor of a single email, from a year earlier, that lacks essential terms. *See id.* Nor does the Opposition even attempt to address the Option Plan's prohibition on exercising stock options more than seven years after they were granted. *See* Malca Dec., Ex. C, § 6(g). In fact, the Opposition admits any options under the 2010 Agreement expired. *See* Opp., p. 17. But it nowhere explains why **all** of the purported options sought—under any of these alleged agreements—do not fail for the exact same reason. *See* Opening Br., p. 22. The FAC thus fails to state any claim for breach of contract at all.

**D.**    **The FAC Fails To State A Claim For Fraud or Negligent Misrepresentation**

In her Opposition, Dr. Brightman claims that: (i) she executed the 2010 Agreement and the 2010 Notice; (ii) these were nevertheless mere "placeholder[s]" and not the actual agreements

governing her stock options; and (iii) a new agreement would be provided (though she nowhere

alleges she ever asked InMode for a new agreement in the *eleven years* after she signed the 2010

Agreement).  *See* Opp., p. 4.  The absurdity of these allegations alone undermines the plausibility

that any misrepresentation ever occurred, let alone that Dr. Brightman reasonably relied on one.

In any event, contrary to her current claim that the 2010 Agreement was never intended to

be the parties' actual agreement, Dr. Brightman expressly acknowledged otherwise in the 2010

Agreement itself.  Specifically, she expressly represented, in the 2010 Agreement, that "in entering

into this Option agreement, the Grantee [Dr. Brightman] is not relying upon any representation . .

. by" InMode, and that the "Notice, the Plan and this Option Agreement constitute the entire

agreement of the parties with respect to the subject matter hereof and supersede in their entirety

all prior undertaking and agreements . . . ."  Malca Dec., Ex. B, §§ 8(a), 12.

Dr. Brightman cannot now claim that she reasonably relied on an alleged oral statement

that the 2010 Agreement would not be the operative agreement when she expressly agreed in the

2010 Agreement that that Agreement was, in fact, "the entire agreement."  *See Warner Theatre*

*Associates Ltd. P'ship v. Metro. Life Ins. Co.*, 149 F.3d 134, 136–37 (2d Cir. 1998) ("Relying on

such an oral representation in the face of a demand for a written disclaimer that specifically denies

the substance of the representation is unreasonable.").[4]  Her misrepresentation claims thus fail.

---

[4]     This is why Dr. Brightman's reliance on *Hobart v. Schuler*, 55 N.Y.2d 1023 (1982) is
misplaced.  There, the provision at issue did not "specifically contradict" the allegedly fraudulent
misrepresentation.  Here, Dr. Brightman alleges that the April 5, 2009 email should govern because
InMode misrepresented that the 2010 Agreement was merely a "placeholder."  But, unlike in
*Hobart*, this allegation *is* "specifically contradict[ed]" by the 2010 Agreement's merger clause.
*See* Malca Dec., Ex. B, §§ 8(a), 12.  "The rule [Dr. Brightman] presses would essentially negate
such disclaimers by allowing naked allegations of prior oral assurances to trump at the pleading
and summary judgment stage even the most explicit disclaimer in [an agreement]."  *Warner*, 149
F.3d at 137.  That is simply not the law.

Finally, and for the avoidance of doubt, InMode notes here that the fraud and negligent

Finally, her negligent misrepresentation claim further fails because the FAC fails to plead a "special relationship."  *See* Opp., pp. 21-22.  The fact that Dr. Brightman previously knew two employees at InMode is insufficient.  *Compare* Opp., p. 22, *with Gander Mountain*, 923 F. Supp. 2d at 369 ("rejecting the plaintiff's request that the Court find that the term 'special relationship' is expansive enough to include close business relationships…") (citation omitted).  Further, Dr. Brightman's express representations in the 2010 Agreement show this was a straightforward, arms-length commercial transaction.  *See, e.g.*, *W. Intermodal Services, Ltd. v. Singamas Container Indus. Co.*, 2000 WL 343780, at *4 (S.D.N.Y. Mar. 31, 2000); *see also Presnall v. Analogic Corp.*, 2018 WL 4473337, at *10 (S.D.N.Y. Sept. 18, 2018).

**E.**     **Leave to Amend Should Be Denied**

The Motion to Dismiss should be granted and leave to amend should be denied.  This Court issued an Order expressly stating that the amendment that resulted in the FAC would be "**Plaintiff's last opportunity to amend in response to any issue raised in the parties' pre-motion letters**."  ECF No. 16, p. 1 (emphasis in original).  The Court should hold Dr. Brightman to that clear Order.  *Jeanty v. Newburgh Beacon Bus Corp.*, 2018 WL 6047832, at *12 (S.D.N.Y. Nov. 19, 2018) (denying request to amend in the same procedural circumstances as here).

---

representation claims fail for the additional reasons set forth in the Opening Brief, which the Opposition fails to address.  *See* Opening Br., pp. 23-24.

                                        K&L GATES LLP

Dated:  February 24, 2023          By:   */s/ Brian D. Koosed*
                                        _____

                                        Brian D. Koosed
                                        1601 K Street, NW
                                        Washington, D.C.  20006
                                        Tel  (202) 778-9204
                                        Fax (202) 778-9100
                                        Email: brian.koosed@klgates.com

                                        Kodey D. Haddox
                                        599 Lexington Avenue
                                        New York, New York 10022
                                        Tel.: (212) 536-3900
                                        Fax: (212) 536-3901
                                        Email: kodey.haddox@klgates.com

                                        *Attorneys for Defendant InMode Ltd.*

**A-162**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: _8/14/2023__
```

_____

DR. LORI A. BRIGHTMAN, an individual,

     Plaintiff,

    -against-

INMODE LTD., a foreign limited liability
corporation, DOES 1 – 10, INCLUSIVE; and ROE
CORPORATIONS 11 – 20, INCLUSIVE,

     Defendants.

_____

1:22-cv-5861 (MKV)

**OPINION AND ORDER
GRANTING DEFENDANT'S
MOTION TO DISMISS**

MARY KAY VYSKOCIL, United States District Judge:

  This case concerns a stock option dispute between Plaintiff Dr. Lori Brightman and

Defendant InMode Ltd. ("InMode"). InMode has moved to dismiss the case for, among other

reasons, *forum non conveniens*.[1] For the reasons stated below, that motion is granted.

        **BACKGROUND**[2]

  Plaintiff is a board-certified dermatologist and dermatologic surgeon. AC ¶ 7. In 2009,

Plaintiff agreed to conduct a clinical trial for InMode, an Israeli corporation, in exchange for 7,500

stock options—an arrangement which was initially sketched out in an email. AC ¶¶ 9, 15–18.

Roughly a year later, after the clinical trial was largely completed, the parties executed two

documents—the Notice of Stock Option Award (the "2010 Notice") and the corresponding Stock

---

[1] In support of its motion, InMode filed a Memorandum of Law [ECF No. 23] ("Def. Br."), as well as the Declaration of Yair Malca [ECF No. 24] ("Malca Decl.") and attached exhibits. In opposition, Plaintiff filed a Memorandum of Law [ECF No. 26] ("Opp."), the Declaration of Lori A. Brightman [ECF No. 26-1] ("Brightman Decl."), and the Declaration of Joshua Reitzas [ECF No. 27] ("Reitzas Decl."). InMode filed a Memorandum of Law in Reply [ECF No. 28] ("Reply Br.").

[2] "On a motion to dismiss for *forum non conveniens* that is decided without a factual hearing, the Court must accept as true the facts alleged in the complaint, but may also consider certain evidence outside the pleadings, including affidavits." *Little v. XL Ins. Co. SE*, No. 18-cv-11919, 2019 WL 6119118, at *2 (S.D.N.Y. Nov. 18, 2019). Accordingly, the following facts are drawn from the Amended Complaint [ECF No. 21] and are assumed to be true or, where noted, from declarations submitted by the parties.

Option Award Agreement (the "2010 Agreement")—which set out the terms of the stock option award in greater detail.  AC ¶¶ 18–19.

Plaintiff took issue with certain terms in the 2010 Agreement.  For example, the agreement stated that Plaintiff was entitled to 7,000 stock options, as opposed to the 7,500 figure she alleges was previously agreed upon, and the agreement also contained expiration terms which the parties allegedly had not previously discussed.  AC ¶¶ 19–20.  More importantly for present purposes, the 2010 Agreement also contained an exclusive forum selection clause, which stated:

> [T]he [parties] agree . . . (ii) in such a case of any suit, action, or proceeding arising out of or relating to the [2010] Notice, the Plan, or this Option Agreement, it shall be brought before the competent court in the City of Haifa, Israel, and that the parties shall submit to the exclusive jurisdiction of such court; (iii) to irrevocably waive, to the fullest extent permitted by law, any objection a party may have to the laying of venue for any such suit, action or proceeding brought in such court.

Malca Decl., Ex. B § 12.  Plaintiff objected to the 2010 Agreement, but she decided to sign it after being advised by an InMode representative that it was only a placeholder and that a revised agreement would follow.  AC ¶ 20.  A revised agreement was never sent.  Brightman Decl. ¶ 9.

Nearly ten years later, InMode had its initial public offering.  AC ¶ 56.  When Plaintiff first found out about the offering (two years after it occurred), she contacted InMode to ask about the stock options she was owed pursuant to the 2010 Agreement.  AC ¶ 57.  Upon doing so, Plaintiff was informed that her stock options had expired under the terms of the 2010 Agreement and that, as a result, she was not entitled to exercise those options.  AC ¶ 58.  Plaintiff also has been unable to exercise the thousands of additional stock options that she allegedly earned pursuant to oral agreements entered in 2009 and 2011—pursuant to which she performed extra work on behalf of InMode.  AC ¶¶ 24–36.

## PROCEDURAL HISTORY

Plaintiff initiated this action by filing a complaint, which asserts six causes of action grounded in breach of contract and fraud.  [ECF No. 1].  Plaintiff later filed an amended complaint—the operative complaint in this case—which asserts the same causes of action.[3]  [ECF No. 21].  InMode moved to dismiss the case primarily on the grounds of *forum non conveniens*.[4] [ECF No. 23].  Plaintiff opposed that motion [ECF No. 26], and InMode replied [ECF No. 28].

## DISCUSSION

"A valid and enforceable contractual forum-selection clause can constitute sufficient grounds for dismissal."  *Yovel-Bash v. Wellesley Asset Secured Portfolio, Inc.*, No. 12-cv-5280, 2013 WL 4781539, at *8 (E.D.N.Y. Sept. 5, 2013).  In determining whether the *presumption* of enforceability applies to a forum-selection clause, a district court must consider three factors: "(1) whether the clause was reasonably communicated to the party resisting enforcement; (2) whether the clause is mandatory or permissive, *i.e.*, whether the parties are required to bring any dispute to the designated forum or [are] simply *permitted* to do so; and (3) whether the claims and parties involved in the suit are subject to the forum selection clause."  *Martinez v. Bloomberg LP*, 740 F.3d 211, 217 (2d Cir. 2014) (cleaned up).

Here, the parties do not dispute that the presumption of enforceability applies to the forum-selection clause contained in the 2010 Agreement.  As a result, the Court must turn to the fourth and final factor of the enforceability inquiry, which asks whether the non-moving party has made

---

[3] The Amended Complaint also added Does 1–10 and Roe Corporations 11–20 as defendants.  However, no allegations were made with respect to these unidentified defendants, and it is unclear why they were added or which entities they are meant to represent.

[4] InMode also argued that the Amended Complaint must be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(6) because the allegations are time barred or, in the alternative, because they fail to state a claim up on which relief can be granted.  [ECF No. 23].  Because the Court concludes that the case must be dismissed on the grounds of *forum non conveniens*, it need not and does not reach the other grounds for dismissal advanced by InMode.

"a sufficiently strong showing that enforcement would be unreasonable or unjust."[5] *Id.* (internal quotation marks omitted). Such a showing can be made by demonstrating that "(1) incorporation of [the forum-selection clause] was the result of fraud or overreaching; (2) the law to be applied in the selected forum is fundamentally unfair; (3) enforcement contravenes a strong public policy of the forum in which suit is brought; or (4) trial in the selected forum will be so difficult and inconvenient that the plaintiff effectively will be deprived of [her] day in court." *Id.* at 228 (internal quotation marks omitted).

Plaintiff first claims fraud. Specially, Plaintiff claims that she was fraudulently induced into signing the 2010 Agreement by a false promise that the agreement was merely a placeholder and that a revised version would follow.[6] But this is not enough. It is well settled that "[f]raud in the inducement of [an] [a]greement, as distinct from fraud in the inducement of the forum selection clause specifically, is insufficient to defeat the forum selection clause." *BMR & Assocs., LLP v. SFW Cap. Partners, LLC*, 92 F. Supp. 3d 128, 137 (S.D.N.Y. 2015). Here, Plaintiff alleges only fraud in the inducement of the 2010 Agreement. AC ¶¶ 19–20. There is no allegation in the Amended Complaint, or assertion in the Brightman Declaration, that Plaintiff specifically objected to the forum-selection clause or that InMode made any promise with respect to that specific clause.

Plaintiff does argue in her opposition brief that she specifically objected to the inclusion of the forum-selection clause and that she was fraudulently induced into signing the 2010 Agreement

---

[5] This final factor is governed by federal law. *See Est. of Nelson v. MillerKnoll, Inc.*, No. 21-cv-7811, 2023 WL 3159678, at *3 (S.D.N.Y. Apr. 28, 2023). Accordingly, any "argument that the clause[] [is] invalid under the laws of New York . . . is misplaced." *Sun Forest Corp. v. Shvili*, 152 F. Supp. 2d 367, 381 n.24 (S.D.N.Y. 2001).

[6] Plaintiff also argues that the addition of a forum-selection clause is a material alteration from the original stock option agreement—memorialized over email—and that, as a result, additional consideration was required absent her consent. Opp. at 10. While Plaintiff seems to frame this as an independent argument concerning consideration, the argument turns on whether Plaintiff consented to the forum-selection clause or whether that clause was the result of fraud. Opp. at 11. Accordingly, analysis of Plaintiff's argument on this score will be folded into an evaluation of her broader fraud-based claim.

based on the assurance that the clause would be removed from the revised agreement. Opp. at 11–12. However, there is no evidentiary support for this assertion and "the Court cannot consider allegations that the plaintiff[] raise[s] for the first time in [her] brief opposing the motion to dismiss." *Presbyterian Healthcare Servs. v. Goldman Sachs & Co.*, No. 15-cv-6579, 2017 WL 1048088, at *13 (S.D.N.Y. Mar. 17, 2017) (internal quotation marks omitted). And even if those new allegations could be considered, they are deficient insofar as Plaintiff does not explain who made the alleged promise that the clause would be removed, where and when this alleged promise was made, or any other details needed to satisfy the heightened pleading standard that applies when a plaintiff seeks to invalidate a forum-selection clause based on fraud. *See Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 290 (2d Cir. 2006); *see also Chen v. Cenntro Elec. Grp.*, No. 22-cv-7760, 2023 WL 2752200, at *4 (S.D.N.Y. Mar. 31, 2023).

Plaintiff next argues that forcing her to litigate in Israel would be unfair and inconvenient because "[i]t would be difficult, if not impossible, for [her] to afford to travel to Israel or retain an Israeli attorney, and it makes little sense when many of the key witnesses are stateside." Opp. at 13. The Court does not doubt litigating in New York would be more convenient for Plaintiff. But InMode is an Israeli corporation. So, "[r]egardless of whether the case is tried in Israel or New York, one party will be inconvenienced, and will be forced to bring witnesses and documents to the selected forum." *Diatronics, Inc. v. Elbit Computers, Ltd.*, 649 F. Supp. 122, 126 (S.D.N.Y. 1986). In any event, the Second Circuit has explained that the sort of expense and inconvenience that Plaintiff complains about are nothing more than "the obvious concomitants of litigation abroad," and are insufficient on their own to defeat a valid forum-selection clause. *Phillips v. Audio Active Ltd.*, 494 F.3d 378, 393 (2d Cir. 2007).

Accordingly, Plaintiff has failed to satisfy her burden of "making a sufficiently strong showing that enforcement [of the forum-selection clause] would be unreasonable or unjust." *Martinez*, 740 F.3d at 217.

<u>**CONCLUSION**</u>

For the reasons stated herein, the motion to dismiss filed by InMode is GRANTED.  This action is therefore dismissed without prejudice to it being refiled in the proper forum.  The Clerk of Court respectfully is requested to close all pending motions and close the case.

**SO ORDERED.**

Date:   **August 14, 2023**
         **New York, NY**

_____
**MARY KAY VYSKOCIL**
**United States District Judge**

**A-168**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------------X
DR. LORI A. BRIGHTMAN, an individual,

               Plaintiff,

    -against-                               22 **CIVIL** 5861 (MKV)

                                                 **JUDGMENT**

INMODE LTD., a foreign limited liability
corporation, DOES 1 – 10, INCLUSIVE; and ROE
CORPORATIONS 11 – 20, INCLUSIVE,

               Defendants.
------------------------------------------------------------------X

      It is hereby **ORDERED, ADJUDGED AND DECREED:**  That for the reasons

stated in the Court's Opinion and Order dated August 14, 2023, the motion to dismiss filed by

InMode is GRANTED. This action is therefore dismissed without prejudice to it being refiled in

the proper forum. Accordingly, the case is closed.

**Dated:**  New York, New York

      August 14, 2023

                                     **RUBY J. KRAJICK**
                                   **Clerk of Court**

               **BY:**
                               _____
                                    **Deputy Clerk**

**BERLANDI NUSSBAUM & REITZAS LLP**
125 Park Avenue, 25th Floor
New York, New York 10017
(212) 804-6329 (Ph)
(646) 461-2312 (fax)
*Attorneys for Plaintiff Dr. Lori A. Brightman*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| ─────────────────────────────── : | **Case No.: 1:22-cv-05861-MKV** |
| DR. LORI A. BRIGHTMAN, an individual,  : | |
| : | |
| Plaintiff, : | |
| : | |
| v.   : | |
| : | |
| INMODE LTD., a foreign limited liability : | |
| corporation; DOES 1 – 10, INCLUSIVE; : | |
| AND ROE CORPORATIONS 11-20, : | |
| INCLUSIVE, : | |
| : | |
| Defendants. : | |
| ─────────────────────────────── | |

<u>**NOTICE OF APPEAL FOR PLAINTIFF LORI A. BRIGHTMAN**</u>

Notice is hereby given that Plaintiff DR. LORI A. BRIGHTMAN in the above-named case

hereby appeals to the United States Court of Appeals for the Circuit from the final judgment (ECF

No. 30) and opinion and order granting motion to dismiss (ECF No. 29) entered in this action on

the day of 14th date of August, 2023.

Dated:      August 29, 2023
             New York, New York

                                        **BERLANDI NUSSBAUM & REITZAS LLP**

                          By:      /s/ Joshua T. Reitzas
                                   Joshua T. Reitzas (JR2149)
                                   125 Park Avenue, 25th Floor
                                   New York, New York 10017
                                   (212) 804-6329 (Ph)
                                   (646) 461-2312 (fax)
                                   *Attorneys for Plaintiff Dr. Lori A. Brightman*

**BERLANDI NUSSBAUM & REITZAS LLP**
125 Park Avenue, 25th Floor
New York, New York 10017
(212) 804-6329 (Ph)
(646) 461-2312 (fax)
*Attorneys for Plaintiff Dr. Lori A. Brightman*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| DR. LORI A. BRIGHTMAN, an individual, | **Case No.: 1:22-cv-05861-MKV** |
| Plaintiff, |  |
| v. | **AFFIRMATION OF SERVICE** |
| INMODE LTD., a foreign limited liability corporation; DOES 1 – 10, INCLUSIVE; AND ROE CORPORATIONS 11-20, INCLUSIVE, |  |
| Defendants. |  |

I, Joshua T. Reitzas., being duly sworn depose and say:

1.  I am not a party to the above-captioned action, and am over 18 years of age.

2.  On August 29, 2023, I served a copy of Plaintiff's Notice of Appeal, dated August 29, 2023, in the above-captioned action upon attorneys for Defendant via PACER electronic filing.

/s/ *Joshua T. Reitzas*
Joshua T. Reitzas